UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF TEXAS

AUSTIN DIVISION

| | | |
|---|---|---|
| CITY OF PONTIAC GENERAL EMPLOYEES' RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, | § | Case No. 1:15-cv-00374-LY |
| | § | |
| Plaintiff, | § | CLASS ACTION |
| | § | |
| vs. | § | The Honorable Lee Yeakel |
| | § | |
| DELL INC., et al., | § | |
| | § | |
| Defendants. | § | |

AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

Lead Plaintiff City of Pontiac General Employees' Retirement System (the "Retirement System" or "Plaintiff") alleges the following based upon personal knowledge as to itself and its own acts, and upon an investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Dell Inc.'s ("Dell" or the "Company") Securities and Exchange Commission ("SEC") filings, Company releases, conference calls, public statements issued by defendants, media reports, analyst reports, industry reports, and consultation with persons familiar with Dell's business. Plaintiff believes substantial additional evidentiary support will likely exist for the allegations set forth herein after a reasonable opportunity for discovery.

## SUMMARY OF THE ACTION

1. This is a securities fraud class action on behalf of purchasers of Dell securities between February 22, 2012 and May 22, 2012, inclusive (the "Class Period") against Dell, its Chairman and Chief Executive Officer ("CEO"), Chief Financial Officer ("CFO") and Chief Commercial Officer ("CCO") for violating §10(b) and §20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

2. Dell is a global information technology company that designs, develops, manufactures, markets, sells, and supports mobility and desktop products, including notebooks, tablets, desktop personal computers, workstations, smartphones, servers and networking products.[1]

3. On February 21, 2012, Dell issued a press release announcing "record" financial results for its fiscal 4Q12 and FY2012, telling the market that 2012 was "the company's most successful financial year ever." In the conference call with investors that followed, defendants highlighted the strong growth the Company was experiencing in its Asia-Pacific, Japanese ("APJ")

[1] As used herein, "PCs" refers collectively to Dell's notebook (laptop) and desktop computers.

and European, Middle Eastern and African ("EMEA") business regions, characterizing EMEA as growing "clearly faster than the market" and APJ as its "fastest growing market."[2]

4. While defendants were making these and similar representations, however, Dell was in fact experiencing weakened demand for and severe pricing pressure associated with its PC product lines, particularly in its APJ and EMEA business regions. Due to a significant shift in PC product demand and increasing competition from efficient low-cost PC manufacturers, the pricing pressure the Company was then experiencing in the APJ business region was so extreme that the Company pointedly decided not to pursue certain PC sales in those markets as continuing to do so would undercut the Company's already diminishing revenues and gross margins.

5. As the growth in Dell's PC business was plummeting, defendants further misled the market by highlighting the Company's strong sales productivity while at the same time concealing the pervasive operational deficiencies Dell was then experiencing within its sales division, which were hindering Dell's business.

6. The consequence of defendants' wrongdoing was severe. On May 22, 2012, Dell shocked the market by announcing a ***half a billion dollar shortfall*** in revenue relative to what the Company had led the market to expect for 1Q13. Perhaps most notably, the Company's cash flow from operations widely missed analysts' expectations of $350 million, swinging from $465 million in 1Q12 to ***negative $138 million*** in 1Q13, the first negative quarter since 1Q08.

7. Significantly, defendants attributed Dell's revenue shortfall to the Company's affirmative decision to forgo PC sales in its EMEA and APJ markets to avoid the negative impact on Dell's reported margins, weak demand for Dell's products and poor sales force productivity and execution.

[2] Dell's fiscal quarters are abbreviated by quarter and year. For example, 1Q13 represents the first quarter of fiscal year 2013. Dell's fiscal years are abbreviated by "FY" and year. Dell's 2012 fiscal year ended on February 3, 2012.

8. On this news, the price of Dell stock declined more than ***17%***, the largest single day decline in Dell's stock price in over a decade on extraordinary volume of more than 100 million shares.

9. Before this revelation, however, Company insiders capitalized on their inside information by selling over 2.4 million shares of Dell stock worth approximately $41.3 million during the short, three-month Class Period – nearly three and a half times the amount of shares sold during all of 2011.

**JURISDICTION AND VENUE**

10. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act (15 U.S.C. §78aa) as the claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

11. Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b).

12. In connection with the acts and conduct alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mails, interstate telephone communications and the facilities of the national securities exchanges and markets.

**PARTIES**

13. The Retirement System is a public retirement system in Pontiac, Michigan that provides benefits to approximately 1,800 participants. As detailed in the previously-filed Certification incorporated herein by reference (Dkt. No. 2), the Retirement System purchased Dell common stock at artificially inflated prices during the Class Period and suffered damages as a result of defendants' alleged misconduct.

14. Defendant Dell offers a broad range of technology solutions, including notebooks, tablets, desktop PCs, networking, storage and mobility products, servers, software and services. While Dell is now privately owned, during the Class Period, the Company's stock was listed and traded on the NASDAQ market, an efficient market, under the ticker DELL. There were more than one billion shares of Dell stock outstanding during the Class Period. During the Class Period, Dell's product lines included: (i) enterprise solutions (servers, networking, and storage products); (ii) client products (mobility and desktop products including notebooks, workstations, tablets, smartphones, and desktop computers); and (iii) software and peripherals (printers, mice, and other products). The Company managed its operations via four business segments during the Class Period: (i) Large Enterprise (large, global and national corporate business customers); (ii) Public (educational institutions, government, health care, and law enforcement agencies); (iii) Small and Medium Business ("SMB"); and (iv) Consumer (individual customers worldwide). The Company collectively referred to its Large Enterprise, Public and SMB segments as its Commercial business during the Class Period.

15. Defendant Michael S. Dell ("Michael Dell") founded Dell in 1984 and served as Dell's CEO and as Chairman of its Board of Directors during the Class Period. As CEO, defendant Michael Dell spoke on Dell's behalf in releases, conference calls and SEC filings. Pursuant to §302 and §906 of the Sarbanes-Oxley Act of 2002, SEC Rule 13a-14(a), and 18 U.S.C. §1350, defendant Michael Dell certified the Company's Form 10-K filed with the SEC on March 13, 2012. Michael Dell also signed the Company's Form 10-K on Dell's behalf.

16. Defendant Brian T. Gladden ("Gladden") served as Dell's Senior Vice President and CFO during the Class Period. Defendant Gladden was responsible for all aspects of Dell's finance functions, including accounting, financial planning and analysis, tax, treasury, and investor relations, and is also responsible for Dell's information technology, global security and facilities functions.

During the Class Period, defendant Gladden sold 68,750 Dell shares at $17.42 per share, reaping proceeds of $1.1 million. As CFO, defendant Gladden spoke on Dell's behalf in releases, conference calls and SEC filings. Pursuant to §302 and §906 of the Sarbanes-Oxley Act of 2002, SEC Rule 13a-14(a), and 18 U.S.C. §1350, defendant Gladden certified the Company's Form 10-K filed with the SEC on March 13, 2012. Gladden also signed the Company's Form 10-K on Dell's behalf.

17. Defendant Stephen J. Felice ("Felice") served as Dell's President and CCO during the Class Period. Defendant Felice headed the Dell organization that created and delivered specific solutions and technology to commercial customers globally and was responsible for Dell's portfolio of products, including PCs, software and peripherals as well as product design and sales. Before serving as Dell's CCO, Felice served as the President of Dell's APJ region. During the Class Period, defendant Felice sold 892,568 Dell shares at an average price of $17.17 per share, reaping proceeds of $15.3 million. As CCO, defendant Felice spoke on Dell's behalf in releases, conference calls and SEC filings.

18. Defendants Michael Dell, Gladden and Felice are sometimes collectively referred to herein as the "Individual Defendants."

19. During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Dell, were in possession of and privy to confidential and proprietary information concerning Dell, its products, global operations, finances, financial condition, and present and future business prospects for all of its product lines and business segments. Because of their positions as Dell's senior-most executive officers, the Individual Defendants obtained, had access to and/or were in possession of material, adverse nonpublic information concerning Dell via internal corporate documents and communications with other corporate officers and employees, attendance at management and/or Board of Directors meetings (and committees thereof), and via the reports, presentations and other information provided to them in connection therewith. As a result of their

possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

20. As senior executive officers and controlling persons of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act during the Class Period, and was actively traded on the NASDAQ and governed by the federal securities laws during the Class Period, the Individual Defendants had a duty to promptly disseminate accurate and truthful information regarding Dell's operations, business and financial statements and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Dell securities would be based upon truthful and accurate information. Defendants' materially false statements and omissions during the Class Period violated these requirements and obligations.

## BACKGROUND TO THE CLASS PERIOD

**Dell Pioneers Direct PC Sales**

21. Dell pioneered the direct selling model for PCs and more than quadrupled its market share from 4% in 1996 to 17% in 2005. By selling direct to its customers, Dell eliminated the reseller's markup, carried less inventory, customized product, and gained an information edge over its competitors on buyer behavior. Indeed, Dell was recognized as the master of supply chain efficiency in the high-tech industry, reducing its inventory cycle times to levels that had previously been considered unthinkable. Dell's supply chain allowed the Company to carry inventory for just a few days rather than a few weeks. This unique model gave Dell significant advantages over its competitors, as it allowed Dell to sell its computers at a lower cost and allowed consumers to customize their PCs. By 2001, Dell had a market value of $130 billion and became the worldwide leader in PCs and related products, with a majority of its revenue earned within the U.S.

**Dell Begins Losing Its Edge**

22. By 2005, however, the tech market began to significantly evolve and Dell's growth began to slow and its stock price – then hovering around $41 per share – started to lose momentum. Other PC manufacturers, like Hewlett Packard, Lenovo and Acer, had closed the competitive gap on direct PC sales to the public. By late 2006, Hewlett Packard overtook Dell as the top PC seller in the world.

**With Michael Dell Back in Charge, Dell Announces a Turnaround Plan**

23. In January 2007, Kevin Rollins, Dell's CEO and the successor to the Company's founder Michael Dell, resigned. Michael Dell resumed his role as CEO and retained his duties as Chairman of the Board.

24. With Michael Dell again at the helm, the Company began implementing an ambitious turnaround plan, dubbed "Dell 2.0", which included several major organizational and strategic changes focused on emerging markets like China and India. Unlike in the U.S., PC shipments in emerging markets were experiencing explosive growth during this period. In 2009, defendant Felice, then-President of Dell's SMB division, told reporters that Dell aspired to be Asia's top PC brand by 2012, stating "'I'm not making a projection, I'm setting an aspiration'" and "'we're going to push the teams to drive for that.'"

**Dell Seeks to Stimulate PC Sales**

25. As part of the turnaround plan, Dell also restructured its logistics network and began outsourcing its PC manufacturing operations to Asia to drive down the Company's costs. By lowering its costs, Dell believed it could restore its low-cost advantage and thus be able to compete against its low-cost rivals like Lenovo and Acer in Asia, where the majority of sales involved base or lower-end PC models. Dell also invested billions of dollars in a supply chain transformation in Asia,

which included establishing 12 distribution sites across Asia, so that it could push into less developed, and less saturated, rural areas.

26. To grow its PC end-user business, Dell also broke from its traditional direct-selling model of selling exclusively online and adopted a multi-channel sales approach, including a retail presence. This change was necessary, in part, because the direct business model did not work in Asia, where consumers generally prefer to physically handle a product before they buy it. By the end of 2008, Dell had expanded its retail operations to approximately 1,200 cities in China and by 2009, Dell's PCs were being featured in nearly 2,000 retail outlets throughout the APJ region. Similarly, Dell had operations in 13 countries in the APJ region.

27. Despite its efforts to reignite growth, Dell was still having difficulty selling PCs and by 2008 overall U.S. PC sales, where most of Dell's business was concentrated, were stagnating as the market became saturated. Not only were U.S. PC shipments declining, analysts saw signs that sales would continue to stagnate because PCs were being replaced less often and the profitability windows for PCs were becoming increasingly shorter due to rapid advancements in technology.

28. At the same time the U.S. PC market was static, Dell was having trouble getting traction in non-U.S. markets. In 2007, the big-four emerging markets, Brazil, Russia, India, and China (or "BRIC" countries), had seen a 36% rise in sales, and China had grown into the world's second largest PC market, yet Dell's PC shipments remained flat, growing less than 1% year-over-year. Unlike its rivals, like Lenovo, Dell chose not to focus on low-margin products in Asia, where most of the growth was occurring in this region. Instead, it focused on high-margin products that had little appeal to consumers in the APJ region.

29. By the end of fiscal 2009, Dell had fallen short of expected earnings and continued to slide in its market share and profit margins. In February 2009, Dell's share price dipped below $8 per share for the first time in 12 years.

**Dell Attempts to Evolve from a PC Company into an IT Business**

30. With PC sales continuing to lag, Dell was forced to transform its business strategy yet again. At a summer 2009 analyst meeting, the Company unveiled a new strategic mission to become an end-to-end technology solutions company with a scalable, mid-market design point. To do so, Dell intended to focus on four areas: servers, networking and storage; services and cloud computing; end-user computing; and software. And, to leverage its end-user PC business and brand recognition, Dell touted its PCs as secure, manageable endpoints to the overall IT solution, working to build the perception that its solutions are more comprehensive than those of its competitors.

31. As part of its transformation into a technology solutions provider, Dell launched Dell Services to help drive its enterprise business. In 2009, the Company also began spending billions of dollars acquiring companies like Perot Systems, which provided IT services in the health care, government, manufacturing, banking and insurance industries. Typically spending between $2-$3 billion per year, Dell continued acquiring numerous other companies to provide storage and systems management, cloud computing and software services, including KACE Networks, Compellent Technologies, Inc., and Secure Works.

32. To make its transformation a success, Dell also needed a global sales force that could sell the Company's end-to-end solutions, of which PCs remained a core component. In the summer of 2010, Dell began adding thousands of salespeople to sell Dell's new IT services to its customers. Dell spent hundreds of millions of dollars expanding its sales force to add specialists to work with its Account Executive generalists, strengthening its training programs, and developing global solution centers where customers could test Dell products and obtain training. By adding thousands of sales specialists, Dell hoped to drive sales, revenues and margins not just for its PCs, but across its entire line of IT solutions. In this way, Dell's goal was to shift a majority of its net revenues away from the

PC market, which was continuing to see declining demand, increased low-priced competition and lower margins.

33. As with its PC business, Dell focused much of its efforts to grow its IT business outside the U.S. in the APJ and EMEA regions. For example, 70% of Dell's new data centers to help support its service operations were located in APJ and EMEA. Similarly, roughly 60% of the Company's workforce was located outside the U.S.

34. Shareholders were encouraged by these changes, and Dell's stock price steadily rose from below $10 per share in 2009 to above $15 per share in February 2011.

**PCs Remain a Major Revenue Driver for Dell,
Despite Expanding into Enterprise Services**

35. Despite Dell's efforts to transform itself into a broader enterprise services business, PCs still comprised a majority of the Company's net revenue at the end of FY2011 and heading into FY2012:

| | *% of Net Revenue* | | |
|---|---|---|---|
| | FY2009 | FY2010 | FY2011 |
| *Mobility & Desktop PCs* | 59% | 56% | 55% |
| *Software and peripherals* | 17% | 18% | 17% |
| *Servers and networking* | 11% | 11% | 12% |
| *Services* | 9% | 11% | 12% |
| *Storage* | 4% | 4% | 4% |

36. Dell's consumer PC segment similarly continued to represent a material percentage of the Company's net revenue:

| | *% of Net Revenue* | | |
|---|---|---|---|
| | FY2009 | FY2010 | FY2011 |
| *Consumer PCs* | 21% | 23% | 20% |
| *Commercial PCs* | | | |
| *Large Enterprise* | 30% | 27% | 29% |
| *Public* | 25% | 27% | 27% |
| *SMB* | 24% | 23% | 24% |

37. Likewise, Dell's non-U.S. regions like APJ, EMEA and emerging markets (including India and China) comprised one-half of Dell's net revenue by FY2011.

**Changes in the PC Market Crater Demand for Dell's Products**

38. By the end of 2011, the industry was experiencing a weakening consumer market in which tablets (like the iPad) and other mobile devices (like the iPhone) were either delaying PC purchases or replacing them altogether. The iPad, in particular, had dramatically cut into PC sales, particularly in Asia, with over 45 million iPads sold during an eighteen-month period.

39. The increased competition from the iPad resulted in tremendous pricing and margin pressure, setting off an intense competition among Asian PC manufacturers. Faced with a threat to its PC sales, Lenovo, the largest manufacturer in Asia and one of Dell's chief competitors, reacted by cutting prices so that it could compete with Apple. Other competitors such as Acer and Asus took similar measures, rolling out low-cost laptops to directly compete with the iPad. In April 2011, the average selling price of a laptop (Dell's primary PC product) in China was 5078 RMB ($800 US dollars). By December 2011, the average selling price of a laptop in China had fallen to 4546 RMB ($727 US dollars). By dropping its prices, Lenovo was also able to increase its market share in the APJ region to 25.4%, up from 20% one year earlier. Asus, too, was able to increase its market share by roughly 30%.

40. Despite these clear downward pressures, Dell continued to reassure investors that it was continuing to see growth in its PC sales. For example, in response to a question about cannibalization of PCs by mobile devices during a March 2011 conference, a Dell executive told analysts that:

> There is consumerization where people bring them to work, and as they look forward – I will tell you something that might actually surprise you. ***We've seen remarkable growth in desktops this year***. Okay, now if we were having this conversation a few years ago, we would have said, okay, you know, mobility grows forever, desktops are going to start shrinking, and at some point tablets will come in and they will go to the next level.

> ***But sometimes these trends can surprise us because what happens is people get into that combination of devices***, which is the way their worker is expected to be productive, and it really is a combination of devices.

41. Defendant Felice similarly reassured investors that the expenditure of hundreds of millions of dollars on the Company's expanded sales force would soon pay off for its enterprise services:

> On the sales and marketing front, we talked during the year about adding capacity and capability in the sales force. And we've added thousands of people during the year that are capable of selling solutions, more specialized, that can talk about architectures and can sell servers and storage in a more complex environment. And what we said towards the middle of the year was ***we will now start focusing on getting a return on that investment***. And that's really what this coming year is all about is ***we now feel like we have a capable force that can continue to grow our enterprise business in a very healthy way. And so we have plenty of capacity and now we're going to start getting the productivity out of that***.

42. However, as 2011 progressed, demand for Dell's PCs was not growing. In 3Q12, Dell saw a 7.2% decline worldwide and a 2.5% decline in emerging markets for its PCs. Dell's market share also dipped, from 10.4% in 1Q12 to 9.8% in 3Q12.

43. In January 2012, weakness in the demand for Dell's PC products in APJ began to rapidly accelerate and Dell exacerbated the problem by choosing not to compete with Lenovo and other PC manufacturers on low-margin PC products. By early 2012, Dell's market share for shipments of PCs in APJ dropped to a low of 8.6%.

44. The cratering demand for Dell's PC products in late 2011 and early 2012 sent shockwaves through Dell's supply pipeline. Like other PC manufacturers, Dell relies on outside suppliers for components and peripherals such as memory cards, hard disk drives, monitors, keyboards and speakers. To ensure that it has these components readily available, Dell updates its Master Production Plan weekly and requires its suppliers to commit to being able to provide enough components to meet its forecast. The quotas in the production plan are important to suppliers, as it normally takes 8 to 12 weeks for a supplier to manufacture the various components to be ready to be

installed in Dell's computers. To minimize its own obligation to carry inventory on its books, Dell requires its suppliers to maintain ownership of that inventory until it is actually taken off the delivery truck and loaded onto Dell's assembly line.

45. Using these constantly refreshed production plans, Dell's suppliers had begun producing PC components in October 2011 for PCs that would ship and be sold in the first calendar quarter of 2012, which was Dell's 1Q13. But, with orders for Dell's PCs sinking, the inventories of unsold components and computers held by Dell's suppliers quickly increased. For example, at Compal Electronics, a Taiwanese manufacturer that supplied over 80% of Dell's enterprise notebooks and over 50% of Dell's consumer notebooks, as well as peripherals, accessories and spare parts, saw its inventories increase by nearly 20% from 43 billion units to 50 billion units between October 2011 and January 2012.

46. Another major Dell supplier, Netlist Inc., which manufactured the dynamic random access memory cards ("DRAM") and flash memory that served as the main memory in Dell's PCs, similarly saw its inventory skyrocket by 50% from four million to six million units by October 2011 and by 250% in early 2012, eventually reaching nearly 10 million units due to lack of demand for Dell's PC products.

47. Dell and its senior executives (including the Individual Defendants) were aware of these ballooning inventories because Dell maintained a secure extranet portal, valuechain.dell.com, for the Company and its suppliers to collaborate in managing the supply chain. As part of its agreements with suppliers, Dell required them to keep a certain level of inventory on hand, and this data gave Dell tight control over inventory levels at suppliers' businesses. Dell recorded and monitored suppliers' deviations from target inventory levels. Dell also regularly evaluated its suppliers, using a quarterly supplier scorecard to ascertain how well the supplier maintained the inventory level set by Dell. Through the portal, Dell was able to pool information from its suppliers

and customer purchases, thereby giving executives instant warnings of material overages. Dell also used the extranet to provide suppliers with current sales data, forecast new data, and other real-time information that would affect the amount of inventory necessary for the suppliers to hold. Dell posted daily performance figures for each supplier against price quality performance, delivery speed, and delivery reliability. Suppliers, in turn, confirmed their ability to meet the forecast based on their existing inventory levels. Suppliers also used the extranet to submit invoices, check engineering change orders, review negotiated and forecasted cost reports, and track their performance.

48. Recognizing and reacting to the problems at Dell, Dell's suppliers slowed production in an effort to reduce their unsold inventory, which took a huge bite out of their sales. Compal, for example, saw its November and December 2011 sales decrease 24.9% and 21.9% year-over-year, respectively. January 2012 sales were even worse, declining 29.7% year-over-year. Compal's gross and net income also took massive hits, dropping more than 50% from 2010 on a year-over-year basis.

49. The weak demand for Dell's computers also hit its other suppliers. Sales at Micro Star International Corporation, the primary supplier of motherboards to Dell, were down 34.1% in November 2011, 46.4% in December 2011, and 43.4% in January 2012. Kemet, which supplied capacitors for Dell's computers, saw its sales plunge 17.3%.

50. Not surprisingly, Dell's suppliers were growing increasingly skittish over Dell's inability to move its PCs. And, to protect their businesses, Dell's suppliers took steps to restore their sales and draw down their inventory backlog by seeking work from Dell's competitors, who, unlike Dell, were seeing tremendous PC sales growth in Asia. In September 2011, Compal struck a deal with Lenovo in which it agreed to form a joint venture to make notebook computers in China. According to Lenovo, the joint venture had the ability to make over 10 million PCs each year. In late December 2011, Compal, through one of its affiliates, Cal-Comp Electronics, struck a deal with

Asus to produce five to six million motherboards in 2012. Under the terms of the deal, Compal would provide Asus with 20% of the total number of motherboards it sold annually.

51. Internally, Dell viewed their suppliers' concern as a serious threat to the viability of its business because, despite its efforts to transform into an IT company, PCs remained its core product, accounting for well over 50% of the Company's $60 billion in annual revenue. Dell had spent tens of billions of dollars establishing a low-cost, efficient manufacturing and supply chain in Asia to support its PC sales and enterprise and server business. Already facing increased competition and smaller margins, and without a consumer tablet to compete with Apple's iPad, Dell could not afford another hit to its struggling PC business. If any of Dell's key suppliers or component manufacturers defected, it would cause massive disruption in its supply chain, cripple its already weak PC sales, and reduce the cash flow the Company badly needed to complete its transformation into an IT company.

52. Thus, heading into the release of its FY2012/4Q12 earnings results, Dell needed to calm the fears of its suppliers and shareholders alike.

**Dell Meticulously Managed and Oversaw Its Business and Was Aware of Its Undisclosed Problems**

53. Before and during the Class Period, Dell obsessively monitored its global PC inventory, sales and shipments as well as its enterprise business. Michael Dell and top-level managers participated in monthly meetings in which five-quarter rolling forecasts were agreed upon and product strategies were developed based upon forecasted sales and production capabilities, all of which was incorporated into the Master Sales Plan. The process was such that Michael Dell established revenue and margin quotas for each General Manager, or GM. Rather than disagree with Michael Dell, the GMs would commit to achieving the quotas that were greater than their segments had previously attained and worked with the finance teams to create a plan to achieve the numbers. If the GMs could not make the established numbers with PC sales, they would regularly fill the gap

with enterprise sales. Once finalized, those plans rolled back up to Michael Dell and became the basis for his forecasts communicated to the market as well as the Master Production Plan. The Master Production Plan broke down the Master Sales Plan into a weekly forecast for each of Dell's lines of business and converted it into a component-level production plan. These regularly updated plans were distributed to: (1) the Company's GMs in charge of selling the Company's products and services to implement the plan to meet the stated quarterly quotas; and (2) the Company's component suppliers and logistical and retail partners to synchronize the Company's meticulously managed supply chain with demand for its PCs every 30 days.

54. A core component of the Company's ability to operate its worldwide business efficiently and effectively was Salesforce.com (internally referred to as "SFDC") which had the capability of displaying real-time information, including progress estimates, order status and channel sales reports. Using SFDC, Dell sales representatives reported all prospective sales opportunities and assigned a percentage of likelihood as to whether the deals were likely to close. This real-time data was available to defendants as daily dashboards.

55. In addition, Dell used an interface for its data warehouse known as Dell Data Direct, or D3, to monitor progress and compare real-time data with business trends and forecasts. Using D3, Dell was able to generate a wide variety of reports on a daily, weekly, monthly and quarterly basis, including PowerPoint presentations and Excel reports detailing the revenue and margin that was being achieved by the Company's different segments across geographic units, including APJ and EMEA, which showed, among other data, the number of units sold and revenues and margins being achieved. Not only did each defendant receive weekly "Executive Leadership Team" PowerPoint reports with the to-date status of top line revenues and margins during the Class Period, defendant Gladden had a computer on his desk with access to a real-time dashboard reflecting daily sales information spanning Dell's products and services in all geographic regions.

56. Dell also maintained a historical database of monthly and quarterly sales data for the Company's "G500" accounts, the top 500 global customers, for all of Dell's products. The reports generated from this data included historical trend analyses of product sales and profit margin which allowed Dell to assess whether sales and margins were increasing or decreasing and how quickly its biggest clients were replacing or acquiring new technology solutions.

57. On a weekly or bi-weekly basis, typically between the third and twelfth weeks of the quarter, GMs from each segment met with the president to assess the top line revenue and margin progress towards the goals Michael Dell set at the beginning of the quarter. At these meetings, PowerPoint presentations were circulated containing each segment's top line revenue and margin progress, based upon SFDC figures. Using this contemporaneous data, defendants could ascertain Dell's progress towards attaining the forecasted top line revenue and margin figures for the quarter.

58. Senior executives also held weekly Lead-Time meetings at which executives in the sales, marketing and supply chain analyzed, interpreted and discussed trends, short-term supply needs and supply issues to determine if component overages (or shortages) were developing. These meetings focused on ensuring that Dell and its suppliers would not be stuck with unsold PC components. Dell executives posted product lead times daily and if the lead time on a product was climbing, or if sales of a product were slowing, Dell could react by changing prices or using sales representative incentives to steer customers to buy products built with unsold components.

59. By employing these and other systematic processes and analytic tools before and during the Class Period, Dell had a constant flow of real-time data reflecting the current state of its business.

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS

60. Heading into the announcement of Dell's fiscal 2012 year-end results, analysts continued to note that recent industry checks pointed to strong headwinds which were expected to

continue throughout the first half of calendar 2012, including continued weak consumer demand levels as a result of tablet and smartphone competition. Based on this information, analysts were eagerly awaiting Dell's FY2012/4Q12 results and, even more importantly, its commentary and guidance for 1Q13 and FY2013.

**4Q12/FY2012 Earnings Release and Conference Call**

61. The Class Period begins on February 22, 2012, the day after defendants released Dell's "Record" 4Q12 and FY2012 financial results on February 21, 2012 after the market closed. The Company's earnings press release highlighted "the company's most successful financial year ever" with revenue of $62.1 billion for FY2012 and $16 billion in 4Q12, as well as cash flow from operations of $5.5 billion for FY2012 and $1.8 billion in 4Q12.

62. With respect to Dell's geographic performance, the Company highlighted its strong growth in the APJ and EMEA business regions:

> Asia-Pacific and Japan revenue grew 10 percent – including 15 percent growth from China – and EMEA increased 8 percent in the quarter. Americas was down 3 percent. Revenue in Growth Countries – defined as those outside the U.S., Canada, Western Europe and Japan – increased 8 percent in the quarter and 12 percent for the fiscal year. Revenue in the BRIC [Brazil, Russia, India, and China] countries increased 10 percent in the quarter and 15 percent for the fiscal year.

63. Regarding the Company's FY2013 and 1Q13 outlook, the Company stated that:

> The company will continue to prioritize operating income and cash flow. For fiscal 2013, the company expects non-GAAP earnings per share to exceed the record $2.13 it delivered in fiscal 2012 and expects to continue strong execution, with cash flow from operations exceeding net income. For Q1, the company expects revenue to decline approximately 7 percent sequentially, which aligns with normal seasonality adjusted for the fourteenth week.

64. Later in the day on February 21, 2012, Dell hosted a conference call led by defendants Michael Dell, Gladden and Felice. Acknowledging the uncertain environment, among other factors, defendant Gladden stated that while Dell was "not providing a revenue outlook for the year," "[o]ver the past three years our first quarter revenue has averaged approximately a 4%

sequential decline," and therefore, "[w]hen normalized for the 14th week [in 4Q12]," Dell "expect[s] [its] first quarter revenue to be approximately in line with this adjusted historical decline [of 7%]." Defendant Gladden continued to paint an optimistic picture of 1Q13 revenue expectations, stating that Dell "anticipate[d] good customer receptivity to the launch of our 12th Generation server line which will occur in the first quarter," while also noting that hard disk drive mix could "continue to be challenging but not as impactful as in the fourth quarter." Finally, Gladden also emphasized that the Company "expect[s] earnings per share for fiscal year '13 to exceed the record $2.13 we delivered in fiscal year '12" and "also expect[s] to deliver strong cash flow again with cash flow from operations exceeding our net income."

65. In light of the recent industry checks and concerns about growth, an analyst asked the defendants to provide additional color on demand and what Dell was hearing from its customers. Defendant Felice emphasized the growth Dell was then-experiencing, stating:

> ***[I]n Europe***, I would say ***we are seeing some definite growth ahead of what appears to be market conditions***, so I'm really pleased with what's going on in Europe. It's a good case where if we run the strategy right ***we're gaining both unit share and revenue share*** while our profit is accretive both on a percentage basis and a dollar growth basis, so that's really a strong story. ***In Asia, we're also seeing some similar dynamics***. So it really is limited to a few sectors like the US federal or some of the larger government entities in Western Europe where we see the biggest headwinds.
>
> ***On the Consumer side, we're seeing pretty healthy growth*** in most parts of the world.

66. When an analyst from Goldman Sachs asked for more color on what Dell was seeing in terms of competitive pricing, defendant Gladden confirmed that "***[w]e haven't seen a substantial change in behavior*** over the last few quarters. There's pockets of aggressiveness, but I wouldn't call it broad based."

67. Another analyst asked defendants to discuss the sales specialists and Dell's ability to measure their contributions to the Company. Defendant Gladden responded that:

> ***[W]e can measure how much growth we're getting*** in the way we define a solution. ***We can measure the pipeline that's generated*** that are multi-line of business for example. We can measure where we've added services content to the sale. ***We can look at the revenue productivity per specialist, so we've got a number of metrics that we're pretty maniacally focused on***. And so ***we know how we're progressing here*** and that's why I said earlier, ***I'm pleased with the improvement in productivity*** as we go into this new year.

68. Based on defendants' statements that 1Q13 revenue would be in-line with normal seasonality after removing the extra week in 4Q12, analysts estimated Dell would earn approximately $14.9 billion in revenue for 1Q13.

69. Defendants' February 21, 2012 statements were materially false and misleading when made. The true facts, which were then known to or recklessly disregarded by defendants based on historical and real-time reports, meetings, and various analytic tools described herein, were that:

(a) the growth Dell experienced in APJ and EMEA during 4Q12/FY2012 was not a reasonable indicator of continued growth in these regions during 1Q13 because contemporaneous with defendants' statements, Dell was experiencing a significant decline in PC sales growth as a result of significant shifts in demand from higher-margin premium PCs to lower cost and lower margin PCs particularly in APJ and emerging markets like China and India – a dynamic the Company decided not to compete in;

(b) Dell was facing significant and increasing competition from efficient, low-cost PC manufacturers like Lenovo and Acer that relied on build-to-stock business models rather than Dell's build-to-order business model, which was resulting in increased product in the market, downward pricing pressure, reduced profit margins and further erosion of Dell's market share in key emerging markets, particularly in China and India;

(c) demand for Dell's PCs had eroded due to the extended delay in enterprise Windows 7 upgrades and lengthening PC replacement cycles as a result of increasing consumer substitution of smartphones and tablets – markets in which Dell had little-to-no presence – for PCs

and the increasing adoption of "bring your own device" policies by businesses which allow employees to make their own decisions regarding which computers and/or other electronic devices they use in the workplace, all of which dramatically impacted Dell's PC revenue and margins;

(d) as a result of ¶¶(a)-(c), Dell's PC component suppliers and manufacturers had accumulated a significant build-up of unsold inventory and Dell had been required to take extraordinary measures to ease the fears of its suppliers and ensure Dell maintained access to key components for the PCs it was still able to sell by entering into $2.6 billion worth of purchase obligations in late FY2012, nearly 800% greater than its FY2011 obligations;

(e) Dell was experiencing material undisclosed operational deficiencies within its sales divisions, which were hindering Dell's ability to transition away from its core PC product and expand its enterprise business. In particular, Dell lacked sufficient specialists to attain the top line revenue and margin quotas established at the beginning of the quarter because the Company had counterintuitively commenced freezing sales personnel hiring requisitions early in the quarter to control operating expenditures in light of lagging demand and sales. Additionally, the Account Executive PC generalists and enterprise specialists were engaged in a turf war. Account Executives withheld permission from specialists to contact customers because it was easier and faster for the generalists to meet their top line revenue and margin goals by selling higher-revenue, lower-margin PCs rather than by expending significantly more time and effort with the specialists selling the same customers lower-revenue, higher-margin enterprise solutions, which practice had the effect of minimizing enterprise's contributions to the Company's revenue and margins;[3]

[3] Dell's Account Executives and specialists had inverted goals: because Dell's PCs produced higher revenues but lower margins, the Account Executives' goals emphasized dollar value over margin. Conversely, because revenue derived from enterprise solutions generated substantially higher margins, the specialists' goals emphasized margins over dollar value.

(f) Dell's enterprise sales pipeline (and the potential revenue and margins associated therewith) was inflated as while Dell required Account Executives to ***record*** five prospective enterprise deals into SFDC each for servers and networking, storage, services, and software and peripherals, it was widely known that a high percentage (50%-70%) of these prospective deals were either bogus and/or stale because these deals were not closely inspected and the Account Executives were not required to actually close these deals to attain their revenue and margin goals for the quarter. Dell was aware that the enterprise pipeline was inflated with bogus deals because it began requiring a substantially higher multiple of potential deals to actual sales for the Account Executives (and by extension, GMs) to meet the established revenue and margin quotas each quarter. For example, historically it was known at Dell that to meet $1 million in projected revenue, a sales person would generally need a multiple of three in the pipeline (*i.e.*, $3 million of potential sales for every $1 million in actual sales). However, by February 2012, Dell's pipeline was so unhealthy and inflated and defendants were aware or recklessly disregarded that the pipeline multiple required to meet the projected revenue and margin figures had increased to ***four times and then five times*** the stated goal;

(g) as a result of ¶¶(a)-(f) above, growth was stagnant, shipments were stalling and inventories were stockpiling, all of which resulted in far too much product and not enough demand for the Company's PCs such that defendants had no reasonable basis to expect and did not in fact expect Dell's first quarter revenue to be approximately in line with its adjusted historical decline of 7%, or approximately $14.9 billion as stated on February 21, 2012; and

(h) to attempt to minimize the negative impact on Dell's FY2013 revenue and margins caused by the undisclosed problems described in ¶¶(a)-(f) above, Dell had embarked on a six-week accelerated multi-billion dollar buying spree of five companies between February and April 2012 – attempting to consummate nearly a full year's worth of acquisitions in a single quarter.

By February 21, 2012, Dell had finalized the negotiations for its acquisition of AppAssure (described as a global leader in complete application protection for virtual, physical and cloud infrastructures), which would be announced just days later on February 24, 2012. At the same time, Dell was also continuing to conduct its due diligence on and negotiating and finalizing the purchase of four additional companies – SonicWALL, Inc., Wyse Technology, Clerity Solutions, and Make Technologies.

70. Following the conference call, Dell continued its efforts to appease its suppliers and reassure them that Dell was seeing growth in APJ. For example, on February 28, 2012, Dell unveiled a new line of servers for its enterprise customers and thereafter entered into talks with Compal to manufacture servers for Dell. This was a highly unusual step for Dell which had traditionally handled assembly of most of its desktops and servers. Moreover, at the time of this announcement, Compal was not in the server business. Also on February 28, 2012, Dell issued a press release saying that it was "'seeing strong consumer and business demand for the new XPS 13 – a system that is unlike anything else on the market today.'"

**Morgan Stanley Technology, Media & Telecom Conference**

71. On February 28, 2012, defendant Gladden spoke on Dell's behalf at the Morgan Stanley Technology, Media & Telecom Conference. The moderator, Katy Huberty, and defendant Gladden engaged in the following discussion about Dell's sales force:

| | |
|---|---|
| Katy Huberty: | "You added thousands of sales resources, some through acquisition, some separate to make sure that those acquisitions are successful. What inning are you in in terms of reaping the top line and the margin benefits of those resources you've added?" |
| Brian Gladden: | "In terms of how we are doing in aggregate with those investments, ***we have detailed tracking around specific productivity commitments*** for say a storage specialist; how much should that storage specialist be able to contribute in revenue and margin over the course of a transition period. ***We have a timeline that we believe is their appropriate ramp time, and I would say we're 30% or 40% of the way through tracking towards those targets and are pretty encouraged***. And that's not just a |

| | |
|---|---|
| | storage comment; that's a broad comment around the specialists (technical difficulty)." |

72. Defendant Gladden's February 28, 2012 statements were materially false and misleading when made. The true facts, which were then known to or recklessly disregarded by defendants Gladden and Dell, were that:

(a) Dell was experiencing material undisclosed operational deficiencies within its sales divisions, which were hindering Dell's ability to transition away from its core PC product and expand its enterprise business. In particular, Dell lacked sufficient specialists to attain the top line revenue and margin quotas established at the beginning of the quarter because the Company had counterintuitively commenced freezing sales personnel hiring requisitions early in the quarter to control operating expenditures in light of lagging demand and sales. Additionally, the Account Executive PC generalists and enterprise specialists were engaged in a turf war. Account Executives withheld permission from specialists to contact customers because it was easier and faster for the generalists to meet their top line revenue and margin goals by selling higher-revenue, lower-margin PCs rather than by expending significantly more time and effort with the specialists selling the same customers lower-revenue, higher-margin enterprise solutions, which practice had the effect of minimizing enterprise's contributions to the Company's revenue and margins; and

(b) Dell's enterprise sales pipeline (and the potential revenue and margins associated therewith) was inflated as while Dell required Account Executives to ***record*** five prospective enterprise deals into SFDC each for servers and networking, storage, services, and software and peripherals, it was widely known that a high percentage (50%-70%) of these prospective deals were either bogus and/or stale because these deals were not closely inspected and the Account Executives were not required to actually close these deals to attain their revenue and margin goals for the quarter. Dell was aware that the enterprise pipeline was inflated with bogus

deals because it began requiring a substantially higher multiple of potential deals to actual sales for the Account Executives (and by extension, GMs) to meet the established revenue and margin quotas each quarter. For example, historically it was known at Dell that to meet $1 million in projected revenue, a sales person would generally need a multiple of three in the pipeline (*i.e.*, $3 million of potential sales for every $1 million in actual sales). However, by February 2012, Dell's pipeline was so unhealthy and inflated and defendants were aware or recklessly disregarded that the pipeline multiple required to meet the projected revenue and margin figures had increased to ***four times and then five times*** the stated goal.

73. The day after defendant Gladden's presentation, February 29, 2012, Dell's stock price reached a Class Period high of $17.70 per share.

**Dell Executives Dump Their Dell Stock**

74. Between February 24 and March 7, 2012, as Dell's stock price peaked, defendant Felice took advantage of the artificial inflation in Dell's stock price caused by the materially false and misleading statements and omissions described above and sold 892,568 shares of his personally held Dell stock for proceeds of $15.3 million. This amount represents almost 1,800% of the number of shares (50,000) he sold in 2011 and 70,000% of the number of shares (1,250) he sold in 2010. And, he did not sell a single Dell share again until Dell went private in 2013.

75. In the small, three-week period between the announcement of its FY2012/4Q12 results and the day before Dell's Form 10-K was filed (February 24-March 12, 2012), six Dell senior executives, including defendants Felice and Gladden, combined, sold over 2.4 million shares of their Dell stock for proceeds in excess of $41 million – nearly three and a half times the amount of shares sold during all of 2011.

**FY2012 Form 10-K Report**

76. Dell's FY2012 Form 10-K, prepared, reviewed and signed by defendants Michael Dell and Gladden, was filed with the SEC on March 13, 2012. In addition to including the results previously announced on February 21, 2012, defendants stated in the management discussion and analysis section that:

> Our improved profitability for Fiscal 2012 was in part due to growth in our enterprise solutions and services business. For Fiscal 2012, enterprise solutions and services revenue grew 6% year-over-year to $18.6 billion, while gross margins generated from this category grew 10% year-over-year. We also substantially improved the profitability of our client product business in Fiscal 2012 by simplifying our product offerings, continuing to optimize our supply chain, and shifting our revenue mix to higher-value products. We will remain focused on growing our revenue and profitability by continuing our efforts to provide IT solutions to our customers in areas such as enterprise solutions and services. In addition, we will continue to utilize our flexible supply chain to enhance the profitability of our client products.
>
> * * *
>
> We believe that we will continue to profitably grow revenue in the long-term through the expansion of our enterprise solutions, services, and product offerings. We will balance revenue growth with the objective of enhancing operating income and cash flow. . . .
>
> At a regional level, revenue from outside the U.S. increased 7% to $31.7 billion and represented 51% of total net revenue while revenue from the U.S. decreased 5% to $30.4 billion. Revenue from Growth Countries increased 12% overall year-over-year. In particular, revenue from BRIC increased 15% year-over-year during Fiscal 2012 and represented 14.2% of our total net revenue for Fiscal 2012, compared to 12.3% for the prior year. We are continuing to expand into these and other emerging countries that represent the vast majority of the world's population, tailor solutions to meet specific regional needs, and enhance relationships to provide customer choice and flexibility.

77. The Form 10-K was false and misleading because it failed to disclose known trends, demands, commitments, events or uncertainties regarding Dell's PC sales which comprised more than 50% of the Company's net revenue and the strength of its enterprise business. The material omitted information that was required to be disclosed to investors, including trends or uncertainties that defendants reasonably expected would have a material unfavorable impact on revenues in

violation of Item 303 of Regulation S-K, 17 C.F.R. §229.303(a)(3)(iii), and the SEC's interpretive releases thereto, included:[4]

(a) the growth Dell experienced in APJ and EMEA during 4Q12/FY2012 and repeated in the Form 10-K was not a reasonable indicator of continued growth in these regions during 1Q13 because Dell had experienced significant shifts in demand from higher-margin premium PCs to lower cost and lower margin PCs particularly in APJ and emerging markets like China and India – a dynamic the Company decided not to compete in;

(b) Dell was facing significant and increasing competition from efficient, low-cost PC manufacturers like Lenovo and Acer that relied on build-to-stock business models rather than Dell's build-to-order business model, which had resulted in increased product in the market, downward pricing pressure, reduced profit margins and a further erosion of Dell's market share in key emerging markets, particularly in China and India;

(c) demand for Dell's PCs had eroded due to the extended delay in enterprise Windows 7 upgrades and lengthening PC replacement cycles as a result of increasing consumer substitution of smartphones and tablets – markets in which Dell had little-to-no presence – for PCs and the increasing adoption of "bring your own device" policies by businesses which allow employees to make their own decisions regarding which computers and/or other electronic devices they use in the workplace, all of which dramatically impacted Dell's PC revenue and margins;

(d) as a result of ¶¶(a)-(c), Dell's PC component suppliers and manufacturers had accumulated a significant build-up of unsold inventory and Dell had been required to take extraordinary measures to ease the fears of its suppliers and ensure Dell maintained access to key

---

[4] *See, e.g.*, Management's Discussion and Analysis of Financial Condition and Results of Operations, Securities Exchange Act Release No. 34-26831, 54 FR 22427 (May 18, 1989).

components for the PCs it was still able to sell by entering into $2.6 billion worth of purchase obligations in late FY2012, nearly 800% greater than its FY2011 obligations;

(e) Dell was experiencing material undisclosed operational deficiencies within its sales divisions, which were hindering Dell's ability to transition away from its core PC product and expand its enterprise business. In particular, Dell lacked sufficient specialists to attain the top line revenue and margin quotas established at the beginning of the quarter because the Company had counterintuitively commenced freezing sales personnel hiring requisitions early in the quarter to control operating expenditures in light of lagging demand and sales. Additionally, the Account Executive PC generalists and enterprise specialists were engaged in a turf war. Account Executives withheld permission from specialists to contact customers because it was easier and faster for the generalists to meet their top line revenue and margin goals by selling higher-revenue, lower-margin PCs rather than by expending significantly more time and effort with the specialists selling the same customers lower-revenue, higher-margin enterprise solutions, which practice had the effect of minimizing enterprise's contributions to the Company's revenue and margins;

(f) Dell's enterprise sales pipeline (and the potential revenue and margins associated therewith) was inflated as while Dell required Account Executives to ***record*** five prospective enterprise deals into SFDC each for servers and networking, storage, services, and software and peripherals, it was widely known that a high percentage (50%-70%) of these prospective deals were either bogus and/or stale because these deals were not closely inspected and the Account Executives were not required to actually close these deals to attain their revenue and margin goals for the quarter. Dell was aware that the enterprise pipeline was inflated with bogus deals because it began requiring a substantially higher multiple of potential deals to actual sales for the Account Executives (and by extension, GMs) to meet the established revenue and margin quotas each quarter. For example, historically it was known at Dell that to meet $1 million in projected

revenue, a sales person would generally need a multiple of three in the pipeline (*i.e.*, $3 million of potential sales for every $1 million in actual sales). However, by February 2012, Dell's pipeline was so unhealthy and inflated and defendants were aware or recklessly disregarded that the pipeline multiple required to meet the projected revenue and margin figures had increased to ***four times and then five times*** the stated goal; and

(g) that, to attempt to minimize the negative impact on revenue and margins caused by the undisclosed problems described in ¶¶(a)-(f) above, Dell embarked on an accelerated buying spree, acquiring AppAssure (February 24, 2012) and announcing the intent to acquire SonicWALL, Inc. (March 13, 2012). Dell was also continuing to conduct its due diligence on and was negotiating and finalizing the purchase of three additional companies – Wyse Technology, Clerity Solutions, and Make Technologies – which acquisitions would all be announced two weeks later during the first week of April 2012.

78. Dell's stock price closed up following the filing of the Form 10-K.

79. Two days later, on March 15, 2012, a Dell senior executive (Stephen F. Schuckenbrock, President of Dell Services) sold 952,480 shares of his Dell stock – an amount equal to 500% of the number of shares he sold in all of 2011 – at the artificially inflated price of $17.25 per share for proceeds of $16.4 million.

**Analyst Disinformation**

80. Just two days after Dell's FY2012 Form 10-K was filed with the SEC, on March 15, 2012, a Jefferies analyst issued a report titled "Cutting HP and Dell Estimates: Checks Indicate PC Sales Slowing Materially" which explained that "[f]ollowing our trip to Asia and checks with retailers in the US and Europe we believe PC and notebook inventories have begun to rise quickly." In lowering its Dell estimates, the report continued:

> We believe this is a non-consensus view and we see our -3% PC growth rate for the year as a far more likely outcome than the consensus expectation of +5%-7%. We cut

> our estimates on HP and Dell due to PC shipment weakness and a less favorable component environment.
>
> **Headwinds to PC growth this year are rising:** 1) Ultrabooks coming: following widespread coverage of CES and the expected introduction of Ultrabooks, we believe PC sales began to slow as consumers began to anticipate new models. 2) Windows 8 coming: then to make matters worse, the Windows 8 preview came out, causing a consumer reaction that is likely delaying purchases similar to the pause before Windows 7 launched. 3) Windows on ARM coming: add in the potential lower prices of WOA and confusion around WOA (backward compatibility, etc.) and you get what we believe is a significant headwind. 4) Ivy Bridge Intel chips coming: while many people have cited excess Sandy Bridge inventory as a reason for the delay (the delay was recently confirmed by the chairman of Intel China), we believe it could be due to yield issues at 22nm. Regardless, we believe OEMs' product refreshes have been pushed out due to the delay. 5) Retina Display iPad is here: The final headwind (or gale force wind) is the launch of the new iPad with Retina Display and quad-core graphics. We believe PC-related companies that are citing Thai-flood HDD issues as the cause of PC weakness have been using it as a smokescreen to mask underlying slower demand trends. Due to these factors, we expect PC sales, especially notebook sales, to slow meaningfully. Finally, we see positive February sales from notebooks ODMs (+7% M/M vs. typical -3%) as backward looking.

81. After this report was published, Dell's stock price began trickling downward.

82. Ostensibly responding to the Jefferies March 15th non-consensus report, a Brean Murray analyst published a report on March 26, 2012 titled "***Defending Dell*** – Raising 2012 Estimates, Buying On Weakness And ***Adding To Our Long-Term Conviction Focus List*** – Our Framework For EPS Upside," which stated that:

> **Our latest work suggests Dell can benefit through 2012 from better than anticipated PC mix and pricing** (Figure 5) – we've previously been modeling 5% - 10% PC ASP declines through 2012 – we now believe it most likely that Dell's blended PC ASPs fall into the 0% to -2% range; with the potential for 0% to +2%, while also benefitting from PC mix – a view we believe has merit given our belief:
>
> 1) PC inventory levels aren't high given drive constraints
>
> 2) PC vendors are expected to improve the mix of PC's sold through the year as the mix of available drives improves . . . .
>
> **Quality PC share gains more likely than not** – an incremental upside lever not yet in our model. Dell has recently done a great job of shifting its PC mix higher, gaining share in those segments, and pulling back from lower end PC's . . . .

**Our work suggests PC demand is tracking in line to our Mar Q estimate of a 15% Q/Q unit decline** . . . .

83. Hoping to further counteract the downward slide and maintain inflation in Dell's stock price, as well as ease the fears of its suppliers who saw their inventories rapidly increasing and shipments decreasing, Dell's management met with UBS analysts in late March 2012.[5] Thereafter, on March 30, 2012, a UBS analyst published a report titled "***Meeting Reinforces Our Thesis; Own for 2H***" which stated that the analyst "recently held meetings with Dell management, which reinforced our transformation thesis." The report went on to communicate facts relayed and emphasized by Dell during that meeting, including that "***Dell expects enterprise PC refresh to continue***," that this would be "***driven by the shift to Windows 7 this year***" through calendar 2012 and "this will start to drive higher margin organic revenue." In addition, the report stated "***[o]ur impression is that senior management is vigilantly keeping an eye on the productivity of its investments (particularly specialists*** that it hired over the past year+)."[6]

84. Defendant Dell's March 30, 2012 statements as communicated to and relayed by the analyst were materially false and misleading when made. The true facts, which were then known to or recklessly disregarded by defendants based on historical and real-time reports, meetings, and various analytic tools described herein, were that:

(a) demand for Dell's PCs had eroded due to the extended delay in enterprise Windows 7 upgrades and lengthening PC replacement cycles as a result of increasing consumer substitution of smartphones and tablets – markets in which Dell had little-to-no presence – for PCs

---

[5] This mid-quarter meeting was highly unusual, especially considering that Dell hosted a yearly analyst day in June and, during the FY2012 conference call, defendants pointedly deferred responding to certain questions until the June analyst event.

[6] Notably, a division of UBS (UBS Loan Finance LLC), was among the lenders that were paid millions of dollars in fees for providing debt financing in connection with the 2013 privatization of Dell by Michael Dell and his partners.

and the increasing adoption of "bring your own device" policies by businesses which allow employees to make their own decisions regarding which computers and/or other electronic devices they use in the workplace, all of which dramatically impacted Dell's PC revenue and margins;

(b) as a result of ¶(a), Dell's PC component suppliers and manufacturers had accumulated a significant build-up of unsold inventory and Dell had been required to take extraordinary measures to ease the fears of its suppliers and ensure Dell maintained access to key components for the PCs it was still able to sell by entering into $2.6 billion worth of purchase obligations in late FY2012, nearly 800% greater than its FY2011 obligations;

(c) Dell was experiencing material undisclosed operational deficiencies within its sales divisions, which were hindering Dell's ability to transition away from its core PC product and expand its enterprise business. In particular, Dell lacked sufficient specialists to attain the top line revenue and margin quotas established at the beginning of the quarter because the Company had counterintuitively commenced freezing sales personnel hiring requisitions early in the quarter to control operating expenditures in light of lagging demand and sales. Additionally, the Account Executive PC generalists and enterprise specialists were engaged in a turf war. Account Executives withheld permission from specialists to contact customers because it was easier and faster for the generalists to meet their top line revenue and margin goals by selling higher-revenue, lower-margin PCs rather than by expending significantly more time and effort with the specialists selling the same customers lower-revenue, higher-margin enterprise solutions, which practice had the effect of minimizing enterprise's contributions to the Company's revenue and margins;

(d) Dell's enterprise sales pipeline (and the potential revenue and margins associated therewith) was inflated as while Dell required Account Executives to ***record*** five prospective enterprise deals into SFDC each for servers and networking, storage, services, and software and peripherals, it was widely known that a high percentage (50%-70%) of these

prospective deals were either bogus and/or stale because these deals were not closely inspected and the Account Executives were not required to actually close these deals to attain their revenue and margin goals for the quarter. Dell was aware that the enterprise pipeline was inflated with bogus deals because it began requiring a substantially higher multiple of potential deals to actual sales for the Account Executives (and by extension, GMs) to meet the established revenue and margin quotas each quarter. For example, historically it was known at Dell that to meet $1 million in projected revenue, a sales person would generally need a multiple of three in the pipeline (*i.e.*, $3 million of potential sales for every $1 million in actual sales). However, by February 2012, Dell's pipeline was so unhealthy and inflated and defendants were aware or recklessly disregarded that the pipeline multiple required to meet the projected revenue and margin figures had increased to ***four times and then five times*** the stated goal; and

(e) that, to attempt to minimize the negative impact on revenue and margins caused by the undisclosed problems described in ¶¶(a)-(d) above, Dell embarked on an accelerated buying spree, acquiring AppAssure (February 24, 2012) and announced the intent to acquire SonicWALL, Inc. (March 13, 2012). Dell was also continuing to conduct its due diligence on and was negotiating and finalizing the purchase of three additional companies – Wyse Technology, Clerity Solutions, and Make Technologies – which acquisitions would all be announced within days.

85. Not coincidentally, Dell's stock price closed higher on April 2, 2012, the next trading day following publication.

**April 2, 2012 Conference Call**

86. On April 2, 2012, Dell hosted a conference call regarding the Wyse Technology acquisition led by Rob Williams (VP, Investor Relations), Dave Johnson (SVP, Corporate Strategy), Jeff Clarke (Vice Chairman & President, Global Operations & End User Computing Solutions). During that call, a Citigroup analyst asked Dell to comment on the timing of the acquisition and

whether Dell was seeing an inflection in the number of customers looking for the types of solutions Wyse offers. On behalf of Dell, Mr. Clarke confirmed that "***[w]e still think there is a healthy PC demand in the industry***."

87. Another analyst asked for "specifics around what percentage of [Dell's] VDI [or virtual desktop infrastructure] customers for Dell are incorporating a full PC." On behalf of Dell, Mr. Johnson stated: "***we don't see any real dramatic change. The IDC forecasts continue to project into the future a sort of steady 15% growth rate***, so there is no apparent broad inflection point."

88. Defendant Dell's April 2, 2012 statements were materially false and misleading when made. The true facts, which were then known to or recklessly disregarded by defendants based on historical and real-time reports, meetings, and various analytic tools described herein, were that:

(a) Dell had experienced significant shifts in demand from higher-margin premium PCs to lower cost and lower margin PCs particularly in APJ and emerging markets like China and India – a dynamic the Company decided not to compete in;

(b) Dell was facing significant and increasing competition from efficient, low-cost PC manufacturers like Lenovo and Acer that relied on build-to-stock business models rather than Dell's build-to-order business model, which had resulted in increased product in the market, downward pricing pressure, reduced profit margins and a further erosion of Dell's market share in key emerging markets, particularly in China and India;

(c) demand for Dell's PCs had eroded due to the extended delay in enterprise Windows 7 upgrades and lengthening PC replacement cycles as a result of increasing consumer substitution of smartphones and tablets – markets in which Dell had little-to-no presence – for PCs and the increasing adoption of "bring your own device" policies by businesses which allow employees to make their own decisions regarding which computers and/or other electronic devices they use in the workplace, all of which dramatically impacted Dell's PC revenue and margins;

(d) as a result of ¶¶(a)-(c), Dell's PC component suppliers and manufacturers had accumulated a significant build-up of unsold inventory and Dell had been required to take extraordinary measures to ease the fears of its suppliers and ensure Dell maintained access to key components for the PCs it was still able to sell by entering into $2.6 billion worth of purchase obligations in late FY2012, nearly 800% greater than its FY2011 obligations;

(e) Dell had already announced the acquisitions of AppAssure (February 24, 2012) and the intent to acquire SonicWALL, Inc. (March 13, 2012) and Wyse Technology. Likewise, Dell had completed the negotiations to acquire Clerity Solutions and Make Technologies at the time this statement was made. These five acquisitions worth approximately $2.5 billion announced over a six week period were designed to help fill the void in revenue and margins that had been caused by the undisclosed PC pricing pressures, lack of PC demand and shipments, and sales execution problems Dell had been experiencing, as well as maintain the artificial inflation in Dell's stock price.

89. Dell's efforts to assuage the concerns of the market and its suppliers continued into early May when Dell, through its marketing director Alison Gardner, told *Reuters* in an unusual quarter-end sound-bite that sales of Dell's new XPS notebook were more than double the Company's internal forecast, driven by strong demand from both consumers and big corporations, which "'has exceeded our expectations.'" This statement was made just days before Dell's 1Q13 closed and just weeks before defendants would be forced to reveal the truth about the Company's abysmal results.

**INVESTORS BEGIN TO LEARN THE TRUTH**

90. After the market closed on May 22, 2012, Dell stunned investors by announcing that 1Q13 revenues were approximately ***$500 million less*** than analyst estimates based upon Dell's guidance just three months earlier. Notably, the Company lost $138 million in cash from operations,

the first quarter of negative cash from operations since 1Q08. Dell's sequential and year-over-year growth rates were negative across the board:

| ***Net Revenue by Product Category:*** | | | | | |
|---|---|---|---|---|---|
| Servers and Networking | $ 2,017 | $ 2,220 | $ 1,973 | (9 %) | 2 % |
| Storage | 444 | 500 | 481 | (11 %) | (8 %) |
| Services | 2,071 | 2,179 | 1,984 | (5 %) | 4 % |
| Software and Peripherals | 2,386 | 2,558 | 2,567 | (7 %) | (7 %) |
| Mobility | 4,236 | 4,877 | 4,716 | (13 %) | (10 %) |
| Desktop PCs | 3,268 | 3,697 | 3,296 | (12 %) | (1 %) |
| Consolidated net revenue | $ 14,422 | $ 16,031 | $ 15,017 | (10 %) | (4 %) |

* * *

| ***Net Revenue by Global Segment:***[(1)] | | | | | |
|---|---|---|---|---|---|
| Large Enterprise | $ 4,436 | $ 4,982 | $ 4,587 | (11 %) | (3 %) |
| Public | 3,466 | 3,833 | 3,621 | (10 %) | (4 %) |
| Small and Medium Business | 3,477 | 3,560 | 3,355 | (2 %) | 4 % |
| Consumer | 3,043 | 3,656 | 3,454 | (17 %) | (12 %) |
| Consolidated net revenue | $ 14,422 | $ 16,031 | $ 15,017 | (10 %) | (4 %) |

91. Later on May 22, 2012, Dell hosted a conference call led by defendants Gladden and Felice during which defendants admitted Dell's $500 million revenue shortfall was primarily caused by: (a) poor sales force productivity and execution; (b) Company directives to forgo PC sales in markets experiencing significant pricing pressures; and (c) weak demand for Dell's PC products in EMEA and Asia. As defendant Gladden finally acknowledged:

> For the quarter, we delivered revenue of $14.4 billion, down 4%. This was below our outlook. There are a few key causes to the shortfall. Our sales execution was not up to our expectations and we've made changes to improve this as we head into the second quarter. Additionally, the demand environment was tougher than we had planned. And I would specifically highlight weaker demand in markets like EMEA and parts of Asia, in addition to public markets. Finally, we are seeing a more challenging competitive environment in a few areas of the business.

(a) Defendant Gladden also acknowledged the unhealthy pipeline:

April was not what we expected. ***We had kind of come into the quarter and seen a bit of a lull in the first couple months***, and were looking at pipelines that were pretty strong for April that really just didn't materialize, and saw some things specifically push.

(b) Regarding the sales force problems, an analyst engaged in the following colloquy with defendant Gladden:

| | |
|---|---|
| Brian Alexander, Raymond James | "I guess I don't understand how you're lacking coverage in certain areas, given all of the hiring you've done. I think it's been thousands of sales specialists, so I would think coverage is going up, not down." |
| Gladden | "When I talk about coverage, I think we over-indexed a little bit on where we put all the specialists. In other words, too many geographies, we had – we probably saturated a place, and then left some places uncovered. Same thing with certain customers sets. So, we are balancing that." |

92. In reports issued after the earnings release and conference call, analysts expressed their surprise at Dell's half-billion dollar revenue shortfall:

(a) As one analyst noted, Dell – unlike its competitors – struggled to counteract PC erosion during 1Q13: "[a]lthough focused on higher-value enterprise systems and services (+2%Y/Y), PCs are still 52% of Dell's mix, where ***units fell -3%Y/Y vs. a market +2%Y/Y***."

(b) A Barclays analyst noted that, after announcing the below-estimate results, "Dell Acknowledges the 'Apple Effect.'" The report stated "Dell's results and commentary around tablets suggest to us that Apple continues to disrupt the traditional PC market and gain momentum through tablets (iPad) and smartphones (iPhone)."

93. In response to this news, Dell's stock price fell precipitously from over $15 per share on May 22, 2012 to close at $12.49 per share on May 23, 2012, a 17% decline on six times the average daily trading volume during the Class Period – ***the largest single day decline in over a decade***.

94. During the Class Period, defendants materially misled the investing public, thereby inflating the price of Dell common stock, by publicly issuing false and misleading statements and

omitting material facts necessary to make defendants' statements, as set forth herein, not false and misleading. Such statements and omissions were materially false and misleading because they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

95. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Dell's business, prospects and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Dell and its business, prospects and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

## LOSS CAUSATION AND THE CLASS MEMBERS' ECONOMIC LOSS

96. During the Class Period, as detailed herein, defendants engaged in a scheme and wrongful course of business that was designed to and did artificially inflate the price of Dell securities, which misconduct operated as a fraud and deceit on those who transacted in the Company's securities during the Class Period. Defendants did this by issuing materially false and misleading statements regarding Dell's revenues; PC inventory, growth and demand; and the strength of its salesforce. As the falsity of defendants' statements was revealed, Dell's stock price fell on May 23, 2012, as detailed in ¶93, as the artificial inflation dissipated. As a result of their

transactions in artificially inflated Dell securities during the Class Period, Plaintiff and other Class members suffered significant damages as a result thereof.

97. The market for Dell securities was open, well-developed and efficient at all relevant times, with average daily trading volume of more than 16 million shares during the Class Period. As a result of these materially misleading statements and failures to disclose the true state of the Company's business performance and financial circumstances, Dell securities traded at artificially inflated prices. Plaintiff and other Class members transacted in Dell securities relying upon the integrity of the market relating to Dell securities and suffered economic loss as a result thereof.

98. Defendants' false or misleading statements had the intended effect and caused Dell's securities to trade at artificially inflated levels.

99. After the market closed on May 22, 2012, news of Dell's revenue shortfall, negative cash from operations, PC pricing pressures, weak demand for PCs, and sales force problems were disclosed to the market. On this disclosure, Dell's stock lost $2.59 per share in value, or more than 17%, a significant decline on extraordinarily heavy trading volume of more than 109 million shares, or more than six times the average daily trading volume during the Class Period.

100. This price decline removed the artificial inflation from Dell's securities, causing real economic loss to investors who transacted in Dell's securities during the Class Period.

101. The decline in the price of Dell's securities at the end of the Class Period was the direct result of the nature and extent of defendants' prior false statements and material omissions being revealed to and/or leaking into the market. The timing and magnitude of Dell's significant price decline negates any inference that the loss suffered by Plaintiff and other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to defendants' fraudulent conduct:




102. The economic loss Plaintiff and other members of the Class suffered was a direct result of defendants' fraudulent scheme to artificially inflate the price of Dell's securities and maintain those prices at artificially inflated levels, as was revealed by the subsequent and significant decline in the value of Dell's securities when defendants' earlier misrepresentations and omissions became publicly available.

## APPLICABILITY OF THE PRESUMPTION OF RELIANCE

103. Plaintiff and the Class are entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against defendants are predicated upon omissions of material fact for which there was a duty to disclose.

104. Plaintiff and the Class are also entitled to a presumption of reliance under the fraud-on-the-market doctrine because the market for Dell securities was an efficient market at all relevant times by virtue of the following factors, among others:

(a) Dell's stock met the requirements for listing, and was listed and actively traded on NASDAQ, a highly efficient and automated market;

(b) Dell's stock traded on large weekly volumes and millions of shares were available for arbitrage activity;

(c) As a regulated issuer, Dell filed periodic public reports with the SEC and NASDAQ;

(d) Dell was eligible to and did file SEC Form S-3 registration statements;

(e) Dell regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(f) Dell was followed by a number of securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. These reports were publicly available and entered the public marketplace.

105. As a result of the foregoing, the market for Dell securities promptly incorporated current information regarding Dell from publicly available sources and reflected such information in the prices of the stock. Under these circumstances, all those who transacted in Dell securities during the Class Period suffered similar injury through their transactions in Dell securities at artificially inflated prices and a presumption of reliance applies.

## CLASS ACTION ALLEGATIONS

106. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons or entities who transacted in Dell securities during the Class Period (the “Class”). Excluded from the Class are defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which defendants have or had a controlling interest.

107. The Class members are so numerous and geographically dispersed that joinder of all members is impracticable. Dell stock was actively traded on NASDAQ. Record owners and other members of the Class may be identified from records maintained by Dell or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. While the exact number of Class members is unknown to Plaintiff, Dell reported more than 28,000 shareholders of record as of March 7, 2012. Accordingly, Plaintiff reasonably believes that there are thousands of members in the proposed Class.

108. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

109. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

110. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) Whether defendants' acts as alleged herein violated the federal securities laws;

(b) Whether defendants' statements made to the investing public misrepresented or omitted material facts about Dell's business, operations and financial conditions;

(c) Whether the price of Dell securities was artificially inflated during the Class Period; and

(d) To what extent the Class members have sustained damages and the proper measure of damages.

111. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy as joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violation of §10(b) of the Exchange Act and Rule 10b-5 Against All Defendants

112. Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

113. Defendants are liable for making false statements and failing to disclose adverse facts known to them about Dell. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on those who transacted in Dell securities during the Class Period was a success, as it: (i) deceived the investing public regarding Dell's business and financial condition; (ii) artificially inflated the price of Dell securities; and (iii) caused Plaintiff and other Class members to transact in Dell securities at inflated prices.

114. During the Class Period, defendants participated in the preparation of and/or caused to be disseminated the false or misleading statements specified above, which they knew or recklessly disregarded were materially false or misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

115. Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a) Employed devices, schemes, and artifices to defraud;

(b) Made untrue statements of material facts or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; or

(c) Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their transactions in Dell securities during the Class Period.

116. Defendants, individually and together, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal the truth and/or adverse material information about Dell's business, operations and financial condition as specified herein.

117. The defendants employed devices, schemes and artifices to defraud, while in possession of material, adverse, nonpublic information and engaged in acts, practices, and a course of conduct as alleged herein by, among other things, participating in the making of untrue statements of material fact and omitting to state material facts necessary in order to make the statements made about the Company and its business operations and financial status, in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon those who transacted in Dell securities during the Class Period.

118. The defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants' misconduct was engaged in knowingly or with reckless disregard for the truth, and for the purpose and effect of concealing Dell's operating condition and financial status from the investing public and supporting the artificially inflated price of its securities.

119. As a result of the dissemination of the materially false or misleading information and failure to disclose material facts, as set forth above, the market price of Dell's securities was artificially inflated during the Class Period. In ignorance of the fact that the market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements, or upon the integrity of the market in which the Company's securities traded, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants, but not disclosed in defendants' public statements during the Class Period, Plaintiff and the other Class members acquired Dell's securities during the Class Period at artificially high prices and were ultimately damaged thereby.

120. At the time of said misrepresentations and omissions, Plaintiff and other Class members were ignorant of their falsity, and believed them to be true. Had Plaintiff and other Class members and the marketplace known the truth regarding the problems that Dell was experiencing, which defendants did not disclose, Plaintiff and other Class members would not have transacted in Dell securities, or, if they had transacted in its securities during the Class Period, would not have done so at the artificially inflated prices which they paid.

121. By reason of the foregoing, defendants have violated §10(b) of the Exchange Act and Rule 10b-5.

122. As a direct and proximate result of these defendants' wrongful conduct, Plaintiff and the other Class members suffered damages in connection with their Class Period transactions in Dell securities.

**COUNT II**

**For Violation of §20(a) of the Exchange Act**
**Against the Individual Defendants**

123. Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

124. The Individual Defendants acted as controlling persons of Dell within the meaning of §20(a) of the Exchange Act:

(a) By reason of their positions as executive officers and/or directors, their participation in and awareness of the Company's operations and intimate knowledge of the false statements and omissions made by the Company and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading;

(b) The Individual Defendants participated in conference calls with investors and were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading before or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected; and

(c) Because of their positions as CEO, CFO and CCO, the Individual Defendants directly participated in the Company's management and were directly involved in Dell's day-to-day operations. The Individual Defendants also controlled the contents of Dell's quarterly reports and other public filings, press releases, conference calls, and presentations to securities analysts and the investing public. The Individual Defendants prepared, reviewed and/or were provided with copies of the Company's reports, press releases and presentation materials alleged to be misleading, before or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected and failed to do so.

125. By reason of such conduct, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A. Declaring that defendants are liable pursuant to the Exchange Act;

B. Determining and certifying that this action is a proper class action and certifying Plaintiff as a class representative and Plaintiff's counsel as class counsel pursuant to Rule 23 of the Federal Rules of Civil Procedure;

C. Awarding compensatory damages in favor of Plaintiff and the Class against defendants, jointly and severally, for damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial;

D. Awarding Plaintiff and the Class pre-judgment and post-judgment interest as well as reasonable attorneys' fees, costs and expenses incurred in this action; and

E. Awarding such other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: July 27, 2015

ROBBINS GELLER RUDMAN
& DOWD LLP
DARREN J. ROBBINS
X. JAY ALVAREZ
LAURIE L. LARGENT
DANIELLE S. MYERS
STEVEN M. JODLOWSKI

s/ X. JAY ALVAREZ
X. JAY ALVAREZ

655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
darrenr@rgrdlaw.com
jaya@rgrdlaw.com
llargent@rgrdlaw.com
dmyers@rgrdlaw.com
sjodlowski@rgrdlaw.com

ROBBINS GELLER RUDMAN
& DOWD LLP
SAMUEL H. RUDMAN
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com

Lead Counsel for Plaintiff

KENDALL LAW GROUP, LLP
JOE KENDALL (State Bar No. 11260700)
JAMIE J. MCKEY (State Bar No. 24045262)
3232 McKinney Avenue, Suite 700
Dallas, TX 75204
Telephone: 214/744-3000
214/744-3015 (fax)
jkendall@kendalllawgroup.com
jmckey@kendalllawgroup.com

Liaison Counsel

SULLIVAN, WARD, ASHER & PATTON, P.C.
CYNTHIA J. BILLINGS
1000 Maccabees Center
25800 Northwestern Highway
Southfield, MI 48075-1000
Telephone: 248/746-0700
248/746-2760 (fax)
cbillings@swappc.com

Additional Counsel for Plaintiff

CERTIFICATE OF SERVICE

I hereby certify that on July 27, 2015, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on July 27, 2015.

s/ X. JAY ALVAREZ

X. JAY ALVAREZ

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone: 619/231-1058
619/231-7423 (fax)

E-mail: jaya@rgrdlaw.com

# Mailing Information for a Case 1:15-cv-00374-LY City of Pontiac General Employees Retirement System v. Dell Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **X. Jay Alvarez**
  jaya@rgrdlaw.com
- **Marcy Hogan Greer**
  mgreer@adjtlaw.com,sjett@adjtlaw.com,gverlander@adjtlaw.com
- **Susan Elaine Hurd**
  susan.hurd@alston.com,angie.knowles@alston.com
- **Steven M. Jodlowski**
  sjodlowski@rgrdlaw.com
- **Evan Jay Kaufman**
  ekaufman@rgrdlaw.com,e_file_ny@rgrdlaw.com,e_file_sd@rgrdlaw.com
- **Joe Kendall**
  jkendall@kendalllawgroup.com,administrator@kendalllawgroup.com
- **Laurie L. Largent**
  llargent@rgrdlaw.com
- **John L. Latham**
  john.latham@alston.com,jeana.mcgraw@alston.com,chuck.mattson@alston.com
- **Alexander Seton Lorenzo**
  alexander.lorenzo@alston.com,managingclerksoffice-NYC@alston.com
- **Jamie Jean McKey**
  jmckey@kendalllawgroup.com,mwilliams@kendalllawgroup.com,administrator@kendalllawgroup.com
- **Danielle S. Myers**
  dmyers@rgrdlaw.com,schateauneuf@rgrdlaw.com,e_file_sd@rgrdlaw.com
- **Darren J. Robbins**
  e_file_sd@rgrdlaw.com,jaimem@rgrdlaw.com
- **David Avi Rosenfeld**
  drosenfeld@rgrdlaw.com,e_file_ny@rgrdlaw.com,e_file_sd@rgrdlaw.com
- **Jody Lynn Rudman**
  jrudman@kendalllawgroup.com,administrator@kendalllawgroup.com
- **Samuel H. Rudman**
  srudman@rgrdlaw.com,e_file_ny@rgrdlaw.com,e_file_sd@rgrdlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)