# EXHIBIT 1

# City of Pontiac General Employees' Retirement System vs. Dell Inc., et al.

## Videotaped Deposition of
## DR. GLENN HUBBARD
## November 30, 2018



www.aptusCR.com / 866.999.8310

Case 1:15-cv-00374-LY   Document 177-1   Filed 04/22/19   Page 3 of 110

Dr. Glenn Hubbard                                    City of Pontiac General Employees'
                                                     Retirement System vs. Dell Inc., et al.

**Page 1**

```
 1              UNITED STATES DISTRICT COURT
                WESTERN DISTRICT OF TEXAS
 2                  AUSTIN DIVISION
 3   --------------------------------)
     CITY OF PONTIAC GENERAL         )Case No. 1:15-cv-00374-LY
 4   EMPLOYEES' RETIREMENT SYSTEM,   )
                                     )
 5   Individually and on Behalf of   )
     All Others Similarly Situated   )
 6                                   )
              Plaintiffs,            )
 7                                   )
        vs.                          )
 8                                   )
     DELL, INC., et al.,             )
 9                                   )
              Defendants.            )
10   --------------------------------)
11
                        90 Park Avenue
12                      New York, New York
                        November 30, 2018
13                      9:08 a.m.
14
15
16        VIDEOTAPED DEPOSITION of DR. GLENN HUBBARD,
17   an Expert witness on behalf of Defendant in the
18   above-titled action, held at the above time and
19   place, before Eileen Mulvenna, CSR/RMR/CRR,
20   Certified Shorthand Reporter, Registered Merit
21   Reporter, Certified Realtime Reporter, and Notary
22   Public of the State of New York.
23
24   Job No. 10049070
25
```

**Page 2**

```
 1   A P P E A R A N C E S :
 2
 3
 4
 5        ROBBINS GELLER RUDMAN & DOWD LLP
          Attorneys for Plaintiffs
 6           655 West Broadway
             Suite 1900
 7           San Diego, California  92101
          BY:  X. JAY ALVAREZ, ESQ.
 8           jaya@rgrdlaw.com
             LAURIE L. LARGENT, ESQ.
 9           llargent@rgrdlaw.com
10
11
12        ALSTON & BIRD, LLP
          Attorneys for Defendants
13           333 South Hope Street, 16th Floor.
             Los Angeles, California  90071
14        BY:  CHARLES COX, ESQ.
             charles.cox@alston.com
15
                   -and-
16
17        ALSTON & BIRD, LLP
             One Atlantic Center
18           1201 West Peachtree Street
             Suite 4900
19           Atlanta, Georgia  30309-3424
          BY:  JOHN LATHAM, ESQ.
             john.latham@alston.com
20
21   A L S O   P R E S E N T :
22           Dan Ortego, Videographer
23           Bruce Deal, Analysis Group
24
25
```

**Page 3**

```
 1               I N D E X
 2   WITNESS        EXAMINATION BY        PAGE
 3
     DR. GLENN HUBBARD
 4
 5             MR. ALVAREZ              5
 6          E X H I B I T S
 7                                     PAGE
 8
 9   Exhibit 524   No Bates numbers, Expert    14
10                 Report of Glenn Hubbard
11   Exhibit 522   Previously marked          116
12   Exhibit 463   Previously marked          183
13   Exhibit 501   Previously marked          213
14   Exhibit 525   Bates Nos. HUBBARD_0003045 219
15                 through HUBBARD_0003046,
16                 Updated Hubbard Fees and
17                 Hours
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1        THE VIDEOGRAPHER:  We're now on the
 2   record.
 3        Today's date is November 30, 2018, and
 4   the time is 9:08 a.m.
 5        This video deposition -- this is the
 6   video deposition of Glenn Hubbard in the
 7   matter of City of Pontiac General Employees'
 8   Retirement System versus Dell, Inc., et al.,
 9   for the United States District Court, Western
10   District of Texas, Austin Division.
11        This deposition is being held at
12   90 Park Avenue, New York, New York.
13        My name is Daniel Ortega.  I'm the
14   legal videographer for Aptus Court Reporting.
15        Counsel, please identify yourselves
16   for the record.
17        MR. ALVAREZ:  Jay Alvarez, Robbins
18   Geller, on behalf of the plaintiff.
19        MS. LARGENT:  Laurie Largent, also
20   with Robbins Geller, on behalf of the
21   plaintiff.
22        MR. COX:  Charles Cox, Alston & Bird,
23   LLP on behalf of defendants and the deponent.
24        MR. LATHAM:  John Latham, Alston &
25   Bird, same.
```

Dr. Glenn Hubbard

Page 13

1 preparation for this deposition today?

2     A.    I did not.

3     Q.    I'm not sure I asked you this, but did

4 you review Professor George Foster's report?

5     A.    No, sir.

6     Q.    Do you know -- do you know whether or

7 not you and Mr. -- or Professor Foster shared some

8 of the same or similar opinions in this case?

9         MR. COX:  Objection.  It's vague and

10 ambiguous.

11         THE WITNESS:  My understanding of

12 Professor Foster's remit was to look at the

13 planning process and budgeting process of the

14 company, which is an entirely different

15 assignment.  As I'm not familiar with

16 everything he did, I can't speak to his

17 individual opinions.

18 BY MR. ALVAREZ:

19     Q.    Do you have an expertise in the

20 planning process of how to create a forecast?

21     A.    Myself or Professor Foster?

22     Q.    No, you.

23     A.    I would argue, yes.

24     Q.    But you weren't asked to do that here?

25     A.    No.

Page 14

1     Q.    Do you know whether or not your report

2 shares the same or some -- same or similar opinions

3 as Dean Hartzell's report regarding insider sales?

4     A.    I don't know.  I think I answered your

5 question that I haven't read his report.

6     Q.    I'm going to show you what has been

7 marked -- what we'll mark as 524.

8         (Exhibit 524, No Bates numbers, Expert

9         Report of Glenn Hubbard, marked for

10         identification.)

11 BY MR. ALVAREZ:

12     Q.    Do you recognize Exhibit 524?

13     A.    Yes, sir.  It's a copy of the report

14 that I submitted in this proceeding.

15     Q.    And that's dated September 23 --

16 September 13, 2018; is that correct, sir?

17     A.    Yes, sir.

18     Q.    Are there any opinions that you intend

19 to give at trial that are not contained in your

20 report?

21     A.    None that I've been asked to at the

22 present time.

23     Q.    When were you retained in this

24 particular case?

25     A.    I don't recall the exact date.

Page 15

1 Sometime in the spring of the year.

2     Q.    How were you first contacted?

3     A.    By Analysis Group.

4     Q.    So it wasn't defense counsel that

5 contacted you?

6     A.    Not personally, no.

7     Q.    It wasn't Dell that contacted you?

8     A.    No.

9     Q.    The company itself?

10     A.    No, sir.

11     Q.    And so in the spring of this year,

12 when Analysis Group contacted you, what did they

13 say?

14     A.    My recollection was simply describing

15 the matter and would I be interested in working on

16 it.

17     Q.    What description of the matter did

18 they provide to you?

19     A.    Just that it was a 10b-5 case, a

20 little bit about the case.

21     Q.    What did they tell you a little bit

22 about the case?

23     A.    I really don't recall, sir.

24     Q.    Who contacted you?

25     A.    Mr. Deal from Analysis Group.

Page 16

1     Q.    Had you ever worked -- I presume that

2 you've worked with Mr. Deal on many cases; is that

3 correct?

4     A.    I have worked with him on some cases

5 before, yes.

6     Q.    When was the last case you worked with

7 him?

8     A.    I believe it was the Dell case, the

9 Dell appraisal case.

10     Q.    Had you ever worked for Alston & Bird

11 prior to this engagement?

12     A.    I don't consider that I work for

13 Alston & Bird at all --

14     Q.    Have you ever been retained by

15 Alston & Bird?

16     A.    Yes, in the Dell matter, Dell

17 appraisal matter.

18     Q.    And prior to that, had you ever worked

19 for Alston & Bird?

20     A.    I don't -- I don't recall.

21     Q.    Other than the Dell appraisal case,

22 had you ever worked for the company itself, been

23 retained by the company itself to provide expertise?

24     A.    "The company" meaning Dell?

25     Q.    Yes.

Dr. Glenn Hubbard

Page 21

1  are distinct, or are they all interrelated with
2  respect to plaintiffs' allegations in this case?
3       A.    That sounds like a legal question.  I
4  respond to each of them as an economist.  I don't
5  know how plaintiffs would characterize them one way
6  or the other.
7       Q.    So when you say that you respond to
8  each of the categories that you described as an
9  economist, what are you referring to?
10      A.    Ms. Davisson offered a number of
11 opinions in these areas, and I respond to her.
12      Q.    Give me an example.
13      A.    She made allegations in each of these
14 areas.  I responded to other information or the
15 presence of such information in already observed
16 market data or market prices.  That would be a
17 standard economist's response.
18      Q.    And you responded by citing certain
19 internal Dell documents; is that correct or not?
20      A.    The economic response is largely,
21 insofar as it's Ms. Davisson, pointing out that she
22 either was citing things already known or knowable
23 by the market or that she had done not even the most
24 basic analysis of those.  There are points in the
25 report where I do cite some internal documents.

Page 22

1       Q.    So these documents that are Bates
2  stamped here that we've been talking about, which
3  you testified that the vast majority were insider
4  sales, you requested those documents from
5  defendants; correct?
6            MR. COX:  Objection --
7            THE WITNESS:  Yes.
8            MR. COX:  Give me a moment to get the
9       objection.
10           Belated objection that it misstates
11      his prior testimony.
12 BY MR. ALVAREZ:
13      Q.    Let's look at the legal documents that
14 you reviewed for a moment.
15           Under the heading "Legal Documents,"
16 you have a list of certain items.
17           Did you review each and every one of
18 these items in its entirety?
19      A.    No, I didn't.  I didn't review all of
20 each of the deposition transcripts there, nor did I
21 review in its entirety Ms. Allen's expert report,
22 which wasn't in this proceeding.
23      Q.    So let me ask you this, though:  Did
24 you review the amended complaint that you cited here
25 in its entirety?

Page 23

1       A.    Yes, sir.
2       Q.    And then -- so what about the
3  declaration of Stephen Schuckenbrock; did you review
4  that?
5       A.    No, I didn't review that in its
6  entirety.
7       Q.    So do you know how it was created?
8  Did you ask for it to be created?
9       A.    Are you asking -- by "it," did I ask
10 for the declaration to be created?
11      Q.    Correct.
12      A.    No, I did not.
13      Q.    Do you know who asked for the
14 declaration to be created?
15      A.    I don't know that one way or the
16 other.
17      Q.    Did you speak with Mr. Schuckenbrock?
18      A.    I did not.
19      Q.    You said that you did not review the
20 declaration of Mr. Schuckenbrock in its entirety.
21           What topics in that declaration do you
22 recall reviewing, as you sit here today?
23      A.    My recollection was just explanations
24 surrounding his stock sales.
25      Q.    What was that explanation?

Page 24

1       A.    I have it in the report.  I believe in
2  his case, it was about the purchase of a home.
3       Q.    And then you have a list -- let's just
4  go through the depositions here.
5           Why is it that -- did you ask to see
6  the specific depositions that are listed here?
7       A.    Yes and no.  The yes part would be
8  there are some -- for example, Mr. Gladden,
9  Mr. Felice are defendants.  Some were answers to
10 questions I had in the case, for example, the
11 financial advisor to your client, Mr. Seizert.
12           For example, people who might have
13 been able to give color around Asia-Pacific, like
14 Mr. Midha, and comments on supply chains.  I believe
15 that would be Mr. Miears and Ms. King and so on.
16      Q.    Why didn't you want to see
17 Mr. Hegarty's deposition to give some color about
18 EMEA?
19      A.    I don't recall asking for that or
20 having seen it.  If there's something you'd like to
21 show me in it or ask me about it, you're welcome to.
22      Q.    I'm just curious.  You said that you
23 looked at Amit's deposition because you wanted some
24 color on APJ.
25           That's one of the allegations that

Dr. Glenn Hubbard

City of Pontiac General Employees'
Retirement System vs. Dell Inc., et al.

Page 137

1    You understand that the company
2    provided guidance of 14.9 billion; is that correct?
3        A.   I think.
4            MR. COX:  Objection; no foundation.
5            THE WITNESS:  Technically, that's the
6        arithmetic -- the company provided some
7        percentage changes.  The import of those
8        percentage changes would have led you to that
9        number, but just to be clear.
10   BY MR. ALVAREZ:
11       Q.   So they never provided -- you have a
12   range here of like 14.3 to 15.6 billion.
13           The company never provided any
14   specific guidance with respect to that range; is
15   that correct?
16       A.   How do you provide guidance to
17   historical experience -- I'm merely commenting
18   that's the three years' experience.  It's not a
19   guidance matter.
20       Q.   The three years' experience, the 14.3
21   to 15.6 billion, how did you arrive at this range?
22   It's somewhere in your report; is that correct?
23       A.   There's a footnote describing the
24   ranges from the three previous years adjusted for
25   this 14-week effect.  I don't remember the exact

Page 138

1    page.
2        Q.   Can you --
3        A.   Let me see if I can find the footnote
4    for you.
5            (Pause.)
6        A.   It's on page 16.
7        Q.   Oh, page 16.
8        A.   The reference is in the text at
9    paragraph 46, and the footnote to which I referred
10   is 39.
11       Q.   When you did your calculation, did you
12   adjust every quarter down by 3 percent as opposed to
13   just the last quarter for the -- for the 14th-week
14   adjustment?
15       A.   No, this is the historical Q4 to Q1
16   revenue change in those years.  So basically I'm
17   just taking their numbers and adjusting by the
18   3 percent that Mr. Gladden had used.
19       Q.   3 percent.
20           And where is it that Mr. Gladden had
21   used the 3 percent?
22           Do you know?
23       A.   Because he had said that 4 really was
24   more like 7.  That was --
25           (Pause.)

Page 139

1        A.   Yeah, he refers -- in paragraph 45,
2    the direct quote from him.  So it's the 3 that I'm
3    getting from his calculations.  That obviously
4    requires some judgment.  3 wouldn't be a mechanical
5    arithmetic answer to that question.  That's his
6    judgment.  So I simply applied his judgment to the
7    others.
8        Q.   Right, but for the prior years, there
9    was no 14th week.  There's only the 14th week for
10   the year prior to the first quarter of fiscal year
11   '13; isn't that correct?
12       A.   I don't recall one way or the other,
13   but this is just to compare -- merely making his
14   same adjustment year to year.  It gives this range.
15       Q.   But you have an understanding as to
16   the two prior years, there was no 14th week and so
17   no 3 percent adjustment was necessary; is that
18   correct?
19       A.   I don't recall that one way or
20   another.  I'm simply trying to do the same
21   adjustment in each.
22       Q.   In each.
23           And -- but you understand that the
24   adjustment that Mr. Gladden did was because of the
25   14th week; right?

Page 140

1        A.   That's true.
2        Q.   Right.
3            But as you sit here today, do you have
4    any understanding whether or not there was a 14th
5    week in the other two prior years?
6        A.   I don't recall.
7        Q.   And if there was no 14th week, your
8    range would be incorrect; is that correct?
9        A.   No.
10           MR. COX:  Objection.
11           Go ahead.
12   BY MR. ALVAREZ:
13       Q.   Why not?
14       A.   No.  I'm simply trying to present an
15   adjustment -- as I said, he took a judgment that
16   wasn't simply arithmetic, so it's his judgment about
17   a lot of things.  I'm simply applying that judgment.
18       Q.   Well, but you said in paragraph 45,
19   you're quoting him, "When normalized for the 14th
20   week, this decline is closer to 7 percent"; right?
21           Do you see?
22       A.   Correct, but that obviously involves
23   judgment because arithmetic wouldn't have gotten you
24   there.  So I'm simply applying his same judgment,
25   which -- I've had to do lots of things to these

Case 1:15-cv-00374-LY   Document 177-1   Filed 04/22/19   Page 7 of 110

Dr. Glenn Hubbard

City of Pontiac General Employees'
Retirement System vs. Dell Inc., et al.

Page 141

1  others.  So the calculation speaks for itself, like
2  it or not, but that's what I did.
3      **Q.    I just want a clear record.**
4          **You don't know whether or not there**
5  **was a 14th week in the other two prior years?**
6      A.   Don't recall.  It wouldn't have
7  mattered for the calculation.
8      **Q.    It wouldn't have mattered.**
9      A.   No.
10     **Q.    Okay.  Why wouldn't it matter?**
11     A.   I think I just said that.  Mr. Gladden
12  had made a set of judgments, which could have
13  related to lots of things.  They obviously weren't
14  arithmetic, so I simply took his judgment.
15         MR. ALVAREZ:  Why don't we just take a
16     lunch break now.
17         THE VIDEOGRAPHER:  The time right now
18     is 12:24 p.m.  We're off the record.
19         (Luncheon recess from the record.)
20
21
22
23
24
25

Page 142

1      A F T E R N O O N   S E S S I O N
2          THE VIDEOGRAPHER:  The time right now
3      is 1:10 p.m.  We're back on the record.
4  DR. GLENN HUBBARD,
5      having been previously sworn, resumed the
6      stand and testified further as follows:
7  EXAMINATION (Cont'd.)
8  BY MR. ALVAREZ:
9      **Q.    Dean Hubbard, I'm going to direct your**
10  **attention to paragraph 18, page 6 of your report.**
11     A.   Okay.  I'm there.
12     **Q.    So in paragraph 18, it lists your**
13  **affirmative opinions in this case; is that correct?**
14     A.   It list the topics for them, yes.
15     **Q.    And then what I want to focus on now,**
16  **because it looks like we've done -- or at least**
17  **touched on three of the topics here -- I want to**
18  **focus on the third bullet point, "Whether stock**
19  **sales during Q1 fiscal year '13 by Dell's senior**
20  **executives provide an economic basis for a finding**
21  **of scienter (intent)."**
22          **So having that in mind, have you ever**
23  **been retained as an expert on the topic of executive**
24  **stock sales?**
25     A.   I don't recall that I've been retained

Page 143

1  on that topic narrowly, but executive stock sales
2  have certainly come up in cases, but I don't recall
3  that narrow a retention, no.
4      **Q.    So let's just go back over here.**
5          **We had previously touched on**
6  **Appendix B2 where you provided testimony as an**
7  **expert witness --**
8      A.   Yes.
9      **Q.    -- for a four-year period.**
10         **In any of these cases here, were you**
11  **ever retained as an expert on the topic of executive**
12  **stock sales?**
13         MR. COX:  Objection.  It misstates his
14     prior testimony.
15         THE WITNESS:  Never had that narrow an
16     assignment.  Are you asking me are executive
17     stock sales an issue in one of these cases
18     or -- as I said, I've never had that narrow
19     an assignment, but --
20  BY MR. ALVAREZ:
21     **Q.    So you've never provided an opinion on**
22  **that narrow of an assignment?**
23         MR. COX:  Objection; misstates his
24     testimony.
25         THE WITNESS:  I may well have.  I'm

Page 144

1  saying my assignment would have been broader
2  than that.  Would you like me to look at
3  these and --
4  BY MR. ALVAREZ:
5      **Q.    Sure.**
6      A.   And I may or may not remember even.
7  Let's see.
8          (Pause.)
9      A.   It's probably a question in Allergan.
10         Good --
11     **Q.    Did you say, "Good"?**
12     A.   Good.
13         MR. COX:  Top of the second page.
14         MR. ALVAREZ:  There it is.
15         THE WITNESS:  Possibly in Ocwen.  I
16     just don't remember.
17         Atlantic Power.
18         Walter possibly, but I just don't
19     remember.  It's so long ago.
20         That would be my recollection.
21  BY MR. ALVAREZ:
22     **Q.    Thank you.**
23         **And have you ever been retained as an**
24  **expert on the topic of insider trading?**
25     A.   Yes, I believe I have.

Dr. Glenn Hubbard

City of Pontiac General Employees'
Retirement System vs. Dell Inc., et al.

Page 165

1  Mr. Gladden made the sales pursuant -- during the
2  class period pursuant to a 10b-5 trading plan, did
3  that affect your opinion in any way in this case?
4      A.    No, because in Mr. Gladden's case,
5  it's probably the easiest to show that he had
6  actually negative self-interest in the behavior that
7  you identify.
8      Q.    What do you mean by that?
9      A.    He would have lost money.
10     Q.    And so he would have lost money, but
11  Mr. Felice and Mr. Schuckenbrock would have made
12  money; is that fair?
13         MR. COX:  Objection; no foundation.
14         THE WITNESS:  I haven't done that
15     math.  I think it's hard to believe, if you
16     look at all the categories, that they would
17     have made much money either, but for Gladden,
18     it's obvious.
19  BY MR. ALVAREZ:
20     Q.    And so why -- if it's obvious for
21  Gladden, how come you didn't do the calculation for
22  Felice and Schuckenbrock then?
23     A.    Gladden's trivial because the amount
24  is so small.  Any compensation offset and given his
25  large existing shareholdings, you don't even have to

Page 166

1  do the math.  That's just ridiculous.  The others,
2  you would have to do the math.  I urge you to do it
3  if that's your theory, but it would be hard to
4  imagine they would be much better off, if at all.
5      Q.    So let's see.  Paragraph 90 --
6         MR. COX:  Sorry.  90?
7         MR. ALVAREZ:  I think so.
8  BY MR. ALVAREZ:
9      Q.    Let's try to see if we can break this
10  down.  You say, "Regardless of whether such a scheme
11  would be economically reasonable, a threshold
12  question is the extent to which stock sales by the
13  Dell insiders appear to be unusual in timing or
14  amount from an economic perspective."
15         So is it your testimony here -- do you
16  believe that the sales by the insiders in this case
17  do not appear to be unusual in timing or amount from
18  an economic perspective?
19     A.    Yes.
20     Q.    And when -- but you are not rendering
21  an opinion as to whether or not these insiders sold
22  their shares during the class period having material
23  nonpublic information; is that correct?
24         MR. COX:  Objection.  It's vague and
25     ambiguous.

Page 167

1         THE WITNESS:  If I'm understanding
2     your question, my only calculations here
3     relate to whether it would have been in their
4     economic self-interest to sell, and I
5     conclude that it's not.  That's a different
6     question -- that's for a finder of fact to
7     decide if they had material nonpublic
8     information.
9  BY MR. ALVAREZ:
10     Q.    And you haven't come to that
11  conclusion then?
12     A.    That would be for a finder of fact.  I
13  can simply say it wouldn't have been in their
14  interest.
15     Q.    And then you say, "Put another way, if
16  the pattern of stock sales are not exceptional and
17  are economically rational, it is much less likely
18  they would be part of any fraud scheme."
19         Do you see that?
20     A.    Yes.
21     Q.    Is it -- would it be -- is it ever
22  economically rational for an executive to engage in
23  insider trading with material nonpublic information?
24         MR. COX:  Objection.  It's vague and
25     ambiguous.

Page 168

1         THE WITNESS:  Personally, I would
2     argue no.  What this sentence is trying to
3     get at is whether, putting aside the ethics,
4     is there even a monetary gain -- is there a
5     reason for me to want to be tempted.  The
6     answer is no.
7  BY MR. ALVAREZ:
8      Q.    So you say, "Putting aside the ethics,
9  is there even a monetary gain -- is there even a
10  monetary gain [for] a reason for me to want to be
11  tempted."
12         Now, you're talking about -- are you
13  talking about yourself or are you talking about the
14  individual insiders that sold?
15     A.    I'm talking about the individual
16  insiders.  If you do the math, there would be no
17  economic reason for them to do it.  So you'd have to
18  have some non-economic reason in mind.
19     Q.    And help me with that then.  Let's
20  look at Felice.  Maybe it's in your report, so help
21  me -- show me where it doesn't make economic sense
22  for him to do that so I can understand this better.
23     A.    Well, when you go over Mr. Felice, we
24  can start at page 45, which is paragraph 105.
25     Q.    All right.

Dr. Glenn Hubbard

City of Pontiac General Employees'
Retirement System vs. Dell Inc., et al.

Page 169

1     A.    So Mr. Felice takes in some proceeds,
2  but, of course, counterfactual, as I told you is
3  important.  He could have sold them post the
4  disclosure of your purported fraud.  So his net gain
5  is about $2.6 million pretax.
6     Q.    Okay.
7     A.    Against that would be taxes, the
8  negative effect on his compensation, the loss on his
9  other stock and the loss in the value of his
10  options.  So if that's your theory, you may want to
11  do the math and see whether that makes sense.
12     Q.    So thank you for that.  I appreciate
13  that.
14           So what dollar amount would it be
15  economically rational for Mr. Felice to engage in
16  the behavior like insider sales then?  You say it's
17  not economically rational for him to do that.  Based
18  on what you testified to, would there ever be a
19  dollar figure that would make it economically
20  rational?
21     A.    Well, now we're chasing our tail, so
22  let's go back a few questions.  For me, no, I think
23  it's an ethics question.  For this, I'm simply
24  making the simple point that he wouldn't have even
25  had a gain.  So it's very hard to believe that it

Page 170

1  would be economically rational.
2     Q.    So when you say -- when you're
3  referring to "me," you're referring to you
4  personally then.
5     A.    Me personally, I wouldn't do this.
6     Q.    Okay.
7     A.    I wouldn't engage in insider trading.
8  If your counterfactual is would somebody be tempted,
9  surely they're not going to be tempted, at least for
10  economic reasons, if there's no gain from a
11  temptation.  You didn't even bother to show that
12  there was a material gain.
13     Q.    I understand that.
14           But what I'm saying is that in --
15  you're the expert.
16           Would there ever be a dollar figure
17  where it would make economic sense for an individual
18  to engage in insider sales?
19     A.    It never makes sense to break the law.
20     Q.    Right.
21     A.    The question is whether an individual
22  has any temptation.  That's an individual facts and
23  circumstances question.  You can ask the defendants
24  that question.  My point is a simple economic point.
25  They didn't even have the temptation.

Page 171

1     Q.    I got you.  Okay.
2           So you couldn't tell me, well, yeah,
3  the temptation would have been like $50 million or
4  something like that, then it would have made
5  economic sense for someone to engage in insider
6  sales.
7     A.    I don't think it ever makes economic
8  sense.  It's merely that the temptation would have
9  been present.  Here I find no evidence there's any
10  temptation at all.
11     Q.    Let's talk -- let's go back to when
12  you were talking about Steve Felice.  You're saying
13  that -- looking at your chart, if I understand your
14  testimony correctly, like from March 2009 to the end
15  of your little chart here, you're doing an
16  eyeball -- and it would indicate that he would have
17  more shares at the end of your chart than he did at
18  the beginning; is that a fair characterization?
19     A.    Yes, sir.
20     Q.    Now, the fact that that took place,
21  right, how was that related, if at all, to whether
22  or not Steve Felice may have sold shares during the
23  class period with material nonpublic information?
24           MR. COX:  Objection; assumes facts not
25     in evidence, no foundation.

Page 172

1           THE WITNESS:  Well, again, my purpose
2     here is calculating whether there's an
3     economic incentive or the word "temptation"
4     that I used.  So there's proceeds from sale
5     less the counterfactual, less taxes, less the
6     compensation.
7           But here there would also be a hit on
8     all his shares.  He knew fraud was going to
9     be revealed in 90 days and he would lose the
10     money.  That's your view of the world.  He
11     would lose the money on all his shares and
12     all his options.  When you do the math, and I
13     would encourage you to do that, you'd have to
14     net all of those things.
15  BY MR. ALVAREZ:
16     Q.    Right, but we go back and you can't
17  tell me if there's ever an economic dollar amount --
18  I know you personally would never break the law, but
19  you can't tell me what dollar figure would entice
20  someone to sell on material nonpublic information;
21  is that correct?
22           MR. COX:  Objection; assumes facts not
23     in evidence.  There's no foundation.  It's
24     been asked and answered.  It may call for a
25     legal conclusion.

1    A.    So Mr. Felice takes in some proceeds,
2 but, of course, counterfactual, as I told you is
3 important.  He could have sold them post the
4 disclosure of your purported fraud.  So his net gain
5 is about $2.6 million pretax.
6    Q.    Okay.
7    A.    Against that would be taxes, the
8 negative effect on his compensation, the loss on his
9 other stock and the loss in the value of his
10 options.  So if that's your theory, you may want to
11 do the math and see whether that makes sense.
12    Q.    So thank you for that.  I appreciate
13 that.
14          So what dollar amount would it be
15 economically rational for Mr. Felice to engage in
16 the behavior like insider sales then?  You say it's
17 not economically rational for him to do that.  Based
18 on what you testified to, would there ever be a
19 dollar figure that would make it economically
20 rational?
21    A.    Well, now we're chasing our tail, so
22 let's go back a few questions.  For me, no, I think
23 it's an ethics question.  For this, I'm simply
24 making the simple point that he wouldn't have even
25 had a gain.  So it's very hard to believe that it

1 would be economically rational.
2    Q.    So when you say -- when you're
3 referring to "me," you're referring to you
4 personally then.
5    A.    Me personally, I wouldn't do this.
6    Q.    Okay.
7    A.    I wouldn't engage in insider trading.
8 If your counterfactual is would somebody be tempted,
9 surely they're not going to be tempted, at least for
10 economic reasons, if there's no gain from a
11 temptation.  You didn't even bother to show that
12 there was a material gain.
13    Q.    I understand that.
14          But what I'm saying is that in --
15 you're the expert.
16          Would there ever be a dollar figure
17 where it would make economic sense for an individual
18 to engage in insider sales?
19    A.    It never makes sense to break the law.
20    Q.    Right.
21    A.    The question is whether an individual
22 has any temptation.  That's an individual facts and
23 circumstances question.  You can ask the defendants
24 that question.  My point is a simple economic point.
25 They didn't even have the temptation.

1    Q.    I got you.  Okay.
2          So you couldn't tell me, well, yeah,
3 the temptation would have been like $50 million or
4 something like that, then it would have made
5 economic sense for someone to engage in insider
6 sales.
7    A.    I don't think it ever makes economic
8 sense.  It's merely that the temptation would have
9 been present.  Here I find no evidence there's any
10 temptation at all.
11    Q.    Let's talk -- let's go back to when
12 you were talking about Steve Felice.  You're saying
13 that -- looking at your chart, if I understand your
14 testimony correctly, like from March 2009 to the end
15 of your little chart here, you're doing an
16 eyeball -- and it would indicate that he would have
17 more shares at the end of your chart than he did at
18 the beginning; is that a fair characterization?
19    A.    Yes, sir.
20    Q.    Now, the fact that that took place,
21 right, how was that related, if at all, to whether
22 or not Steve Felice may have sold shares during the
23 class period with material nonpublic information?
24          MR. COX:  Objection; assumes facts not
25    in evidence, no foundation.

1          THE WITNESS:  Well, again, my purpose
2    here is calculating whether there's an
3    economic incentive or the word "temptation"
4    that I used.  So there's proceeds from sale
5    less the counterfactual, less taxes, less the
6    compensation.
7          But here there would also be a hit on
8    all his shares.  He knew fraud was going to
9    be revealed in 90 days and he would lose the
10    money.  That's your view of the world.  He
11    would lose the money on all his shares and
12    all his options.  When you do the math, and I
13    would encourage you to do that, you'd have to
14    net all of those things.
15 BY MR. ALVAREZ:
16    Q.    Right, but we go back and you can't
17 tell me if there's ever an economic dollar amount --
18 I know you personally would never break the law, but
19 you can't tell me what dollar figure would entice
20 someone to sell on material nonpublic information;
21 is that correct?
22          MR. COX:  Objection; assumes facts not
23    in evidence.  There's no foundation.  It's
24    been asked and answered.  It may call for a
25    legal conclusion.

Case 1:15-cv-00374-LY   Document 177-1   Filed 04/22/19   Page 11 of 110

Dr. Glenn Hubbard

City of Pontiac General Employees'
Retirement System vs. Dell Inc., et al.

Page 173

1    THE WITNESS:  I can't -- that's also
2  not the goal here.  I'm simply saying if I
3  were going to accuse these defendants, I
4  would probably want to know if there's any
5  economic temptation for them at all.  You
6  made no effort, or your experts, to be
7  accurate, made no effort to do that.
8  BY MR. ALVAREZ:
9    Q.    And I think you also include, in your
10  report regarding Mr. Schuckenbrock, I guess one of
11  the economic reasons or why it was economically
12  reasonable for Mr. Schuckenbrock to make the sale
13  was so that he could buy a home; is that right?
14    MR. COX:  Objection.  That
15  misstates -- that misstates the document.
16  That misstates his opinion and assumes facts
17  not in evidence.
18    THE WITNESS:  I think I mentioned a
19  number of things.  One was the threshold of
20  being in the money that I referred to from
21  academic research, but, yes, also the point
22  about his buying a home.
23  BY MR. ALVAREZ:
24    Q.    And, I'm sorry, did you say -- did you
25  review Mr. Schuckenbrock's declaration?

Page 174

1    A.    For this point, it is cited right
2  there.
3    Q.    Right.
4    For the point about buying the home;
5  right?
6    A.    Well, yes.
7    Q.    So is there a way Mr. Schuckenbrock
8  could have financed his new home without selling any
9  Dell shares?  Are you aware?
10    MR. COX:  Objection; calls for
11  speculation.
12    THE WITNESS:  Don't know that he could
13  or couldn't, but I don't know that it would
14  be reasonable to suggest that he didn't do
15  his own financial planning correctly.
16  BY MR. ALVAREZ:
17    Q.    But he could have taken out a
18  mortgage; right?
19    MR. COX:  Objection; calls for
20  speculation.
21    THE WITNESS:  Perhaps, but I don't see
22  why that's relevant.
23  BY MR. ALVAREZ:
24    Q.    Okay.  I'm just saying.  I'm just
25  asking.

Page 175

1    He could have paid cash if he had the
2  cash sitting around; right?
3    A.    He certainly could have, but, again,
4  unless you're purporting to give him financial
5  planning advice, I'm not sure why it would be
6  relevant one way or the other.
7    Q.    Is there any reason why
8  Mr. Schuckenbrock couldn't have a 10b-5 trading plan
9  when he made these shares?
10    MR. COX:  Objection; calls for
11  speculation.
12    THE WITNESS:  I really don't know what
13  his discussions were with Dell one way or the
14  other.
15  BY MR. ALVAREZ:
16    Q.    Is there any reason for Mr. Felice not
17  to have a 10b-5 trading plan?
18    MR. COX:  Same objection.
19    THE WITNESS:  I really don't know what
20  his discussions with Dell were one way or the
21  other.
22  BY MR. ALVAREZ:
23    Q.    Did you think -- would it have been
24  important for your opinions -- or would it change
25  your opinion in any way if you had spoken to

Page 176

1  Mr. Felice and he told you why or why not -- why
2  not -- he didn't want a 10b-5 trading plan?  Was
3  that something you would have wanted to know in
4  formulating your opinions?
5    MR. COX:  Objection; assumes facts not
6  in evidence, no foundation, calls for
7  speculation.
8    THE WITNESS:  No, because the opinion
9  I'm rendering is simply whether it's in their
10  economic interest.  All I need is the data
11  for that.  I don't need a conversation.
12  BY MR. ALVAREZ:
13    Q.    Do you have any opinion as to -- from
14  the perspective of the shareholders, would it be
15  better for executives to trade most of their shares
16  in a short period of time or over time?
17    A.    I think that would be speculative and
18  be facts and circumstances.
19    Q.    Let me ask you this -- going to
20  paragraph 104.
21    A.    Okay.
22    Q.    So you say, "The actions of Mr. Felice
23  are consistent with academic research on stock
24  option exercise behavior by senior executives.
25  Obviously, executives will only exercise if the

Dr. Glenn Hubbard

Page 205

1  second half of fiscal year of '12?
2      A.   I don't recall doing that.  I mean, I
3  recall looking at the earnings calls, which I talked
4  about here, which clearly discussed the issues.  So
5  it was out in the marketplace.
6      Q.   It doesn't look like you cited any
7  internal Dell documents for any support here; right?
8          MR. COX:  Objection; vague and
9  ambiguous.
10          THE WITNESS:  I don't know why I
11          would.  I had the earnings calls.  That would
12          have been released to the market.
13  BY MR. ALVAREZ:
14      Q.   I understand the earnings call would
15  have been released to the market, but I guess what
16  I'm just trying to get at is that -- what if there
17  were internal e-mails that Dell had and some
18  internal information that Dell had regarding
19  low-margin products that wasn't disclosed to the
20  market?
21          Would you have wanted to know that
22  information to formulate your opinions here?
23      A.   I'm not sure why it would be relevant.
24  The market will understanded the difference in
25  revenue implications of the two strategies.  Dell's

Page 206

1  strategy was known to the market.  Ms. Davisson may
2  disagree with it, but it was known to the market.
3      Q.   What was their strategy, Dell's
4  strategy?
5      A.   To focus more on the higher margin
6  business, cutting off some of the lower margin
7  business, which might necessarily mean cutting off
8  business in some key emerging markets.
9      Q.   Was that their only strategy?  Were
10  there any other strategies that you're aware of that
11  Dell had during this time period?
12          MR. COX:  Objection.  It's vague and
13  ambiguous.
14          THE WITNESS:  There are many, but you
15          asked me about Section C.
16  BY MR. ALVAREZ:
17      Q.   Right.
18      A.   Section C is on this point, and I'm
19  answering questions on that.  If you want to flip to
20  another page, we'll talk about that page.
21      Q.   No, I'm not being broader.
22          Are you aware of any other strategies
23  that Dell had during this time period?
24          MR. COX:  Objection.  It's vague and
25  ambiguous.  It's overbroad.

Page 207

1          THE WITNESS:  Dell was in the middle
2          of a shift toward more enterprise market.  It
3          certainly realized the issues in its
4          incumbent markets.
5  BY MR. ALVAREZ:
6      Q.   Did you review any internal Dell
7  documents in the second half of fiscal year of '12
8  regarding this whole transformation and how the
9  transformation was going?
10      A.   If I'm understanding your question, I
11  don't recall that.  I'm not sure why it would be
12  relevant, but...
13      Q.   Let's go to D.  Right.  So it says,
14  "Dell's sales force was not doing well as of the
15  start of the first quarter fiscal year '13 and Dell
16  didn't disclose this to the market."
17          Did you review any internal Dell
18  documents at the end of the second half of fiscal
19  year '12 and in the beginning of the first quarter
20  of fiscal year '13 that dealt with this particular
21  topic area?
22      A.   Well, I did, in the final appendix to
23  the report, review some Dell documents.  So if you
24  look at the last page of the report on sales force
25  productivity.

Page 208

1      Q.   Okay.
2      A.   I have nothing more to say beyond
3  those statements.  I can read them.
4      Q.   Are you making some legal conclusion
5  that the statements were not false and misleading?
6  That's what it says, "Why the statements were not
7  false or misleading."
8          MR. COX:  Objection.  It's
9  argumentative.
10          THE WITNESS:  Everything I can do is
11          only from an economic perspective.  I'm not a
12          lawyer.
13  BY MR. ALVAREZ:
14      Q.   So when you put here "Why these
15  statements were not false and misleading," to be
16  clear, it's from an economic perspective only.
17      A.   Correct.  Obviously --
18      Q.   Okay.
19      A.   -- the jury will find whatever it
20  finds about what's false and misleading.
21      Q.   So did you actually review all these
22  e-mails here that you cite on Appendix D3?
23      A.   These were the questions I asked given
24  Ms. Davisson's report and the information that I got
25  back.

**Page 205..208**

Dr. Glenn Hubbard

City of Pontiac General Employees'
Retirement System vs. Dell Inc., et al.

Page 209

1  Q.   So you say "the questions that I
2  asked."
3        Who are you asking these questions to?
4  A.   Of the Analysis Group staff who worked
5  under my direction.
6  Q.   Like with respect to -- let's just
7  take the first one, "Sales force productivity."  So
8  what do you recall asking the Analysis Group
9  regarding sales force productivity?  What did you
10 want to know?
11 A.   I wanted to know, given the statements
12 she alleged were misleading, could Dell measure
13 sales force productivity, over what period, over
14 what period was that productivity supposed to be
15 expected?  That would be in internal documents, and
16 this is my summary of those documents.
17 Q.   Right here -- so with respect to --
18 okay.
19       So then you asked the questions of the
20 Analysis Group, and then the Analysis Group went --
21 did some research or analysis, and then they gave
22 you these certain internal documents that answered
23 your question?
24 A.   Correct.
25 Q.   So let me ask you this:  Are you

Page 210

1  saying this is an economic analysis, D3, sales force
2  productivity?  This entire thing is an economic
3  analysis?  Because the way I read it, it says,
4  "Allegedly false and misleading statements"; right?
5  And then it says, "Why these statements were not
6  false and misleading."
7        How is this an economic analysis?
8  A.   It's economic because they're economic
9  questions like can you measure sales force
10 productivity, over what time period, do you expect
11 it to be profitable?  Those are fundamentally
12 economic, and those are asked and answered.
13 Q.   So are you opining on sales force
14 productivity?
15       MR. COX:  Objection.  It's vague and
16 ambiguous.  His opinions are set forth in his
17 report and testimony he's provided.
18       THE WITNESS:  I have no idea what that
19 even means.  It's a factor you raised.  Your
20 expert made some specific allegations, and
21 I'm looking at them from an economic
22 perspective.  I don't even know whether it's
23 interesting, but you raised it.
24 BY MR. ALVAREZ:
25 Q.   Have you ever been retained to provide

Page 211

1  any expert testimony on a sales -- a company's sales
2  force productivity and how it can be measured?
3  A.   I have been very much in the trenches
4  on sales force productivity from my work as a
5  director at ADP.
6  Q.   I didn't ask you that.
7        I said have you ever been retained?
8  A.   No, but I'm telling you I have
9  practical experience.
10 Q.   Thank you.
11       Let's go to 75, E, "Opinions related
12 to:  'Dell's growing inventory as of the start of 1Q
13 fiscal year '13.'
14       Did you review any documents --
15 internal Dell documents in the second half of fiscal
16 year '12 and the start of the first quarter of
17 fiscal year '13 regarding this particular topic?
18 A.   It's my recollection, no, I wouldn't
19 have needed to for the discussion that's here.
20 Q.   So let's go to 79, F.  It says,
21 "Dell's revenue forecast did not take into account
22 changing PC market conditions as of the start of 1Q
23 fiscal year '13."
24       Same question:  Did you review any
25 internal Dell documents in the second half of fiscal

Page 212

1  year '13 going into the first part of the first
2  quarter fiscal year '13?
3  A.   Not to my recollection.  It wouldn't
4  have been necessary to disprove her point here.
5  Q.   What about -- let's turn to 82, G.
6  "Dell's enterprise transformation was not
7  progressing as planned."
8        Did you review any internal Dell
9  documents regarding the second half of fiscal year
10 '12 going into the first quarter of fiscal year '13?
11       MR. COX:  Are you asking him in
12 connection with his assignment in this matter
13 or the work he's done in the prior appraisal
14 case?
15       MR. ALVAREZ:  This matter.  I don't
16 care about that other case.
17       THE WITNESS:  In this matter, I didn't
18 separately do that.  It was obviously a big
19 deal in the appraisal case.
20 BY MR. ALVAREZ:
21 Q.   I understand that.  It may well be,
22 but we have nothing to do with that case; right?
23       You understand that?
24 A.   Okay.  But you asked me about my
25 knowledge base.

Dr. Glenn Hubbard

Page 213

1    Q.    I said -- okay.  Then I stand
2  corrected.  I'm just referring to this particular
3  case.
4    A.    Okay.
5    Q.    And the answer is no?
6        MR. COX:  Ask the question again.
7  BY MR. ALVAREZ:
8    Q.    You did not review any internal Dell
9  documents regarding -- in the second half of fiscal
10  year '12 going into the first quarter of fiscal year
11  '13 regarding Dell's enterprise transformation was
12  not progressing as planned, for this case only?
13    A.    My recollection, no, it wouldn't have
14  been necessary for this case, but I have certainly
15  reviewed those in the past.
16    Q.    So then let me show you what has been
17  previously marked as 501.
18        (Exhibit 501, Previously marked.)
19  BY MR. ALVAREZ:
20    Q.    Do you recognize 501?
21    A.    Yes.
22    Q.    And this is the expert rebuttal report
23  of Valerie Davisson dated October 22, 2018; correct?
24    A.    Yes.
25    Q.    And you said you did have an

Page 214

1  opportunity to review this and, after you reviewed
2  it, it still didn't change the opinions set forth in
3  your original report; correct?
4    A.    Correct.  She essentially just doubled
5  down, so there's no disagreement from my previous
6  report.
7    Q.    Just we have a clear record here of
8  everything, just like with Dr. Nye's rebuttal
9  report, can you tell me what criticism you have of
10  Ms. Davisson's rebuttal report in a nutshell?
11    A.    Should we just go through her sections
12  of the rebuttal report?
13    Q.    Yes.  Yes.
14    A.    Starts at page 55.
15    Q.    I'm sorry.  I wasn't clear.  As it
16  only relates to you, not everybody else.  Sorry.
17    A.    Yes.
18        So basically this first section on
19  "Hubbard's belief that Davisson opined that Dell
20  failed to disclose that the PC market did not look
21  strong," with respect, this is just a regurgitation
22  of her previous argument.  It was wrong before; it's
23  still wrong.
24    Q.    You say it's wrong before, and it's
25  just wrong based on everything that you have only

Page 215

1  listed in your original report; is that correct?
2    A.    Correct.  Or in my answers to you when
3  you asked me about it.
4    Q.    Yes.  Okay.
5    A.    And then "Hubbard's belief that
6  Davisson opined that Dell should have focused on
7  low-margin products," again, I -- I think she's just
8  doubling down here.  I didn't find it persuasive.
9  It's the same problem I raised before.
10        Shall I just keep going?
11    Q.    Please.
12    A.    Number 3 was "Hubbard's belief that
13  Davisson opined that Dell failed to disclose that
14  its sales force wasn't doing well."
15        She notes that I had noted that Dell
16  had been guiding down, and then she simply repeats
17  some points she made about hiring from the first
18  report.  Wasn't persuasive to me then; it's not
19  persuasive to me now.
20        Number 4 is a little bit more.
21  "Hubbard's belief that Davisson opined that Dell
22  failed to disclose that its inventory was growing."
23  This is kind of a highly in-the-weeds fight that
24  isn't worth having, but I'll take any battle brought
25  to me.

Page 216

1        So basically she makes a number of
2  errors conflating the time period she used in her
3  first report and this report, the data sources she
4  used.  It's not really a big deal one way or the
5  other, but the points that I made in the first
6  report, that, for two of three suppliers, inventory
7  was rising, it is.
8        The economic point that she misses, in
9  both report and this report, none of that even
10  matters because the real issue is that inventory was
11  not just for Dell and not just for particular
12  products.  All the statements she was trying to make
13  were worthless to begin with.  Same view as my
14  first -- first report.
15    Q.    Okay.  Let me stop you there.
16        You said that some of your
17  criticisms -- there were two other ones, you said
18  the time period and the data sources.  So -- I know
19  you said ultimately they're irrelevant, but can we
20  talk about those.
21        What did you mean by "the time
22  period"?
23    A.    My recollection here, and it's not an
24  important point, so I may not remember everything,
25  but she uses two different time periods between her

# EXHIBIT 2

# City of Pontiac General Employees' Retirement System vs. Dell Inc., et al.

## Videotaped Deposition of
## SHANNON CROSS
## November 29, 2018



www.aptusCR.com / 866.999.8310

Shannon Cross

City of Pontiac General Employees'
Retirement System vs. Dell Inc., et al.

**Page 1**

```
1              UNITED STATES DISTRICT COURT
2       WESTERN DISTRICT OF TEXAS - AUSTIN DIVISION
3              CASE NO. 1:15-CV-00374-LY
4  -------------------------------------------------
5  CITY OF PONTIAC GENERAL
6  EMPLOYEES' RETIREMENT SYSTEM,
7  Individually and on Behalf of All Others
8  Similarly Situated,
9              Plaintiffs,
10         -vs-
11 DELL INC., et al.
12          Defendants.
13 -------------------------------------------------
14              90 PARK AVENUE
15            NEW YORK, NEW YORK
16       November 29, 2018 - 8:19 a.m.
17
18     VIDEOTAPED DEPOSITION of Shannon Cross,
19 before S. Arielle Santos, Certified Court
20 Reporter, Certified LiveNote Reporter and Notary
21 Public.
22
23
24
25 JOB NO.  10049069
```

**Page 2**

```
1                 APPEARANCES:
2
3  COUNSEL FOR PLAINTIFF:
4  BY - LAURIE LARGENT, ESQ.
5  BY - RACHEL COCALIS, ESQ.
6  ROBBINS GELLER RUDMAN & DOWD LLP
7  655 West Broadway, Suite 1900
8  San Diego, CA  92101
9  Llargent@rgrdlaw.com
10 Rcocalis@rgrdlaw.com
11
12 COUNSEL FOR DEFENDANT:
13 BY - JOHN LATHAM, ESQ.
14 BY - SUSAN HURD, ESQ.
15 BY - CHRISTINA BORTZ, ESQ.
16 ALSTON & BIRD LLP
17 1201 W. Peachtree Street
18 Atlanta, GA  30309-3424
19 John.latham@alston.com
20 Susan.hurd@alston.com
21 Christina.bortz@alston.com
22
23
24
25
```

**Page 3**

```
1            APPEARANCES (CONT.)
2
3  ALSO PRESENT:
4  ROB CROSS
5  TOM BROWN, In-House Counsel,
6         Dell (Telephonically)
7  DANIEL ORTEGA, Videographer
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
1
2
3                  INDEX
4  SHANNON CROSS                              7
5       BY MS. LARGENT
6
7
8       EXHIBITS MARKED - ATTACHED
9  Exhibit 515 - report                     16
10 Exhibit 516 - Updated Shannon Cross Fees  24
11      and Hours, Bates Cross 0001745
12      through 746
13 Exhibit 517 - subpoena to produce         41
14      documents, to Shannon Cross
15 Exhibit 518 - amended Appendix B to       91
16      report
17 Exhibit 519 - Bates Cross 69, F4/Q12     172
18      Preview Other Commodities
19      Offset HDD Pressure,
20      February 17, 2012
21 Exhibit 520 - Cross Research CROSSfire,   228
22      Quick Take on F4/Q12 Results,
23      dated February 21, 2012
24 Exhibit 521 - Cross earnings review,      232
25      February 22, 2012
```

Shannon Cross

City of Pontiac General Employees'
Retirement System vs. Dell Inc., et al.

Page 17

1 the complete basis for your opinions in
2 this case?
3     A    Well, the -- because I have now
4 reviewed her rebuttal opinion and her
5 deposition, there may be incremental
6 thoughts that I have related to that --
7 there are incremental thoughts.
8     Q    Okay.
9         And I am trying to make a
10 distinction between opinions and
11 thoughts.  So I guess my question to you
12 is, do you have any supplemental opinions
13 or amendments to the opinions that you
14 have already given as a result of reading
15 Ms. Davisson's rebuttal report or viewing
16 the documents cited in the rebuttal
17 report?
18         MR. LATHAM:  Object to the
19     form of the question.
20         THE WITNESS:  No -- no change
21     to my opinion that there's no
22     indication of fraud or any -- you
23     know, that I would have changed my
24     opinions on the stock because
25     of -- you know, there's no change

Page 18

1     to that, no.
2 BY MS. LARGENT:
3     Q    Okay.
4     A    I have thoughts about what she
5 said in her deposition and what she said
6 in her rebuttal report.
7     Q    Okay.
8     A    But there's no change to my
9 fundamental belief that there's no case
10 here.
11     Q    Are you prepared to talk about
12 those thoughts today?
13     A    Yes.
14     Q    Okay.
15         Was that work that you were
16 asked to do in connection with this
17 engagement?
18     A    Yes, I was asked to review her
19 rebuttal report and I did it in
20 preparation for the deposition and then
21 also, you know, to review her deposition.
22     Q    Okay.
23         Did you prepare any written
24 documents in connection with your
25 review -- in connection with your

Page 19

1 thoughts about the rebuttal report?
2     A    No.
3     Q    Okay.
4         So at this point, you don't have
5 any plans to change your opinions or add
6 to them or amend to them?
7         MR. LATHAM:  Object to the
8     form of the question.
9         THE WITNESS:  No.
10 BY MS. LARGENT:
11     Q    When were you retained in this
12 case?
13     A    It was early August of 2018.
14     Q    And is this case your first time
15 serving as an expert witness in
16 litigation?
17     A    Yes.
18     Q    And what made you choose to do
19 that?
20     A    I was contacted by Susan Hurd.
21 She explained, you know, that they were
22 looking for an expert witness.  We
23 reviewed the complaint and based upon my
24 years of coverage of Dell, understanding
25 of what went on during that period of

Page 20

1 time, I thought the complaint was
2 baseless and so I felt that this was
3 something that I wanted -- that I felt
4 comfortable getting behind.
5     Q    Okay.
6         So -- so was that a conclusion
7 that you came to prior to being retained
8 by the defendants in this case?
9     A    No.  It was a conclusion that I
10 came to when I read it and I thought, you
11 know, this doesn't fit anything that I
12 have seen from the company or that I
13 remember from the time period and so, you
14 know, I would say what I have reviewed
15 since then in the preparation of this
16 expert report and following that has, you
17 know, definitely led me to that
18 conclusion.
19         My initial take was this doesn't
20 make any sense.  It's beyond sort of what
21 I know of management and how -- what went
22 on in that time period and it was a very
23 chaotic time period in the industry.
24         And so, you know, once in -- but I
25 am now definitely of that opinion after

Shannon Cross

City of Pontiac General Employees'
Retirement System vs. Dell Inc., et al.

Page 29

1 economic analysis?
2    Q    Like any models, revenue models,
3 forecast models.
4    A    I mean, we put together -- I --
5 we looked at -- it was more actuals.  So
6 we didn't do any forecast models given it
7 was many years ago.  I don't think there
8 was anything that was done that I would
9 say was particularly, like, involved
10 Excel macros or anything like that.
11        It was more taking data and
12 looking at the data, you know, that
13 occurred at the time.
14    Q    Okay.
15        And you covered Dell since 2004;
16 is that correct?
17    A    Yes.
18    Q    Okay.
19        So you were actively covering
20 Dell before the class period in this case
21 and during the class period in this case?
22    A    Yes.
23    Q    Okay.
24        And so the documents that you
25 analyzed in connection with your

Page 30

1 opinions -- I mean, did you learn
2 anything different from them about --
3 about the industry issues at the time of
4 the class period?
5        MR. LATHAM:  Object to form.
6        THE WITNESS:  No, I think
7    that -- I mean, again, I refreshed
8    my memory would be a better way of
9    putting it.  You know, we lived
10    through it, so we knew what
11    happened with HDDs.
12        I mean, I remember seeing the
13    pictures of the floods hitting and
14    that -- and realizing it was going
15    to be an issue.  So it was much
16    more sort of a reminder, a
17    historical review of what we had
18    gone through in the past.
19 BY MS. LARGENT:
20    Q    So no new information in
21 reviewing or analyzing the documents that
22 you reviewed in connection with your
23 opinions in this case?
24        MR. LATHAM:  Objection to the
25    form of the question.

Page 31

1        THE WITNESS:  I may have
2    looked a little more deeply into
3    Lenovo's results or something,
4    but, no, nothing -- nothing that
5    material.
6 BY MS. LARGENT:
7    Q    Okay.
8        I want to go over some of these
9 folks who are identified in Exhibit 516.
10        So we have you.  S. Cross, I
11 take it that's you?
12    A    Yes.
13    Q    We have R. Cross.  Is that
14 Robert Cross?
15    A    That is, yes.
16    Q    Robert Cross is with us today
17 here in the room?
18    A    Yes.
19    Q    Are you related?
20    A    Yes.
21    Q    Is he your husband?
22    A    Yes.
23    Q    Okay.
24    A    We have had some people who
25 thought brother and sister.  A little

Page 32

1 strange with our kids, but, yes, he is my
2 husband.
3    Q    And are you -- is -- is Mr.
4 Cross also a founder of Cross Research?
5    A    Yes, he is.
6    Q    Are there any other founders
7 besides the two of you?
8    A    No.
9    Q    And who is S. Fox?
10    A    That is Steven Fox.  He's
11 another senior analyst at our firm.
12    Q    Looks like Mr. Fox only spent
13 four hours on the engagement?
14    A    He -- yes, he basically -- he
15 covered -- directly covered the HDD
16 industry at that point in time, so he
17 brought him in to do, you know, some --
18 again, refresh of what went on during
19 that period of time.  So that was his
20 scope in the engagement.
21    Q    Okay.
22        And then there is an A. Ellis.
23 Who is that?
24    A    Ashley Ellis.  She is my most
25 senior junior analyst.

Shannon Cross

Page 41

1   Q   I am handing you what's been
2 marked as Exhibit 517.
3       For the record, Exhibit 517 is a
4 subpoena to produce documents, to
5 Shannon Cross.
6       Take a look at Exhibit 517, Ms.
7 Cross, and let me know when you are done.
8   A   (Reviewing.)
9       (Exhibit 517 is Marked.)
10      THE WITNESS:  I am done.
11 BY MS. LARGENT:
12   Q   Okay.
13       Ms. Cross, have you seen
14 Exhibit 517 before?
15   A   Yes.
16   Q   And when was the first time you
17 saw it?
18   A   I am not sure on the exact date.
19 The attorney sent it to me, I would
20 assume correctly, you know, right after
21 you sent it to them.
22   Q   Okay.
23       And did you understand that it
24 was a request by my office for you to
25 produce certain documents?

Page 42

1   A   Yes.
2   Q   Okay.
3       If you will turn to page -- it's
4 actually, I think, an exhibit -- or no,
5 it's on page 7 -- starting on page 7,
6 under Roman Numeral number V.
7   A   Documents requested.
8   Q   Do you see that?
9   A   Yes.
10   Q   Okay.
11       I want to talk about request
12 number 2, which is on the next page.
13   A   (Reviewing.)
14   Q   Did you search for documents
15 responsive to that category?
16   A   Yes.
17   Q   Okay.
18       And what did you do to search
19 for documents?
20   A   We looked through our files.  At
21 that point in time, because of our
22 document retention policy, we did not
23 have access to our e-mails.  We as a firm
24 have a policy of not using text messages
25 to communicate with anybody because it's

Page 43

1 difficult to track them.  So we don't
2 have text messages.
3       We have no records of phone
4 calls other than what we did provide was
5 our calendars and the calendars on there
6 had some references to phone
7 conversations.
8       We looked through -- in terms of
9 notes, we looked through all the file
10 cabinets and everything and we did
11 provide whatever we still had.
12       We had gone through two moves as
13 a firm and I am notoriously bad at
14 keeping notes.  So the way I take notes
15 is sort of on a running basis and I tend
16 to throw them away after I am on a
17 conference call.
18       It's probably one of my
19 shortcomings, frankly, because if I ever
20 get hit by a bus, there's an issue.  You
21 know, in terms of the way our business
22 works, we are always sort of looking
23 prospective, not retrospective.
24       And so, you know, we sort of had
25 cleaned things out.  It would be similar

Page 44

1 for other companies, frankly.  What we
2 tend to keep are, and which you were able
3 to receive, were all of our Cross
4 Research analyst reports, which would be
5 a history of our thoughts on the company
6 at the time, including our models,
7 because they are hard-copy printed on the
8 back.
9   Q   All right.  I am going to break
10 that down a little bit.
11   A   Okay.
12   Q   I think you had mentioned that
13 you didn't have access to e-mails because
14 of the firm's retention policy; is that
15 correct?
16   A   That is correct.
17   Q   And what did you mean by that?
18   A   Again, it goes back to the class
19 period.  It was several years ago, and
20 you know, we have a policy of -- I am not
21 sure and I am not in charge of this.
22 Actually, it's three to six years.
23       We have an outside compliance
24 consultant e-mail retention, and -- so we
25 just don't -- I don't have access to

Page 45

1 them.
2    Q   In 2000 -- I'm sorry.  So when
3 you say you don't have access to them,
4 does that mean, like, that they have been
5 destroyed?
6    A   We literally don't have them
7 anymore.  They are gone from that period
8 of time.  I think our e-mail goes back
9 like three years.
10    Q   Okay.
11       There's no backup tapes for your
12 e-mail system that go back to 2012?
13    A   No. No. No.
14    Q   In 2012, did you e-mail with
15 Dell management?
16    A   I would have -- I don't think I
17 ever e-mailed with Dell senior
18 management, like, the named defendants.
19       Sorry.
20       I would have e-mailed with
21 investor relations.
22    Q   And who in investors relations
23 did you speak with mostly during that
24 time period?
25    A   Rob Williams, David Mehok.  Mike

Page 46

1 McMullen, I believe, was there during the
2 time.
3    Q   So there would have been e-mails
4 from 2012 with respect to communications
5 between you and Dell's investor
6 relations?
7    A   Yes, although I don't think --
8 actually, I don't know.  Yes, there would
9 have been some, probably around
10 scheduling meetings or, you know, calls
11 after earnings, things like that.
12    Q   Okay.
13       During 2012, did your husband
14 sit in on conference calls with you?
15    A   Yes -- I mean, the earning
16 calls?
17    Q   Yes.
18    A   Yes.  What -- actually, let
19 me -- can you define "sit in," because
20 it's a dial in call, so...
21    Q   Okay.
22       Describe for me how you do that.
23    A   I just want to be clear.  So
24 basically with an earnings call, you can
25 either listen into it on the web.  In

Page 47

1 which case, you don't have the ability to
2 ask a question.  Or you can listen to
3 it -- like, I dial in.  I give them my
4 name.  And then they put me into the Q&A
5 roster, the queue.
6       So I don't remember specifically
7 back then.  Typically, my husband Rob
8 will either sit in with me and, you know,
9 just sit in while I ask questions or he
10 will listen to the dial-in.
11       A lot of times he listens --
12 just goes through the dial-in and stays
13 in his office.
14    Q   Okay.
15       Do you know whether Rob took
16 notes during the conference call?
17    A   No.  I know he does not take
18 notes during the conference call.
19    Q   Okay.
20       And when you had calls with
21 Dell's investor relations department, did
22 you take notes with regard to any of
23 those calls?
24    A   If I would have taken notes,
25 that is the kind of note where I just jot

Page 48

1 a few things down, and then I typically
2 throw them away.
3    Q   Does your firm have a retention
4 policy with respect to hard copy notes
5 or --
6    A   No, the retention policy we have
7 with respect to reports or written
8 documents is purely we keep all of the
9 reports that we have written, but not --
10 when I talk about reports, those are --
11 they say "Cross Research" across the top.
12       No, we don't have that retention
13 policy in those that I am aware of.
14    Q   Okay.
15       When you say you made two moves,
16 you have made two moves since 2012?
17    A   Correct.
18    Q   Okay.
19    A   To be specific, one was a move
20 to literally a new space, and the second
21 move was we cut our office in half
22 because we had more space than we needed
23 and both of those times we, you know,
24 sort of went through stuff and got rid of
25 it.

Shannon Cross

City of Pontiac General Employees'
Retirement System vs. Dell Inc., et al.

Page 261

1  **to you?**
2       A    If -- if it had been a dramatic
3  change from typical seasonality and if it
4  had been something where they believed
5  for some reason it would continue, then
6  that's something, you know, would have
7  been of a concern but what happens in
8  one quarter -- again, because so much of
9  it becomes one was Christmas, one was
10  back to school -- it's one of the things
11  that I think Ms. Davisson, because she is
12  an industrial analyst, she thinks about
13  things sequentially much more so than
14  analysts looking at tech.  We tend to
15  think about things on a year-to-year
16  basis.
17       Because there are just seasonal
18  puts and takes that happen every year
19  that we think about.  So I think that
20  the -- the other thing is if there was a
21  slowdown and they still had incorporated
22  that slowdown into their guidance -- and
23  remember, they gave us 4.9 billion so
24  they hadn't pulled guidance for that
25  quarter -- then, no, I don't think we

Page 262

1  needed to know.
2       They are only three weeks into
3  the quarter at that time.  One of the
4  things I think they believed and we
5  believed was that there was going to be
6  an improving availability and demand for
7  PCs through the first quarter as sort of
8  the HDD issues found their way through
9  and that didn't come to fruition.
10       **Q    Do you spend your time on**
11  **conference calls asking questions that**
12  **aren't important to you?**
13       A    No.  No.
14       **Q    Linearity was an issue or**
15  **linearity was an issue --**
16       (Simultaneous Crosstalk.)
17       A    I ask that question -- I
18  probably asked that question to, you
19  know, companies -- I may not ask it every
20  quarter to every company, but I ask it
21  all the time.  It's kind of one of my
22  questions.
23       **Q    So it's important?**
24       A    Yeah, but it's probably arguably
25  more important -- when I ask the software

Page 263

1  company, how is linearity in the quarter,
2  you know, they -- you get more nervous if
3  they are like, oh, it was a real hockey
4  stick at the end of the quarter because
5  that means they gave stuff away.
6       But it tends to be one of my
7  go-to questions for companies when you're
8  asking.
9       **Q    So what I am trying to**
10  **understand is, is it -- is it a question**
11  **that you care about, or is it just a**
12  **thoughtless routine question that you**
13  **ask?**
14       A    It's not a thoughtless routine
15  question.  I think what happened here in
16  the answer they gave a ton of color and
17  they talked a lot about -- so it's not,
18  you know -- I could have come back and
19  said, you know, what did you think about
20  linearity but they had given us so much
21  information and, you know, frankly, you
22  also don't want to be a conference hog.
23       You want to be polite on the
24  calls.  You know, we -- you want to have
25  a good working relationship with

Page 264

1  companies, and so you do push them on
2  things, but, you know, I was curious what
3  they were seeing in terms of in demand
4  and clearly, from what they gave us, it
5  was mixed.
6       **Q    Okay.**
7       **So let's look a little bit at**
8  **the responses that you got.**
9       **I want to talk about Felice's**
10  **response.  He says -- the first sentence**
11  **I want to read it -- first couple of**
12  **sentences.**
13       **"Well, you know, there's not a**
14  **lot to add there.  In Europe, I would say**
15  **we are seeing some definite growth ahead**
16  **of what appears to be market conditions."**
17       **And I think in your report, you**
18  **just testified that you believed that to**
19  **be a historical comment on the fourth**
20  **quarter 2012 and not what they were**
21  **seeing in the first quarter 2013.**
22       **Was that your opinion?**
23       A    My opinion is that he was
24  talking about it.  He was not talking
25  about it.  But it doesn't mean it wasn't

Page 297

1  you say, "Based upon my knowledge and
2  experience as an analyst covering Dell,
3  and my review of the statements made
4  during the May earnings call and related
5  analyst reports, it is my opinion that no
6  new information came to light on that
7  call that led me to believe that I had
8  been misled regarding Dell or its future
9  prospects going into Q1 fiscal year '13."
10        Do you see that?
11   A   Yes.
12   Q   And are you giving an expert
13  opinion as to whether the defendants in
14  this case made any false or misleading
15  statements?
16   A   That's not what I was -- what I
17  was brought on to do.  To the best of my
18  knowledge, though, I have not seen any
19  false or misleading statements within the
20  documents that I have looked at.
21   Q   But you are not giving any
22  expert opinion as to whether defendants
23  in this case made false and misleading
24  statements in violations of the
25  securities law, right?

Page 298

1   A   No.
2   Q   You are not a lawyer, correct?
3   A   No.
4   Q   And is it something you feel
5  you're qualified to do, to opine on
6  whether or not defendants gave false or
7  misleading statements?
8   A   No.
9   Q   So is your belief that you were
10  not misled by management, a personal
11  belief?
12   A   Yes.
13   Q   And you are not speaking on
14  behalf of other analysts, are you?
15   A   No.
16   Q   If you turn to paragraph 91,
17  which is on page 47 -- oh, I'm sorry.  It
18  starts on page 46 --
19   A   Hm-hm.
20   Q   -- but the sentence I want to
21  ask you about is similar to the one we
22  just looked at.
23        It says, "Therefore, I do not
24  see Mr. Felice's Q4 fiscal year '12
25  commentary is either fraudulent or

Page 299

1  inaccurate."
2        And so, again, I want to ask you
3  if you're opining as to whether Mr.
4  Felice made any false or misleading
5  statements in the context of securities
6  laws?
7   A   No.
8   Q   And so that statement is also
9  your personal opinion, correct?
10   A   Yes.
11   Q   If you were -- if you accused
12  Dell of being misleading or any of its
13  management to be misleading, would that
14  impact your relationship with Dell?
15   A   No.  I mean, it would -- again,
16  my -- well, it might impact my
17  relationship with Dell, but it wouldn't
18  impact my overall business because my
19  business is paid by my clients.  I don't
20  receive any revenue from Dell.
21        MS. LARGENT:  Okay.
22        I don't have anything else.
23        (Whereupon a Discussion is
24  Held Off the Record.)
25        MR. LATHAM:  Okay.

Page 300

1        I think that's fine.
2        MS. LARGENT:  Okay.
3        MS. HURD:  She will read and
4  sign.
5        THE VIDEOGRAPHER:  The time
6  right now is 3:24 p.m.
7        We are off the record.
8        (Whereupon Testimony
9  Concluded at 3:24 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

# EXHIBIT 3

# City of Pontiac General Employees' Retirement System vs. Dell Inc., et al.

## Videotaped Deposition of
## GEORGE FOSTER
## November 20, 2018
## ***CONFIDENTIAL***



www.aptusCR.com / 866.999.8310

**Page 1**

```
 1            UNITED STATES DISTRICT COURT
 2         FOR THE WESTERN DISTRICT OF TEXAS
 3                  AUSTIN DIVISION
 4    -------------------------------x
 5    CITY OF PONTIAC GENERAL
      EMPLOYEES' RETIREMENT
 6    SYSTEM,
 7    Individually and on Behalf
      of All Others Similarly
 8    Situated,
 9              Plaintiffs,
10       vs.          No. 1:15-cv-00374-LY
11    DELL, INC., et al.,
12              Defendants.
13    -------------------------------x
14          ***CONFIDENTIAL***
15       VIDEOTAPED DEPOSITION OF GEORGE FOSTER
16
17    DATE:        November 20, 2018
18    TIME:        9:06 a.m.
19    LOCATION:    ALSTON & BIRD LLP
                   1950 University Avenue, 5th Floor
20                 East Palo Alto, California 94303
21
22
23    Reported By:
24    Lynne Ledanois, CSR 6811
25    Job No. 10049068
```

**Page 2**

```
 1          A P P E A R A N C E S:
 2
 3    On Behalf of the Plaintiffs:
 4    ROBBINS GELLER RUDMAN & DOWD LLP
      BY: X. JAY ALVAREZ, ESQ.
 5        STEVEN M. JODLOWSKI, ESQ.
      655 West Broadway, Suite 1900
 6    San Diego, California 92101
      619.230.1058
 7    jalvarez@rgrdlaw.com
      sjodlowski@rgrdlaw.com
 8
 9
10    On Behalf of the Defendants:
11    ALSTON & BIRD LLP
      BY: SUSAN HURD, ESQ.
12        CHARLES COX, ESQ.
          ANDREW T. SUMNER, ESQ.
13    1201 West Peachtree Street
      Atlanta, Georgia 30309
14    404.881.7000
      john.latham@alston.com
15    charles.cox@alston.com
      andy.sumner@alston.com
16
17
18    Also Present: Lorenzo Fernandez-Kopec,
19    Videographer
20    Bruce Deal, Analysis Group
21    Daniel B. Deisenroth, Analysis Group
22
23
24
25
```

**Page 3**

```
 1       I N D E X   O F   E X A M I N A T I O N
 2    Examination by:                    Page
 3       MR. ALVAREZ                      7
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1       I N D E X   O F   E X H I B I T S
 2    Deposition      Description          Page
 3    Exhibit 513 Expert Report of George
 4                Foster;                    7
 5    Exhibit 514 Document headed, Undated
 6                George Foster Fees and
 7                Hours;                    210
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

George Foster

Page 13

1    Q    So you mentioned --
2         MS. HURD:  I'm sorry, were you done
3    with your answer?
4         THE WITNESS:  Yes.
5         MS. HURD:  Okay.
6         THE WITNESS:  That's the start of the
7    process.
8  BY MR. ALVAREZ:
9    Q    And we'll get to that in detail later
10   on, but you made a couple of comments.
11        You said that the strategic plan
12   includes -- or incorporates acquisitions and new
13   products.  What acquisitions are you referring
14   to in this three-year strategic plan?
15   A    Well, Dell is looking at repositioning
16   their strategies to take more of an enterprise
17   approach, so they are trying to acquire
18   companies that have products or services that
19   would be appealing to enterprise companies.
20   Q    I understand that.  Do you have any
21   understanding as to what acquisitions
22   specifically they were targeting under the
23   strategic plan that you just referenced?
24        MS. HURD:  What time period are we
25   talking about here?

Page 14

1  BY MR. ALVAREZ:
2    Q    The three-year strategic plan that
3    you've just testified about.
4    A    Well, in the three-year strategic
5    plan, at that stage they haven't made the
6    acquisitions.  So I'm not privy to what
7    strategic plan would have the acquisitions, but
8    they have in mind a set of companies that may be
9    attractive to the customers that they are
10   looking at.
11   Q    Well, when did the strategic plan take
12   place, when did it first start?
13   A    The strategic plan has been going on
14   with Dell for quite a few years, as I understand
15   it.  It's an ongoing process.
16   Q    So the strategic plan that you have
17   just testified about, what time period are you
18   referring to?
19   A    The strategic planning process in my
20   Exhibit 7, I outline the forecast process that
21   is the underpinning, that is part of the
22   underpinning of the fiscal '13 Q1 guidance, and
23   that takes place between February and July 2011.
24   Q    So do you know whether or not Dell
25   acquired any companies from July of 2011 to the

Page 15

1    beginning of the first quarter fiscal year '13?
2    A    I believe they acquired several
3    companies.
4    Q    Do you know which companies?
5    A    I believe one of the -- Wyse was one
6    of the acquisitions they announced.
7    Q    Do you know any other ones?
8    A    I cannot remember the specific names.
9    Q    Do you know how the implementation of
10   the Wyse Company was going with respect to
11   productivity?
12        MS. HURD:  Objection, vague and
13   ambiguous.
14        THE WITNESS:  I haven't specifically
15   examined that issue.
16   BY MR. ALVAREZ:
17   Q    You weren't asked to do that?
18   A    I haven't examined that issue.
19   Q    You didn't think it was important to
20   examine that particular issue in coming up with
21   your opinion on Exhibit 513?
22        MS. HURD:  Objection, argumentative.
23        THE WITNESS:  The Wyse acquisition is
24   part of an ongoing process that occurs
25   during fiscal '13 -- fiscal -- quarter 1

Page 16

1    fiscal '13.  And so that is embedded in the
2    analysis that is going on in the company.
3  BY MR. ALVAREZ:
4    Q    You also, with respect to this
5    strategic plan, referenced products.  What
6    products were included in the strategic plan?
7         MS. HURD:  Objection, vague.
8         THE WITNESS:  There are services and
9    products.  I haven't examined the specific
10   products that rolled out in the specific
11   plan.
12   BY MR. ALVAREZ:
13   Q    And you didn't believe that it was
14   important to examine the specific products that
15   were rolled out into the strategic plan?
16        MS. HURD:  Objection, argumentative.
17        THE WITNESS:  My analysis focused on
18   the revenues, which is an aggregation of the
19   individual products.  There are many, many
20   different products.
21   BY MR. ALVAREZ:
22   Q    Yes, but if new products were rolling
23   out during the strategic plan, wouldn't you
24   think that would be important for you to analyze
25   and look at in coming up with your opinions set

Case 1:15-cv-00374-LY   Document 177-1   Filed 04/22/19   Page 28 of 110

Confidential

George Foster

City of Pontiac General Employees'
Retirement System vs. Dell Inc., et al.

Page 17

1  forth in Exhibit 513?
2      MS. HURD:  Objection, mischaracterizes
3  his prior testimony.  Argumentative.
4      THE WITNESS:  When you're forecasting
5  a company that has many, many different
6  products in many different countries, the
7  analysis focuses on the general revenue
8  streams, not on the contribution of an
9  individual product that may be in its
10  genesis.
11 BY MR. ALVAREZ:
12     Q      Have you considered any other
13  materials for purposes of this case since you
14  completed your rebuttal report on
15  September 13th, 2018?
16     A    I've looked at the depositions of
17  Ms. Davidson on that.
18     Q      Any other depositions or is that the
19  only one you looked at?
20     A      That's the one I mainly concentrated
21  on.  I can't remember if I -- I think I saw
22  Mr. Nye's -- Dr. Nye's deposition.
23     Q      When did you read Ms. Davidson's
24  deposition?
25     A      About two weeks ago.

Page 18

1      Q      And you also said that in preparing
2  your expert report in this case, that you did
3  look at deposition transcripts; is that correct?
4      A    Yes, it is.
5      Q      And you have a list of the depositions
6  on it looks like page -- I don't know -- it must
7  be Page 7 of 11 of Appendix C.
8      A    Yes, I have it.
9      Q      So you have one, two, three, four,
10  five, six, seven, eight, nine, ten -- 11
11  depositions.  How did you go about deciding that
12  I'm going to read these 11 depositions?
13     A    Well, three of the depositions, people
14  involved that have been charged in the case.
15     Q      Who are they?
16     A    Mr. Dell, Mr. Felice, and Mr. Gladden.
17     Q      Okay.
18     A    Then I was looking at the -- they were
19  provided in part by counsel, and also when I was
20  examining the flow of documents and the emails,
21  that highlighted to me people who may have been
22  brought in to have opinions on what was the
23  corporate budgeting process at Dell.
24     Q      So let's just take the first one,
25  deposition of Jeffrey Clarke.  Do you see that?

Page 19

1      A    Yes, I do.
2      Q      Did you review his deposition in its
3  entirety?
4      I'm sorry, it's right there, 7 of 11.
5  That one right there.
6      A    Yeah, I know.
7      MS. HURD:  I think he's looking for
8  something else.
9      MR. ALVAREZ:  Okay.  I'm sorry.
10     MS. HURD:  That's all right.  We just
11  need to give him time.
12     MR. ALVAREZ:  That's fine.
13     Take your time, Professor.
14     THE WITNESS:  Okay.
15 BY MR. ALVAREZ:
16     Q      So before you begin, can I just --
17  what are you referencing so I can follow along
18  in your report?
19     A    Individuals cited in my report.
20     Q      You're looking at a particular chart.
21  Can I --
22     A    Yes, it's Appendix D, Glossary of key
23  terms and deposed individuals.
24     Q      Okay.  So it's Appendix B, Litigation
25  depositions, reports, and court/arbitration

Page 20

1  appearances?
2      MS. HURD:  He's looking at Appendix D.
3      MR. ALVAREZ:  My mistake.  Okay.
4      Appendix D.  I'm here.
5      Okay, I'm sorry, you were responding.
6      THE WITNESS:  Do you want to repeat
7  the question?
8      MR. ALVAREZ:  Yes, why don't we do
9  that.
10     COURT REPORTER:  Counsel, do you want
11  me to read the question back?
12     MR. ALVAREZ:  Yes, please.
13     (Record Read.)
14 BY MR. ALVAREZ:
15     Q      Let me just -- let me just ask you
16  this again so that we -- looking -- my question
17  to you was, looking at that first deposition
18  that you have listed in Appendix -- it's
19  Appendix --
20     MS. HURD:  C.
21 BY MR. ALVAREZ:
22     Q      -- C.  You have the name Jeffrey
23  Clarke.
24     A    Right.
25     Q      Did you review Mr. Clarke's deposition

Page 21

1  transcript in its entirety?
2     A    Not in its entirety, no.
3     Q    Why not?
4     A    The way I structured my analysis here
5  is that I come to the assignment with a very
6  good background in terms of understanding what
7  corporate budgeting is in large companies like
8  Dell.
9         I work with Analysis Group, three of
10  which individuals that I have worked with are
11  here.  And at the start of the assignment, I
12  gave them very explicit guidance in terms of
13  what I was looking for in terms of understanding
14  the corporate budgeting process and to show me
15  excerpts or alert me to reading the full
16  depositions of individuals.
17         I've been -- I gave them very strong
18  guidelines in terms of what I was looking for,
19  and they followed up on that, and then if I felt
20  like I needed more information, I went back and
21  asked for more information.
22     Q    For the budgeting purposes of your
23  opinion in this particular case, what guidelines
24  did you give the Analysis Group to look for in
25  these depositions?

Page 22

1     A    Well, if you have a look at my report,
2  and if you look in the -- in my report on
3  Page 16, Paragraph 42, I outlined eight criteria
4  that I have developed over time in terms of
5  evaluating a financial forecasting system which
6  includes the budgeting system.
7         And so I went through and I described
8  to individuals in the Analysis Group what I was
9  interested in in each of those categories.
10     Q    So is it a fair characterization that
11  they would go through certain depositions,
12  highlight certain aspects of those depositions
13  according to your eight criteria, and then
14  provide that information?
15     A    That was the general guiding rule.
16  And also what is the actual basics of the flow
17  of documents.
18     Q    What does that mean?
19     A    Well, a budgeting process is a
20  continuing process that occurs during a period.
21  And as you'll see in terms of my Exhibit 7, I've
22  detailed various phases that go on with Dell.
23         And during the period 2011, Dell had
24  formalized that process in the nature of a
25  playbook.  And that playbook was in some ways a

Page 23

1  very extensive document that gave me a very good
2  roadmap of what to be looking for in terms of
3  what we asked people to look for in terms of
4  deposition testimony.
5     Q    Okay.  Out of these 11 depositions
6  that you have listed, how many of those did you
7  read in their entirety?
8         MS. HURD:  Let's go back to -- so he
9  has the list in front of him.  So that's
10  Appendix C, and you guys were looking at
11  Page 7 of 11.
12         THE WITNESS:  Yes.  I -- certainly
13  Michael Dell, Steve Felice, and Bruce
14  Gladden.
15  BY MR. ALVAREZ:
16     Q    Brian Gladden?
17     A    Brian Gladden.
18         Michelle King.  Jeffrey Likosar.
19     Q    Okay.  Thank you.
20         Did you read Professor Hubbard's
21  report in this case?
22     A    Yes, I have.
23     Q    Is there anything in that report that
24  you relied upon in coming up with your opinions
25  in your report?

Page 24

1     A    No, there is not.
2     Q    Did you read the Cross report?
3     A    Yes, I have.
4     Q    Are there -- was there anything in
5  Ms. Cross's report that you relied upon in
6  drafting or coming up with your opinions?
7     A    No, there's not.
8     Q    Did you do an economic analysis of the
9  conditions Dell was facing in the second half of
10  fiscal year '12 going into the fiscal year '13
11  as compared to the same time period the prior
12  year?
13         MS. HURD:  Objection, vague and
14  ambiguous.
15         THE WITNESS:  Did I -- is the question
16  did I independently do?
17  BY MR. ALVAREZ:
18     Q    Yes.
19     A    No, I did not.
20     Q    Why not?
21     A    My assignment was to understand the
22  budgeting process in the corporate forecasting
23  of Dell and to see to what extent that was
24  reflective of what -- the information set they
25  were looking at.

George Foster

Page 37

1  we'll have a look at the period.  This is -- I'm
2  looking at my document from Paragraph 74
3  onwards, and it will go all the way up to
4  Paragraph 85.
5       And they said:  On January the 19th --
6  I'm reading Paragraph 75.
7    **Q    Okay.**
8    A    [As read]:  On January the 19th, 2012,
9  the BOT -- business operating team -- met to
10  discuss the planning that had taken place over
11  the prior month, and they provided information
12  that Dell had adjusted slightly by taking into
13  account acquisitions and investments and
14  solidified revised unhedged plan budget
15  strategic business unit reducing its forecast to
16  67.43 million.
17       And there is a flow of documents that
18  are highlighted in my report about why negative
19  information is coming through that they are
20  taking into account.
21    **Q    Do you know if they took into account**
22  **that, during this time period, that demand is**
23  **lower than they had anticipated?**
24       MS. HURD:  Objection, assumes facts
25    not in evidence.

Page 38

1       THE WITNESS:  Incorporated in that
2  flow of emails is information about what the
3  demand situation is.
4  BY MR. ALVAREZ:
5    **Q    As you sit here today, do you know**
6  **what the demand situation was during the time**
7  **period of December 11th -- December 2011 through**
8  **January 2012?**
9    A    I haven't examined the specific --
10  what Dell is saying in their general flow is
11  that demand is challenging.
12    **Q    So you didn't, though, examine for**
13  **yourself whether -- the trajectory of the demand**
14  **during the time period that you are referring to**
15  **here, December 2011 through January 2012; is**
16  **that correct?**
17       MS. HURD:  Objection, vague.
18       THE WITNESS:  I'm not attempting to
19  develop my own internal forecast of what
20  demand was during that period.
21       I'm an expert at understanding the
22  corporate budgeting process and the ways
23  corporations process information to develop
24  what they believe is appropriate forecasting
25  procedures which result in reliable numbers

Page 39

1    as the information sets that were made.
2  BY MR. ALVAREZ:
3    **Q    Well, yeah, we're going to talk in**
4  **detail about your eight points later on.  Let me**
5  **just get back to some more general stuff then.**
6       **Let's look at your resume, Exhibit A.**
7    A    Mm-hmm.
8    **Q    Is this your current and accurate**
9  **resume?**
10    A    Yes, it is.
11    **Q    Do you have anything to subtract or**
12  **add from it?**
13    A    No, I do not.
14    **Q    Your report says [as read]:  My**
15  **academic research and teaching areas include**
16  **budgeting and forecasting.**
17       **What courses that you teach cover**
18  **those areas?**
19    A    Budgeting and forecasting?
20    **Q    Yes.**
21    A    The courses I've taught over the years
22  have included -- I have a list of courses
23  taught, and this is on Page 4.
24    **Q    Okay.**
25    A    Cost accounting, cost management

Page 40

1  certainly does.  That's the -- the textbook of
2  which I'm coauthor of is used in that.  And
3  there is a chapter there on budgeting.
4       I was an author of a textbook that
5  was -- five editions of a textbook called "Cost
6  Accounting," the sixth to the tenth edition, and
7  I wrote that chapter on budgeting.
8    **Q    May I ask you this:  So when you're**
9  **talking about these textbooks, when were they**
10  **first published?**
11       MS. HURD:  Objection, vague.
12       THE WITNESS:  The first edition that I
13  was an author, coauthor on was I believe
14  1986.
15  BY MR. ALVAREZ:
16    **Q    Okay.  And was there another textbook**
17  **that you published?**
18    A    Well, I've published multiple
19  textbooks.
20    **Q    Okay.**
21    A    But the Cost Accounting book, I was on
22  the sixth, seventh, eighth, ninth and tenth
23  edition.  The tenth edition came out in 2000, I
24  believe.
25    **Q    2000.  Okay.**

**Page 37..40**

George Foster

Page 45

1  if it's a retailer, and a retailer expects to
2  have fourth quarter sales, and typically
3  retailers have an end of year that's
4  approximately January, end of January, so the
5  fourth quarter retailers is a large number
6  relative to the first, second, or third quarter.
7  So that would be what we'd call a seasonal
8  pattern in the business.
9     Q    Okay.  So when you're developing the
10  forecast, you would want to look at the seasonal
11  pattern from one period to another; is that
12  correct?
13     A    If your assumption is that once -- one
14  way which you can sort of identify seasonal
15  patterns is to look at past series of data and
16  see if there is consistently a pattern of going
17  up or going down.
18        I've done that for retailers, and you
19  will see a very large bump in that fourth
20  quarter for most of the retailers that I've
21  examined.
22     Q    And is this also true for tech
23  companies?
24     A    It varies.  I mean some tech companies
25  have seasonal patterns.

Page 46

1     Q    Does Dell have a seasonal pattern
2  during the fiscal year '12, the first quarter of
3  fiscal year '13?
4     A    Typically the first quarter of the
5  fiscal year is lower than the first quarter of
6  the fourth quarter of the prior year.
7     Q    So one of the other -- in this
8  triangulation that you were speaking about, the
9  second factor would be people in the field; is
10  that correct?
11     A    That's correct.
12     Q    And what type of information would
13  the -- would people in the field have that would
14  be used to develop a forecast?
15     A    The --
16        MS. HURD:  Objection, vague.  Sorry.
17        THE WITNESS:  You're very interested
18  in what is changing internally within the
19  company and what is potentially changing
20  externally in the company.
21        And what is changing internally in the
22  company -- I mean, if there are changes in
23  strategies in terms of new products, new
24  customers, new partnerships, that is
25  something that you're interested in that may

Page 47

1     not be reflected in past data.
2        If there is a change in the
3     environment, then that's something that you
4     may want to consider in going forward.
5  BY MR. ALVAREZ:
6     Q    So -- and you yourself have used this
7  triangulation process when looking at -- to see
8  whether or not a forecast -- I guess the
9  forecast process is rigorous; is that correct?
10     A    That's one of the things that you look
11  at is to see are you -- are you sort of putting
12  checks and balances in the system in the way
13  you're collecting the data.
14     Q    Now, have you yourself -- I'm not
15  talking about the Dell case, but in other cases,
16  have you looked at, when you're using your
17  triangulation data and you're talking about
18  people in the field, is it important for you --
19  do you ever go interview these people in the
20  field to get that information to see that the
21  forecast, you know, is -- the forecast progress
22  is rigorous?
23        MS. HURD:  Objection, compound.
24        THE WITNESS:  What context are we
25     talking in?

Page 48

1  BY MR. ALVAREZ:
2     Q    Well, I'm not talking about Dell, I'm
3  just talking about when you yourself, you said
4  that you used this triangulation process.
5     A    As a means of checks and balances.
6     Q    As a means of checks and balances,
7  yes.
8        So my question is:  When you are using
9  that process as a means of checks and balances
10  in these other cases that you've been working
11  on, do you normally go talk to the people in the
12  field to get the information from them so that
13  you can -- you could determine whether or not,
14  yes, these checks and balances are there, and
15  that their forecast process is rigorous?
16        MS. HURD:  Objection, compound.
17        THE WITNESS:  Sometimes you can look
18  at the document flow and see whether --
19  because that's -- in terms of the -- in
20  these days it's emails, so some parts that
21  you've got to -- that's a very good source
22  sometimes of what is the flow of information
23  between the people in the field.
24  BY MR. ALVAREZ:
25     Q    But is it also -- I mean, would it

George Foster

Page 49

1  also be a very good source if you actually went
2  out and talked to those people as opposed to
3  just relying on the emails?
4     A    Well, the question is how many people
5  do you interview on that.  But you could.
6        But I've often found that emails are a
7  very good source of that because people are
8  relatively careful about what they put in emails
9  in corporations in terms of -- in the budgeting
10 system.  Because budgeting systems have
11 memories.
12    Q    What do you mean by budgeting systems
13 have memories?
14    A    Well, if some person is consistently
15 optimistic, then that person will develop a
16 reputation so that when they bring the forecast
17 forward, they qualify them.
18    Q    Have you heard the term "tops-down" in
19 formulating a forecast?
20    A    Yes, I have.
21    Q    And what does that refer to?
22    A    "Tops-down" is -- it depends on the
23 context that's used.  If it's a singular
24 tops-down process, it's an imposition from a
25 part of the organization down to lower levels of

Page 50

1  the organization about what the forecast numbers
2  will be.  That would be what I would call a
3  singular tops-down approach.
4        A dual approach is where there is a
5  tops-down and bottoms-up, where it becomes a
6  much more interactive process where tops-down
7  may go first, but not necessarily, tops-down
8  goes first, and then bottoms-up comes back, and
9  then tops-down.  And they actually don't
10 necessarily sit independent of each other.
11       The idea is that over -- as the
12 process goes forward, this interaction, whether
13 it's interaction through emails, interaction in
14 meetings, interactions with phone calls or
15 whatever.
16    Q    Are there any pros or cons with
17 respect to a tops-down approach?
18       MS. HURD:  Objection, vague.
19       THE WITNESS:  Tops-down -- is the
20 question the tops-down approach singularly,
21 or tops-down approach as part of a co --
22 comprehensive budgeting approach?
23 BY MR. ALVAREZ:
24    Q    How about let's go with the second.
25    A    Well, one of the reasons that

Page 51

1  companies do this -- there are several reasons
2  why they do this -- is that it's typically the
3  tops-down people who know more about where the
4  strategic direction of the company is heading.
5        So if, for instance, the company has
6  made a strategy to exit a country for political
7  reasons, say, then they don't want the
8  bottom-down people to continually start
9  preparing budgets not knowing that information.
10       So that's what you would call an
11 efficiency reason for doing that.
12       They also have information about where
13 they see the potential resources that could be
14 provided to people down in the field.
15       So typically both have valuable
16 information, the top-down and the bottom have
17 valuable information.  The idea is can you
18 comprehensively package this together.
19    Q    What strategic market information
20 would you expect sales personnel to have when
21 creating a bottoms-up estimate?
22       MS. HURD:  Objection, vague.
23       THE WITNESS:  What -- which part of
24 the organization are we talking about in
25 marketing?  Salespeople.  Are we talking

Page 52

1  about countries or products?
2  BY MR. ALVAREZ:
3     Q    We're talking about in countries.  So
4  let's just break it down.  First countries, then
5  products.
6     A    Okay.  So what you would be looking at
7  in terms of the salespeople is looking at what
8  we think -- there would be macro information
9  relating to that part of the world.  There would
10 be information about what the competitive
11 dynamics is in that part of the world.  There
12 would be information about what the individual
13 salespeople within the organization, who they
14 have approached.  And depending on the
15 information system, that may be highly
16 structured.
17       So what -- since Salesforce came
18 through in the early 2000s, Salesforce systems
19 have become a much more accepted way of
20 packaging that information from the field within
21 the company itself.
22    Q    Do you know whether or not Dell had a
23 Salesforce --
24    A    Yes.
25    Q    -- system?

George Foster

Page 53

1   A    Dell does have a Salesforce system.

2   **Q    As part of your analysis in coming up**

3   **with the opinions in your report, did you look**

4   **at the information that was provided in**

5   **Salesforce.com for the second half of fiscal**

6   **year 2012 going into the first quarter of fiscal**

7   **year '13?**

8        MS. HURD:  Objection, vague.

9        THE WITNESS:  I've seen reports of it,

10   that information.

11  BY MR. ALVAREZ:

12   **Q    You said you saw reports of that?**

13   A    I've seen references in depositions to

14  Salesforce information.

15   **Q    You said you saw reports of**

16  **Salesforce.com information and references in**

17  **depositions to Salesforce information.**

18   A    Right.

19   **Q    What specific information do you**

20  **recall?**

21   A    What I recall is the information

22  saying that in certain areas like China, there

23  was optimism about revenues in terms of, say,

24  North America.  There was more pessimism in

25  terms of laptop sales.

Page 54

1   **Q    And what time period are you talking**

2   **about?**

3   A    I'm talking about it would be -- it

4  would be fourth quarter 2012 and first quarter

5  2013.

6   **Q    Did you -- when you were looking at**

7   **the information in Salesforce.com, did you look**

8   **to see whether or not -- how many specific**

9   **potential deals were in there in the fourth**

10   **quarter of fiscal year '12?**

11   A    No, I did not.

12   **Q    Did you look to see whether or not --**

13   **how they were weighted with, you know, weighted**

14   **that, you know, you had a PO already signed,**

15   **which would mean weighted higher, or just a call**

16   **that went in, which would mean that it would be**

17   **weighted much lower?**

18        MS. HURD:  Objection.

19  BY MR. ALVAREZ:

20   **Q    Did you look at any of that**

21   **information?**

22   A    I did not look at the individual

23  Salesforce information.

24   **Q    You didn't think that was important to**

25   **do so in coming up with the opinions in your**

Page 55

1  **report?**

2        MS. HURD:  Objection, argumentative.

3        THE WITNESS:  I'm looking at the

4    aggregate revenue flows and predictions of

5    this, and that information would be taken

6    into account by the individuals providing

7    the forecasts.

8  BY MR. ALVAREZ:

9   **Q    So you just took -- whatever**

10  **information that these individuals have set**

11  **forth in all of these emails that you've**

12  **reviewed, you just assumed what they were saying**

13  **was true and accurate; is that correct?**

14        MS. HURD:  Objection, mischaracterizes

15    his testimony.

16        THE WITNESS:  I'm assuming the

17    information has is that that represents

18    their opinions, and what you see is a push

19    back and a push forward in terms of the way

20    the process operates.  That's how budgeting

21    systems work.

22  BY MR. ALVAREZ:

23   **Q    Well, do you know what the pipelines**

24  **were for let's say G500 going into the first**

25  **quarter of fiscal year '13?**

Page 56

1   A    I have not looked at that.

2   **Q    You didn't think it was important to**

3  **look at that?**

4        MS. HURD:  Objection, argumentative.

5        THE WITNESS:  The people who were

6    coming from the G500 area, business area,

7    would be incorporating that information into

8    their analysis both in terms of the

9    budgeting process and during the

10    within-quarter analysis.

11  BY MR. ALVAREZ:

12   **Q    So you didn't know what the**

13  **pipeline -- what the status of the pipeline was**

14  **for enterprise going into the first quarter**

15  **fiscal year '13 either; is that correct?**

16        MS. HURD:  Objection, vague.

17        THE WITNESS:  I have not examined the

18    specific information.  When the people are

19    providing the forecasts, they are

20    incorporating the pipeline information into

21    their own individual areas, and when they

22    are evaluating the within-quarter movement,

23    they are also incorporating the information

24    on the Salesforce on a much more granular

25    basis.

George Foster

Page 57

1  BY MR. ALVAREZ:
2      Q    And you have no understanding as to
3  what the pipeline was for consumer EMEA going
4  into the first quarter of fiscal year '13; is
5  that correct?
6          MS. HURD:  Objection, mischaracterizes
7      testimony.
8          THE WITNESS:  What's the area you're
9      talking about?  EMEA?
10 BY MR. ALVAREZ:
11     Q    EMEA consumer.
12     A    Well, EMEA is one of the areas, the
13 business areas.
14     Q    I'm sorry, what are you looking at?
15     A    I'm looking at Exhibit 14C.
16          And what you have there is that you
17 have -- you have here the updated as-sold
18 unhedged plan, and that incorporates information
19 from the pipeline.
20     Q    Okay.  But you didn't examine the
21 pipeline, you had no independent knowledge of
22 what the pipeline for EMEA consumer was going
23 into the first quarter of fiscal year --
24     A    I've not attempted to independently
25 look at the pipeline.

Page 58

1          MR. ALVAREZ:  Why don't we take a
2  quick break.
3          MS. HURD:  Okay.
4          VIDEOGRAPHER:  The time is 10:07.
5  We're going off the record.
6          (Recess Taken.)
7          VIDEOGRAPHER:  The time is 10:21.
8  We're back on the record.
9  BY MR. ALVAREZ:
10     Q    Professor Foster, I'm just going to
11 look at your resume again, Appendix A, and
12 direct you to Page 2 of 10.
13     A    Page 2 of 10, yes.
14     Q    It lists various boards that you sat
15 on of various companies; is that correct?
16     A    That's correct.
17     Q    Do you sit -- is this updated here?
18     A    No, I don't sit on any boards at the
19 moment.
20     Q    Okay.  So the last time you sat on a
21 board then was, according to your resume, 2009;
22 is that correct?
23     A    Actually, I was on a board for about a
24 year last year, and I'm just trying to think in
25 terms of the name of the company.  But they

Page 59

1  changed their strategy, so I stepped off the
2  board.
3      Q    What do you mean by they changed their
4  strategy?
5      A    Their strategy was to have, in another
6  round of financing, VCs on the board rather than
7  an independent on the board.
8      Q    So other than that board which you
9  stepped off -- which you sat on last year, you
10 haven't sat on another board since 2009?
11     A    No, I have not.
12     Q    And these companies that are listed
13 here, are these all private companies or public
14 companies?
15     A    WI Harper is a venture firm.  So that
16 dealt with predominantly private companies as
17 investments.
18          Century Networks was private.  Pengana
19 Capital was public.  Active Sky was private.
20 Core Digital was private.  Allen & Buckeridge
21 was a venture capital firm.  And Authenticate
22 and Blue Gum were private.
23     Q    So with respect to any of these
24 boards, did you have -- did you play any role in
25 coming up with a rigorous forecasting process

Page 60

1  for any of these companies?
2      A    Well, part of the -- say if you looked
3  at Blue Gum Technologies, that firm, part of
4  what I did was to help develop the financial
5  reporting system.
6      Q    And what do you mean by that?
7      A    Well, Blue Gum Technologies was a
8  company that was based in Australia.  IBM had a
9  manufacturing plant in a town called Wangaratta.
10 And they wanted to exit the plant and
11 consolidate.  And an offer was made to them to
12 buy the plant with a forward contract with IBM.
13          And then subsequently we also acquired
14 a plant of Alcatel in Sydney and dealt with
15 computer board assembly and selling to major
16 electronics companies.
17          And that -- actually, I was involved
18 in building the budgeting system of that
19 company.
20     Q    So you were involved in building the
21 budgeting system for that company.
22     A    That is correct.
23     Q    So what did you do in order to build
24 that -- or to help build the budgeting process
25 for that particular company?

George Foster

City of Pontiac General Employees'
Retirement System vs. Dell Inc., et al.

Page 89

1  balances occur, do you get accountability in
2  terms of somebody has to explain their position
3  and they are listened to.
4      Q    Is there an ongoing use of forecast?
5  What's that referring to?
6      A    Ongoing use of forecast is that when
7  we look at decision-making within the company
8  going forward, and that could be allocation of
9  resources, so such as the need for more
10  investments.  Clearly, that occurs in the Dell
11  case.
12         It could be week-to-week management
13  and pushing salespeople.  We see certainly that
14  going on in the Dell case.
15         Is there use of the budgeting system
16  in terms of the executive compensation.
17         So we see -- I've got on Page 44,
18  Paragraph 88, I have the corporate financial
19  bonus grid which is anchored in the budgeting
20  process.  75 percent of it is anchored in the
21  budgeting process.
22         So I would say that would be examples
23  of ongoing use.
24      Q    Are there shortfall responses?  What's
25  that referring to?

Page 90

1      A    Shortfall responses is that in every
2  budgeting system that I've seen, sometimes
3  you're up, sometimes you're down, and that's
4  just the way it is in terms of the uncertainty
5  of business.
6         And so typically companies worry a
7  little bit more on the downside, and some of
8  these come from financial people, so they are
9  much more worried about the downside oftentimes
10  than the upside.
11         So do they do something with the
12  information when it appears that it's not going
13  to meet budget or there is a difference of
14  opinion in terms of what the forecast would be,
15  et cetera.
16      Q    And the last:  Is there a learning
17  aspect in the forecasting process, what does
18  that mean?
19      A    It means that over time the learning
20  can be in the process itself.  So the structure
21  and the flow of documents to make it more
22  efficient, such as the introduction of the
23  formal playbook thing.
24         It can be in terms of we found IDC is
25  a useful document, so can we go back to them and

Page 91

1  ask them to sort of extend the contract or can
2  they drill down further?
3      Q    So those are the eight criteria for a
4  reasonable forecasting process in your opinion;
5  is that correct?
6      A    That is the criteria I've used and
7  developed over time.
8      Q    Are there any more criteria other than
9  these eight or that's it?
10      A    I believe these are collectively an
11  opinion that's sufficient for me to form a
12  judgment.
13      Q    Okay.  Has this opinion that's set
14  forth right here we've been talking about
15  appeared in any peer-reviewed publication as set
16  forth here?
17      A    No, it has not.
18      Q    Has the opinion set forth here
19  achieved general acceptance in your field of
20  expertise?
21      A    I haven't probed that.  I believe that
22  if you spoke to people who evaluate budgets,
23  they would find that criteria very germane.
24      Q    You haven't probed it though?
25      A    No.

Page 92

1      Q    So you don't know one way or the
2  other, correct?
3      A    I have not.
4      Q    And then you created this opinion for
5  purposes of this litigation; correct?
6      A    No, I did not.
7      Q    You didn't?
8      A    No.
9      Q    Which one of these -- you said you
10  testified in AT&T and Oracle; is that correct?
11      A    That is correct.
12      Q    And you testified in those cases about
13  the budgeting process, about the rigorous
14  forecasting process; is that correct?
15      A    That's correct.
16      Q    Okay.  Which one of these eight
17  factors did you use in coming to your opinion in
18  the AT&T case in 2001?
19      A    I can't remember that.
20      Q    You can't remember?
21      A    I mean, I can't remember which of
22  the -- whether the -- the eight factors here
23  were certainly in the Oracle case.
24      Q    All eight of these factors were in --
25      A    I believe.

George Foster

Page 105

1    that's what the budgeting process is about.
2  BY MR. ALVAREZ:
3      **Q    But you have -- you don't have an**
4  **understanding as to what -- whether -- what**
5  **order flows were going on with respect to Dell**
6  **when they were developing this annual operating**
7  **plan, do you?**
8         MS. HURD:  Objection, vague.
9         THE WITNESS:  I'm opining on the
10    structure of the budgeting process itself
11    and --
12 BY MR. ALVAREZ:
13     **Q    Not the inputs?**
14        MS. HURD:  Okay.  He was not done with
15    his question.  Can you complete your answer?
16        THE WITNESS:  And the inputs are
17    coming from many different parts of the
18    organization.
19        I'm not independently verifying the
20    inputs.  My task is to say, is there a
21    structured process by which a broad set of
22    information from people who are
23    knowledgeable about different parts of Dell
24    are built into the structure?
25 BY MR. ALVAREZ:

Page 106

1      **Q    So you were not independently**
2  **verifying the inputs.  So you were just assuming**
3  **whatever inputs there were, that they were**
4  **reasonable; is that correct?**
5         MS. HURD:  Objection, mischaracterizes
6    his testimony.
7         THE WITNESS:  I'm not assuming the
8    inputs in the way you described.  There are
9    checks and balances for people to -- if
10    somebody gives a number that they don't
11    think is even feasible in sales, then the
12    regional sales manager may push back.
13 BY MR. ALVAREZ:
14     **Q    How do you know that that happened**
15  **here?**
16     A    You see the flow of emails in terms of
17    somebody will say something and there will be
18    questions.  That's what budgeting processes do.
19     **Q    Can you give me a specific example of**
20  **that as you sit here right now?**
21     A    Well, I gave you an example earlier.
22    And we see the example of the -- if you looked
23    at the -- where the -- if we looked at
24    Exhibit 8A, that the -- where there's an initial
25    budget of -- this would be a budget of 65 --

Page 107

1    66.51 in the December period they push it up
2    from the solutions group.  But the solutions
3    group also says, we can provide you some extra
4    investments in order to attain that.
5      **Q    Are you --**
6         MS. HURD:  He's not done.
7         MR. ALVAREZ:  Are you done?
8         MS. HURD:  Let him answer the
9    question.
10        THE WITNESS:  That's how the process
11    works.
12 BY MR. ALVAREZ:
13     **Q    Okay.  Let me use your chart as an**
14  **example.  So you said, what you were talking**
15  **about, you have the 66.51 billion; right?**
16     A    Right.
17     **Q    Then it goes up to 67.5 billion.  Do**
18  **you see that?**
19     A    I see that.
20     **Q    So what's the basis for the increase?**
21  **Do you know what the basis for the increase is?**
22        MS. HURD:  Objection, asked and
23    answered.
24        THE WITNESS:  The solutions group is
25    coming and saying, you have -- we think you

Page 108

1    can do better.
2  BY MR. ALVAREZ:
3      **Q    But based on what?**
4         MS. HURD:  Objection, vague.
5         THE WITNESS:  They've got all broad
6    sets of information about where the strategy
7    is going.
8  BY MR. ALVAREZ:
9      **Q    But you've just never validated that;**
10  **is that correct?**
11        MS. HURD:  Objection, asked and
12    answered, mischaracterizes his prior
13    testimony.  And you're still not letting him
14    finish the answers.
15        THE WITNESS:  I've not attempted to do
16    an independent forecast of any of the
17    numbers in the system.
18 BY MR. ALVAREZ:
19     **Q    Okay.  Thank you.**
20        Can a forecasting process be rigorous
21  but still result in guidance that misleads the
22  market?
23        MS. HURD:  Objection, assumes facts
24    not in evidence, lack of foundation,
25    improper hypothetical.

George Foster                                    City of Pontiac General Employees'
                                                 Retirement System vs. Dell Inc., et al.

Page 117

1   uncertainty, they would conclude that this is a
2   well-managed company.
3      Q    You said that you had -- in preparing
4   your report, you reviewed all of these analyst
5   reports. Is that correct?
6      A    I've reviewed some analyst reports.
7      Q    Okay. And give or take, is it fair to
8   say that there was like 15 to 17 different
9   analysts following Dell during the relevant time
10  period?
11     A    I have not counted them up.
12     Q    Did you ever interview any of these
13  analysts that were following Dell to determine
14  whether or not they had any idea what Dell's
15  annual operating plan process was?
16     A    I have not interviewed the analysts.
17     Q    Yeah. Do you know whether or not --
18  strike that.
19         So just going back, just so I'm clear,
20  you have your eight criteria. Does a public
21  company such as Dell have to exhibit all eight
22  of these criteria in order for you to come to
23  the conclusion that the forecasting process was
24  rigorous?
25     A    The way I use the criteria is that

Page 118

1   it's an evaluative process, and that if I see
2   strength in each of the eight criteria, then I
3   will say it's a rigorous process.
4          The way you -- the way you then grade
5   it and say, if I don't see two out of eight,
6   what my opinion is, I haven't formed an opinion
7   on that.
8          I'm asked to form an opinion on
9   whether this is a rigorous process. I'm not
10  passing judgment on other companies and saying,
11  if you take two of the boxes out of eight, it's
12  less rigorous. I've not opining on that issue.
13     Q    Okay. Okay. I know you're not -- so
14  you're not opining on that issue in this
15  particular case?
16         MS. HURD: Objection, vague.
17         THE WITNESS: I have some criteria
18  that I developed before I came to this case,
19  okay. I've come to the conclusion, on each
20  of those eight criteria, Dell is very
21  strong.
22         So I'm confident in my conclusion that
23  Dell has a structured rigorous process.
24  That's all I -- what I've done.
25  BY MR. ALVAREZ:

Page 119

1      Q    So, but let's forget about Dell then;
2   right? I mean, so if you're examining the
3   company, what if they are missing, like you
4   said, two out of these eight criteria, would you
5   still -- any two -- would you still believe that
6   the process was rigorous?
7          MS. HURD: Objection, improper
8   hypothetical, assumes facts not in evidence,
9   calls for speculation.
10         THE WITNESS: The way I would answer
11  that question is I would say, look, I'm
12  dealing with eight factors. On two of these
13  factors, you're not strong, six of them you
14  are, and let whoever the person I'm
15  providing that information --
16  BY MR. ALVAREZ:
17     Q    So, but --
18     A    I don't have to -- I don't have to use
19  the word "rigorous" as a single word if I've got
20  eight factors and I'm providing those eight
21  pieces of information.
22     Q    Right. So let's just say you're, you
23  know, you were asked to look at the forecasting
24  process for company A. Company A is as big as
25  Dell. And then you have these eight criteria

Page 120

1   that you use to measure it.
2      A    Right.
3      Q    And when you do -- you're looking at
4   internal emails, you're looking at everything.
5   They only have four out of the eight.
6          Would you still have an opinion that
7   that company had a good process?
8      A    Well --
9          MS. HURD: Objection, asked and
10  answered. Assumes facts not in evidence,
11  calls for speculation.
12         THE WITNESS: I mean, I would have to
13  look at the context and then -- let's
14  suppose I was brought into a company to give
15  an evaluation of that as a consultant, and
16  this is what consultants often do. And I
17  looked at my criteria, and they were strong
18  on four and weak on four.
19         I would make recommendations, very
20  strong recommendations that they buttress
21  and invest heavily in the four that they are
22  weak and sustain the four that are strong.
23  That's how I would phrase it. I would say,
24  at this stage, you can do better.
25  BY MR. ALVAREZ:

George Foster

Page 121

1   Q    But in that scenario that we're
2   talking about, if a company had issued guidance
3   and they had missed guidance and they only
4   had -- they were good in four and not so good in
5   four of your criteria, would you believe
6   guidance was reasonable?
7   A    I would have to look at the context on
8   that one and see what was potentially the impact
9   on the guidance of ones that were still missing.
10  It's a context-specific.
11       But in this case, we have eight
12  criteria, and I believe Dell is strong on all
13  eight.
14  Q    Are you aware of any other expert who
15  has utilized and applied your test?
16  A    No, I'm not.
17       MS. HURD:  Objection, mischaracterizes
18  prior testimony.
19       THE WITNESS:  I've not attempted to --
20  if the test that you refer to is the eight
21  criteria, I'm not aware of an expert using
22  that.  I haven't really examined that issue.
23  BY MR. ALVAREZ:
24  Q    You said that you used this criteria
25  in the Oracle and the AT&T case.

Page 122

1   A    The -- I believe I used it in the
2   Oracle.  Implicitly a lot of the discussion of a
3   qualitative kind was in the AT&T.
4   Q    Did the judge ever -- were you ever
5   Dauberted in those cases?
6       MS. HURD:  Objection, vague.
7       THE WITNESS:  No, I don't believe I
8   was.
9   BY MR. ALVAREZ:
10  Q    So the judge never determined whether
11  or not you were qualified to render your opinion
12  before the jury; is that correct?
13       MS. HURD:  Objection, mischaracterizes
14  prior testimony.  Assumes facts not in
15  evidence.
16       THE WITNESS:  I don't know the answer
17  to that.
18  BY MR. ALVAREZ:
19  Q    Is there an element of subjectivity in
20  your eight criteria?
21       MS. HURD:  Objection, vague.
22       THE WITNESS:  There is an element of
23  subjectivity in this criteria.  It's not a
24  scoring system that you --
25       MS. HURD:  Were you done with your

Page 123

1   answer?
2       THE WITNESS:  Yes.
3       MS. HURD:  All right.
4   BY MR. ALVAREZ:
5   Q    Is there a name for your criteria here
6   or -- just curious.
7       MS. HURD:  Objection, vague.
8       THE WITNESS:  It's a criteria to
9   evaluate the rigors of a corporate
10  forecasting system, budgeting and
11  forecasting system.
12  BY MR. ALVAREZ:
13  Q    So Dell missed revenue by
14  approximately $500 million at the end of the
15  first quarter fiscal year '13; is that correct?
16  A    I believe that is correct.
17  Q    Is the magnitude of a miss with
18  respect to revenue, is that relevant to whether
19  the process, the forecasting process was
20  reasonable or not?
21  A    The criteria of reasonableness is what
22  is the information set known at the time.  And
23  after the fact, there can be large misses or
24  small misses.
25       So if what happens is you incorporate

Page 124

1   information that became available after the time
2   the forecast was available, then I would believe
3   the answer is it's not germane to evaluating the
4   rigor of a forecasting process.
5   Q    Now, you were talking about large or
6   small misses.  In this case, how would you
7   characterize the $500 million revenue miss?
8   A    In the context of financial numbers, I
9   don't think the 500 million is a sizable number
10  relative to what analysts were looking at
11  relative to some of the past variations from
12  actual to actual were for Dell.
13  Q    But you understand the stock dropped
14  17 percent on the day of the announcement;
15  right?  Is that correct?
16  A    I understand the stock price dropped.
17  Why it dropped is the more important question.
18  Q    17 percent, is that a significant drop
19  or not?
20  A    It's a significant --
21       MS. HURD:  Objection, argumentative.
22       THE WITNESS:  17 percent is a
23  significant drop, but the reasons for it is
24  the important issue.
25  BY MR. ALVAREZ:

George Foster

Page 145

1   correct?
2       A   Well, that's the regional submission.
3       Q   Right.  And you understand that the
4   outlook for week 7 was compiled by each of the
5   regions and submitted up; right?
6       A   Right.
7       Q   Okay.  And their number was 14.8;
8   correct?
9       A   That's what this says.
10      Q   Right.
11          MR. ALVAREZ:  I don't know if you want
12      to stop, Susan, because I'm going to go on
13      to this thing.
14          MS. HURD:  Okay.  Why don't we -- I
15      can check and see if lunch is here because
16      it's probably getting to be that time.
17      Let's go off the record.
18          VIDEOGRAPHER:  The time is 12:14.
19      We're going off the record.
20          (Lunch Recess Taken.)
21          VIDEOGRAPHER:  The time is 12:57.
22      We're back on the record.
23   BY MR. ALVAREZ:
24      Q   Professor Foster, the eight criteria
25   that you have listed in your report, can I find

Page 146

1   those eight criteria in any book that you have
2   written?
3       A   Not in a book I've written, no.
4       Q   How about an article?
5       A   No.
6       Q   Other than here, where else can I
7   find --
8       A   These eight criteria?
9       Q   -- these eight criteria?
10      A   This may be a place to correct it, but
11   it was in the AT&T report that I -- that I put
12   them in.
13      Q   So you put them in -- all eight in the
14   AT&T report --
15      A   Yes, that's correct.
16      Q   -- but not in the Oracle report?
17      A   The Oracle report was a rebuttal, and
18   I was concentrating on a subset of them.  But
19   the AT&T was the closest to the analogous cases
20   here where I wasn't rebutting somebody, I was
21   doing very similar.
22          MR. ALVAREZ:  Can we stop there?
23          So what's -- this thing is not on.
24   What am I supposed to do?
25          VIDEOGRAPHER:  Do you want to take a

Page 147

1   break?
2          MS. HURD:  Yeah.
3          VIDEOGRAPHER:  We're now off the
4   record.
5          MR. ALVAREZ:  Can we be off the
6   record?
7          VIDEOGRAPHER:  The time is 12:58.
8   We're going off the record.
9          (Recess Taken.)
10          VIDEOGRAPHER:  The time is 1:00.
11   We're back on the record.
12   BY MR. ALVAREZ:
13      Q   So Professor Foster, before we broke
14   for some technical issues, is it now your
15   testimony that at least some or all of these
16   eight criteria were used in your report in the
17   AT&T case?
18      A   Yes, all eight of the criteria.
19      Q   And so now you're correct in your
20   testimony that not all eight of this criteria
21   were used in the Oracle case; is that correct?
22      A   It was a rebuttal report, not a
23   comprehensive examination.
24      Q   And so how many of the eight criteria
25   did you use in your rebuttal report?

Page 148

1       A   I can't remember at this stage.
2       Q   But it was a subset --
3       A   It was a subset.
4       Q   -- of the eight?
5       A   It was a subset of the eight.
6          I can't remember the exact words, but
7   this was first done in 2004 for an analogous
8   assignment.  There was a rigorous budget in
9   process at AT&T to support the revenue numbers
10   released to the market.
11      Q   Okay.  Just so the record is clear,
12   you had testified that this was first done in
13   2004 for analogous --
14      A   I think AT&T was 2004, 2005.
15      Q   Okay.  Would it -- I mean, I think
16   that's incorrect.  I'm going to represent to you
17   I think it was like 2001.  Does that make sense?
18      A   It could be.  I don't know the exact
19   dates.  But the AT&T report, the criteria were
20   there.
21      Q   Okay.  And then Oracle was 2007;
22   correct?
23      A   I think that's correct.
24      Q   Okay.  So then is it a fair
25   characterization that other than in your report

Case 1:15-cv-00374-LY   Document 177-1   Filed 04/22/19   Page 40 of 110
Confidential
City of Pontiac General Employees'
Retirement System vs. Dell Inc., et al.
George Foster

Page 149

1  in AT&T and in your report here, that's the only
2  two locations where I can find these criteria
3  spelled out; is that correct?
4     A    That is, I mean, it's my judgment and
5  professional opinion that these are criteria,
6  yes.
7     Q    Earlier this morning we -- you
8  testified about the strategic plan.  Do you
9  remember that?
10    A    Yes, I do.
11    Q    How was the strategic plan, if you
12 know, related to the annual operating plan?
13    A    Okay.  The strategic plan starts --
14 where is that Exhibit 7 I'm looking for?
15       MS. HURD:  Is it this one?
16       THE WITNESS:  Yes, this one here.
17       So the strategic plan is a three-year
18    process of looking -- it's a three-year
19    forward-looking analysis of where Dell would
20    like to place themselves with a pathway.
21    And so it could be that we are interested in
22    doing new areas of emphasis.
23       So in Dell's case, they had been for
24    some time trying to increase the percentage
25    of revenues coming from the higher margin

Page 150

1  enterprise area and then reducing over time
2  the exposure to what they viewed as a lower
3  margin laptop business.
4        And so that would be -- and
5  incorporated in that strategic plan would be
6  how much of this is going to come through
7  organic shifting and how much of it is going
8  to come through acquisitions.  That would be
9  one aspect of that.
10 BY MR. ALVAREZ:
11    Q    And what do you mean by organic
12 shifting?
13    A    Organic shifting is where you take the
14 existing organization and just expand the
15 customers, expand the products without
16 necessarily seeking the infusion of a whole new
17 company or a division of another company.
18    Q    So that particular strategic plan you
19 said was from 2011.  So it covered 2011, 2012,
20 2013?
21    A    Well, I guess the strategic plan
22 starting in February, July, would be a look
23 ahead.  I think the first year of that would be
24 the 2013.
25    Q    2013, 2014, 2015?

Page 151

1     A    2013, 2014, 2015.
2     Q    And so then how is the annual
3  operating plan related to the strategic plan?
4     A    Well, the solutions group then starts
5  developing a one-year lookout that's guided by
6  the strategic plan in the positioning of the
7  company.
8     Q    And when you refer to scenario one,
9  this is in reference to scenario one of the
10 annual operating plan?
11    A    Let's see.  I believe the tops-down is
12 a scenario.  It's a not a plan, it's a scenario.
13    Q    Right.  But scenario one, was that a
14 subset or at least a part of the annual
15 operating plan?
16    A    It's the first sort of analysis that
17 the bottoms-up then can react to.
18    Q    What kind of information was set forth
19 in the scenario in scenario one?
20    A    I believe this is -- it would be --
21 we're intending to increase our revenue mix
22 towards enterprise.  We ideally would like to
23 have a lower percentage.  It's really driven by
24 margin, a strategy saying that there are higher
25 margin areas that we're currently much more

Page 152

1  exposed to than we want to.
2        We're having a look at the laptop
3  business, and we think it's low margin, but we
4  think it may get more competitive.
5        So what is necessary in terms of the
6  positioning of the products or the customers or
7  the geographies that are necessary we think to
8  make this shift and move to a higher margin
9  business.
10    Q    Do you have an understanding as to
11 what regions Dell was trying to get away from
12 the low-end PC business?
13       MS. HURD:  Objection, vague.
14       THE WITNESS:  I think in general, the
15    low-end PC business, the lower-margin PC
16    business would be providing, if you have a
17    look at Exhibit 1 of mine -- Exhibit 1 of
18    mine, then the PC business or the -- what
19    some people say is really coming across all
20    the seven businesses.  Because Dell provides
21    those products in all of those seven
22    businesses.
23 BY MR. ALVAREZ:
24    Q    No, I understand that.  I'm talking
25 about which regions were they trying to --

George Foster

Page 157

1  have the sort of bottoms-up, and the groups then
2  really start to come together as sort of an
3  alignment exercise.
4  **Q    Did you look at any underlying**
5  **assumptions in the annual operating plan with**
6  **respect to economic growth in the United States?**
7  A    Incorporated into the decision, the
8  information sets that Dell is considering in
9  that are the IDC reports, which has growth by
10 country.  And I did see IDC reports on that,
11 which are one of the inputs in terms of the Dell
12 budgeting process.
13 **Q    And what do you recall it saying?**
14 A    I can't recall.
15 **Q    You can't recall.  But you did review**
16 **them, both IDC reports.**
17 A    I showed there were IDC reports.
18 **Q    So other than reading IDC reports, you**
19 **did not yourself conduct any type of analysis as**
20 **to what the economic growth in the U.S. was**
21 **going to be for purposes of the annual operating**
22 **plan?**
23      MS. HURD:  Objection.
24      THE WITNESS:  I did not do an
25      independent analysis of what the budget

Page 158

1  should have been in any of the divisions.
2  BY MR. ALVAREZ:
3  **Q    In any of the divisions and in any of**
4  **the regions; is that correct?**
5  A    My task was not to do a separate
6  budgeting exercise.
7  **Q    I understand that.  So the answer is**
8  **you didn't do that; is that correct?**
9      MS. HURD:  Objection, asked and
10     answered.
11     THE WITNESS:  I did not do a separate
12     budgeting exercise.
13 BY MR. ALVAREZ:
14 **Q    Did you do any analysis as to how any**
15 **future acquisitions fit into the annual**
16 **operating plan?**
17     MS. HURD:  Objection, vague and
18     ambiguous.
19     THE WITNESS:  Well, Dell has a
20     strategy of augmenting its growth by
21     acquisitions.  If we have a look at some of
22     the charts where they say what we're moving
23     on from last year to what we predict this
24     year, like what is called a step-up graph,
25     you'll see some inclusions of information

Page 159

1  about acquisitions.
2  BY MR. ALVAREZ:
3  **Q    But other than reviewing that, you**
4  **didn't actually do any independent analysis as**
5  **to how the acquisitions were going to affect the**
6  **annual operating plan; is that correct?**
7  A    No.  And then you -- at this stage,
8  you didn't know what acquisitions they were
9  making.
10 **Q    Well, you knew they were making some**
11 **acquisitions during the second half of fiscal**
12 **year '12; correct?**
13 A    Right.  But I haven't made any attempt
14 to sort of redo the budgeting process and
15 augment it with known acquisitions.
16 **Q    Did you do any analysis for this**
17 **budgeting process as to how much pruning was**
18 **taken into consideration in developing the**
19 **annual operating plan?**
20     MS. HURD:  Objection, vague and
21     ambiguous.
22     THE WITNESS:  There are comments
23     throughout the budgeting process of what you
24     call pruning or moving away from low-margin
25     business and statements to the fact that we

Page 160

1  weren't doing certain business because they
2  were low margin.  And so I see that they
3  were incorporated from various parts of the
4  budgeting process.
5  BY MR. ALVAREZ:
6  **Q    Okay.  But other than that, you didn't**
7  **do an independent analysis as to how or -- how**
8  **pruning would have affected the AOP in any way?**
9  A    I've not attempted to do a rebudgeting
10 process independently of Dell.
11 **Q    And you didn't do an independent**
12 **analysis as to how PC growth rate assumptions**
13 **would have affected the AOP; is that correct?**
14 A    I did not do an independent budgeting
15 process.
16 **Q    And you did not do an independent**
17 **analysis as to how server growth rate**
18 **assumptions would affect the AOP; is that**
19 **correct?**
20 A    My assignment was not to do an
21 independent budgeting process.
22 **Q    And you did not do an independent**
23 **analysis as to how storage growth rate**
24 **assumptions would affect the AOP; is that**
25 **correct?**

**Page 157..160**

Case 1:15-cv-00374-LY   Document 177-1   Filed 04/22/19   Page 42 of 110
Confidential
George Foster
City of Pontiac General Employees'
Retirement System vs. Dell Inc., et al.

Page 209

1      MS. HURD:  Well, wait.  Hold on.
2      The question that was pending from
3  Jay, he was trying to ask you to get you to
4  summarize all your opinions about --
5      MR. ALVAREZ:  No, that's not my
6  question.  My question is already done.
7  Read it back.  I have no more questions
8  about that report.  You want to ask him
9  questions about the report, feel free to.
10     MS. HURD:  All right.  Sure.
11     MR. ALVAREZ:  We're done.
12     THE WITNESS:  We're now back to
13  Davidson?
14     MR. ALVAREZ:  No, we're done with
15  that.
16     MS. HURD:  He's saying he's not --
17  he's saying he's not interested in hearing
18  your opinions about Davidson's rebuttal
19  report.
20     MR. ALVAREZ:  No, that's not true.  I
21  finished my questioning about that.  I've
22  got some more questions.
23     THE WITNESS:  Oh, okay.
24     MS. HURD:  So could you mark where we
25  stopped so we can come back to it?

Page 210

1      THE WITNESS:  Yes.
2      MS. HURD:  Thank you.
3      MR. ALVAREZ:  I'm going to show you
4  what I'll mark as next in line.
5      (Exhibit 514 was marked.)
6  BY MR. ALVAREZ:
7      Q    So do you recognize this document,
8  Professor?
9      A    I believe it's a summary of hours.
10     Q    Is this accurate as of today?
11     A    It's the first time I've seen this
12  document.
13     Q    Take your time then.
14     A    I think it's approximate.
15     Q    Okay.  I would represent to you I
16  believe we got this yesterday, so it's
17  up-to-date --
18     A    Up to a couple of days ago.
19     Q    Okay.  So I understand that there is
20  no retainer agreement with Alston & Bird in this
21  case; is that correct?
22     A    That is correct.
23     Q    And why is there no retainer
24  agreement?
25     A    I was not asked to sign one.  I

Page 211

1  typically don't have retainer agreements.
2      Q    You don't.  That's your practice, you
3  just don't sign one?
4      MS. HURD:  Objection, asked and
5  answered.
6      THE WITNESS:  No, I said I -- very
7  rarely have I been asked to sign a retainer
8  document.
9  BY MR. ALVAREZ:
10     Q    What about in the Oracle case?
11     A    I can't remember.
12     Q    What about AT&T?
13     A    I can't remember.
14     Q    So tell me about the Analysis Group.
15  Who are they, how did they help you?
16     A    Analysis Group is a -- it's an
17  economic and litigation support organization
18  that's in multiple offices.  I believe it was
19  started initially in Massachusetts.
20     And they -- some of their experts do
21  expert testimony, some of them provide
22  consulting services, and there is a large staff
23  that does expert witness support.
24     Q    So how did the Analysis Group help you
25  in drafting your report in this particular case?

Page 212

1      A    Okay.  Well, initially what I did is
2  that when I was approached to look at the case
3  by -- Analysis Group asked me, I think, to have
4  a meeting in Austin to discuss the case.
5      And so Bruce Deal and I flew down to
6  Austin, and we had a meeting with Austin
7  attorneys, and I think there was also a Dell
8  person in there, but I'm not sure.
9      Q    So let me see if I can get this
10  straight.  So it was Bruce Deal who's sitting
11  here who first contacted you in or about March
12  of 2018 --
13     A    Right.
14     Q    -- to work on the Dell case?
15     A    That's correct.
16     Q    So it wasn't anybody from Dell or
17  Alston & Bird that contacted you originally?
18     A    No.  I think Bruce Deal had a
19  relationship from past cases with Dell, and I
20  don't know whether Dean Hubbard was engaged at
21  that stage or not.  But I believe Dean Hubbard
22  was also an expert in the Oracle case.
23     And so there was a belief that a
24  division of responsibilities in terms of myself
25  looking at the internal structure of the

# EXHIBIT 4

# City of Pontiac General Employees' Retirement System vs. Dell Inc., et al.

## Videotaped Deposition of
## DR. JAY HARTZELL
## November 16, 2018



www.aptusCR.com / 866.999.8310

Case 1:15-cv-00374-LY   Document 177-1   Filed 04/22/19   Page 45 of 110

Dr. Jay Hartzell

City of Pontiac General Employees'
Retirement System vs. Dell Inc., et al.

**Page 1**

```
 1            UNITED STATES DISTRICT COURT
 2            WESTERN DISTRICT OF TEXAS
 3                  AUSTIN DIVISION
 4  CITY OF PONTIAC GENERAL    ) Case No. 1:15-cv-00374-LY
    EMPLOYEES' RETIREMENT      )
 5  SYSTEM, Individually and   )
    on Behalf of All Others    )
 6  Similarly Situated,        )
                               )
 7            Plaintiff,       )
                               )
 8     vs.                     )
                               )
 9  DELL INC., et al.,         )
                               )
10            Defendants.      )
11  _____
12        ORAL AND VIDEOTAPED DEPOSITION OF
13               DR. JAY HARTZELL
14              NOVEMBER 16, 2018
15       ORAL AND VIDEOTAPED DEPOSITION OF DR. JAY HARTZELL,
16  produced as a witness at the instance of the Plaintiffs,
17  and duly sworn, was taken in the above-styled and
18  numbered cause on November 16, 2018, from 9:12 a.m. to
19  11:51 a.m., before Candice Andino, Certified Shorthand
20  Reporter in and for the State of Texas, reported by
21  machine shorthand, at the offices of Alexander Dubose
22  Jefferson & Townsend LLP, 515 Congress Avenue,
23  Suite 2350, Austin, Texas, pursuant to Notice and in
24  accordance with the Federal Rules of Civil Procedure.
25  Job No. 10049066
```

**Page 2**

```
 1          A P P E A R A N C E S
 2  FOR THE PLAINTIFFS:
 3      ROBBINS GELLER RUDMAN & DOWD LLP
        BY:   LAURIE L. LARGENT
 4      655 W. Broadway, Suite 1900
        San Diego, California 92101
 5      (619) 231-1058  (619) 231-7423 FAX
        llargent@rgrdlaw.com
 6
    FOR THE DEFENDANTS:
 7
        ALSTON & BIRD LLP
 8      BY:   JOHN LATHAM
              ANDREW T. SUMNER
 9      One Atlantic Center
        1201 W. Peachtree Street
10      Atlanta, Georgia 30309-3424
        (404) 881-7000  (404) 253-8204 FAX
11      john.latham@alston.com
        andy.sumner@alston.com
12
    ALSO PRESENT:
13
        WALTER BRYAN, Videographer
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1             I N D E X
 2                               PAGE
 3  Appearances.........................................2
 4  WITNESS:  DR. JAY HARTZELL
 5  Examination by:
 6      MS. LARGENT.....................................4
 7  Reporter's Certificate.............................102
 8
 9             EXHIBITS
10  NO.        DESCRIPTION               PAGE
11  Exhibit 510  Expert Report of Dr. Jay Hartzell    7
                 dated September 13, 2018
12
    Exhibit 511  Dell Securities Trading Policy       50
13               (DELL-COP-00000007 -
                 DELL-COP-00000012)
14
    Exhibit 512  Jay Hartzell Fees and Hours          94
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1      FRIDAY, NOVEMBER 16, 2018, 9:12 A.M.
 2            AUSTIN, TEXAS
 3       THE VIDEOGRAPHER:  This is the beginning of
 4  Recording No. 1.  We're now on the record.
 5       The time is 9:12 a.m.  Today's date is
 6  Friday, November 16th, 2018.
 7       Madam Court Reporter, will you please swear
 8  in the witness.
 9       DR. JAY HARTZELL,
10  having been first duly sworn, was examined and testified
11  as follows:
12            EXAMINATION
13  BY MS. LARGENT:
14  Q.  Good morning.
15  A.  Morning.
16  Q.  Could you please state your name for the
17  record.
18  A.  Jay Hartzell.
19  Q.  Okay.  And, Dean Hartzell, would you prefer to
20  be called Dean Hartzell throughout the deposition today?
21  A.  That's fine.
22  Q.  Okay.  As I introduced myself to you before, my
23  name is Laurie Largent.  I'm with the law firm of
24  Robbins Geller Rudman & Dowd, and my firm represents the
25  plaintiff in the matter that we're here on today.
```

Page 1..4

Dr. Jay Hartzell

City of Pontiac General Employees'
Retirement System vs. Dell Inc., et al.

Page 37

1  is done for the period 2009 to 2012.

2          Would that be the period of time that you
3  looked at the Form 4s, or did you look further back?

4      A. I don't recall looking any further back than
5  that.

6      Q. Okay.

7      A. There's some -- that's -- that's probably as
8  far back as I went. There's some other stuff that comes
9  from the proxy that may have had a wider window, but
10 that's what I recall.

11     Q. Okay. The 2009/2012 time frame that's referred
12 to in your report, is that a -- is that a time period
13 that you selected?

14     A. Yes.

15     Q. Okay. And why did you select that period?

16     A. It gives a kind of reasonable buildup to the
17 class period in question and, for example, the fact that
18 a lot of the compensation instruments that are used by
19 Dell vest over three-year periods. Then, by looking
20 back three years, you get a sense of what was granted
21 when and -- because those are the things that are
22 typically vesting on or around the class period.

23     Q. Your report examines the stock sales for three
24 individuals, Steve Felice, Brian Gladden and
25 Stephen Schuckenbrock.

Page 38

1      A. That's correct.

2      Q. Okay. And for purposes of your report and your
3  opinions, the stock sales you looked at were within the
4  class period; is that correct?

5          MR. LATHAM: Object to the form. Asked and
6  answered.

7      A. I looked at the stock sales within the class
8  period, but I also have understanding of what happened
9  prior to the class period.

10     Q. (BY MS. LARGENT) Okay. Did you personally
11 speak with any of the individuals in connection with
12 preparing your report?

13     A. What -- what do you mean by "individuals"?

14     Q. Steve Felice, Brian Gladden or Stephen
15 Schuckenbrock?

16     A. No.

17     Q. Did you ask to speak with them?

18     A. No.

19     Q. Is there any reason you couldn't have spoken
20 with them?

21     A. Not that I know of.

22     Q. Okay. If you go back to page 1 of Appendix B,
23 there's a reference to the declaration of
24 Stephen Schuckenbrock, dated September 10, 2018.

25          Do you see that?

Page 39

1      A. Yes.

2      Q. Did you ask that that declaration be prepared?

3      A. No.

4      Q. Do you know how it came about that that
5  declaration was prepared?

6      A. No.

7      Q. Okay. Let's turn to paragraph 1 of the report.
8  Paragraph 1, it -- it looks to contain four -- four
9  general topics that you were retained to opine on; is
10 that correct?

11          MR. LATHAM: Object to the form of the
12 question.

13     A. Yes.

14     Q. (BY MS. LARGENT) Okay. And it looks like the
15 first topic is to explain and discuss the structure and
16 function of executive compensation plans such as the
17 ones used at Dell or used by Dell.

18     A. Yes.

19     Q. Okay. And what's your understanding of why you
20 were being asked to explain this topic in the context of
21 this case?

22     A. That it could be useful for the Court to have
23 some context for why compensation plans are the way they
24 are, what the role of incentive compensation is,
25 especially as it pertains to executives. And that would

Page 40

1  also help shed some light on why, for example,
2  executives tend to own a lot of stock in some cases, and
3  it could help put in context the -- the decisions that
4  those executives face with respect to their holdings.

5      Q. Okay. And the second topic is to explain and
6  discuss how information is communicated -- communicated
7  between publicly-traded corporations and their
8  shareholders.

9          What was your understanding of why you were
10 being asked to explain that topic in the context of this
11 case?

12     A. Because they're the -- if you think about it, a
13 couple of things that come up in this case, questions
14 about, for example, the earnings calls, which are going
15 to come up a little bit later in the same paragraph.
16 But there's -- one of the questions is how does the
17 market understand and react and learn about what's going
18 on within the firm, and what do those communications
19 typically look like.

20     Q. Okay. The third topic, then, is to review the
21 stock sales made by Dell executives named in the amended
22 complaint during the class period.

23          Again, what -- what's your understanding of
24 why you were being asked to explain this topic in the
25 context of this case?

Dr. Jay Hartzell

Page 53

1 Steve Felice's trading history prior to the class period
2 have any impact on your opinions in this case?
3    A.  It's hard to say def- -- definitively.  It --
4 it didn't -- that -- the pattern, including the trades,
5 during and before the class period, in total, still led
6 to my conclusion that -- that I have in the -- in the
7 report.
8    Q.  Okay.  And -- and would you agree that
9 Mr. Felice's stock sales during the class period were
10 far greater than the stock sales that he had made in the
11 four-year period prior to the class period?
12    A.  Yeah, I would agree.  I -- I think I looked
13 more pes- -- specifically at -- so '09, '10, and '11, so
14 maybe three-year period.
15    Q.  Okay.
16    A.  But yes.
17    Q.  Okay.  And that didn't impact your opinion in
18 this case, that -- regarding the suspiciousness of the
19 sales?
20    A.  I -- I knew that information, and I still
21 arrived at this opinion.
22    Q.  Okay.  I'm going to also ask you that same
23 question with respect to Schuckenbrock.  At -- did you
24 look at his stock sales prior -- for the three-year
25 period prior to the class period?

Page 54

1    A.  Yes, I know those -- that pattern.
2    Q.  Okay.  And would you agree with me that -- that
3 the sales he made during the class period -- which I
4 think were in excess of a million shares -- were far
5 greater than the sales that he made in the three years
6 prior to that?
7    A.  I would agree that they were bigger, yes.
8    Q.  Okay.  And did that impact your opinion on --
9 on whether or not his sales were suspicious in timing
10 and amount?
11    A.  Like Mr. Felice, I -- I knew of those facts and
12 considered them, but it -- and reached the same
13 conclusion.
14    Q.  Did you consider whether or not Felice,
15 Gladden, or Schuckenbrock had material nonpublic
16 information at the time the class period trades were
17 made?
18    A.  Not directly.  I considered whether the pattern
19 of trades and the trade-offs that they made was
20 consistent with the plaintiff's hypothesis, that they
21 may have been trading on inside information.
22    Q.  So I just want -- I want to -- I want to --
23 strike that.
24        Are you offering any opinions as to whether
25 Gladden, Felice, or Schuckenbrock had material nonpublic

Page 55

1 information at the time their class period trades were
2 made?
3    A.  I -- I can't rule out that they may have had
4 material nonpublic information.  What I'm offering an
5 opinion about is the pattern of facts that, in -- in
6 my -- my opinion, is consistent with the idea that this
7 was economically and financially motivated.  And it's --
8 it's economically implausible that they were trading due
9 to what's been alleged, that it was a fraud that they
10 were taking advantage of through their trades.
11    Q.  So if, in fact, Felice, Gladden, or
12 Schuckenbrock did have material nonpublic information at
13 the time they made their trades, would that change your
14 opinion that the executive stock sales were not
15 suspicious?
16    A.  In the broad meaning of suspicious, sure.
17 So -- so, you know, again, here, when I was looking at
18 whether -- how does one think about the decisions that
19 they were facing given the economic considerations, but
20 if -- if I knew definitively that there was another
21 motive, then that would change my opinion.
22    Q.  Okay.  Okay.  The last part of paragraph 7,
23 which is on, actually, the next page, page 5, the -- the
24 last sentence that starts (as read):  Based on my review
25 of the economic professional.

Page 56

1        Do you see that?
2    A.  I do.
3    Q.  Okay.  And then the latter part, you -- you --
4 it says (as read):  I find it illogical and implausible,
5 from an economic point of view, that the possible gain
6 or avoided loss from these stock sales would have
7 motivated them to intentionally defraud Dell's
8 shareholders.
9        Do you see that?
10    A.  I do.
11    Q.  Okay.  And what do you mean by "economic point
12 of view"?
13    A.  So it's -- it's, I think, a sort of
14 straightforward idea that if -- if an executive and --
15 under consideration has a million dollars to gain by a
16 certain action but has -- if you sort of took, for
17 example, what he or she had to lose and called that
18 $10 million they had to lose with a high probability,
19 then that's economically implausible or irrational that
20 they would gain a million to lose ten.
21    Q.  And are you basing that on the analysis that
22 Hubbard did in his report with respect to the profits
23 that the executives made with respect to the sales?
24    A.  I -- I took -- I took Professor Hubbard's data
25 as part of my consideration, yes.

Dr. Jay Hartzell

Page 57

1   Q.  Okay.  So when you're -- when you say "an
2  economic point of view," is it just that data that
3  you're -- that you're referring to in this part of your
4  opinion?
5          MR. LATHAM:  Object to the form.
6   Q.  (BY MS. LARGENT)  I guess what I'm asking you
7  is:  Did you do your own independent economic analysis
8  in terms of the profit or losses that Defendants made on
9  their class period sales in coming up with your opinion?
10   A.  So if the -- if the question is did I
11  recalculate Hubbard's numbers, I did not.
12   Q.  Okay.
13   A.  I took those numbers as given.  But -- but I
14  also, in my analysis, considered the costs.  If you call
15  that the benefit of being fraudulent, then there are a
16  lot of costs, and I went -- thought about those things
17  myself.
18   Q.  Okay.  Are -- are the words "illogical" and
19  "implausible" your words?
20   A.  Yes.
21   Q.  Okay.  And are those -- are -- have you ever
22  been asked to -- to opine before whether something is
23  illogical or implausible?
24   A.  Probably.  I -- it's hard to know
25  whether the -- whether the -- the -- a court or an

Page 58

1  attorney said "These are the two words I want you to
2  use."  But I would think that a lot of what I do is try
3  to think of -- through things, whether the -- for
4  example, someone on the other side of -- of a matter is
5  being illogical.  That's a pretty normal thing in
6  what -- what I do.
7   Q.  Okay.  You testified that you -- you read
8  Mr. Hubbard's report.
9   A.  I did.
10   Q.  And did you -- it looks like you -- you share
11  some of the same opinions as Mr. Hubbard.  Is that -- is
12  that fair to say?
13   A.  I would -- I would say they're consistent with
14  each other.
15   Q.  Okay.  And that, in fact, you did make some of
16  the same opinions with respect to executive compensation
17  and the need to diversify a portfolio?
18   A.  Yes, I think we both talk about that point.
19   Q.  Okay.  And you also talk about the point of
20  whether or not the -- the sales were -- the sales that
21  you looked at were sensible from a financial -- or,
22  excuse me -- an economic perspective; is that right?
23   A.  That's right.
24   Q.  Okay.  All right.  Let's turn to page 12 of
25  your report and the section that's titled "Executive

Page 59

1  Stock Sales."
2          Do you see that?
3   A.  I do.
4   Q.  And it looks like, in the first several
5  paragraphs of that section, you're discussing reasons
6  why executives might sell their company's stock; is that
7  correct?
8   A.  Yes.  I think, both.  I'm discussing why --
9  what are the trade-offs between sock and -- stock and
10  safe pay, which is related to the question of why do
11  executives hold stock at all.
12   Q.  Okay.  And then if you'll turn to paragraph 28,
13  the second sentence that starts with "Standard finance
14  theory."
15          Do you see that?
16   A.  Yes.
17   Q.  And what are you referring to there, "standard
18  finance theory"?  I don't see a citation.
19   A.  Yeah, that's -- that's so ubiquitous, it's hard
20  to know what to cite.
21   Q.  Okay.
22   A.  So, you know, very -- you can pick up any --
23  any finance textbook that covers the topic of
24  portfolios, and it would talk about the benefits from
25  diversification.

Page 60

1   Q.  Okay.  It says -- and then, in the last
2  sentence of that paragraph, it says (as read):  If an
3  investor is risk averse, or prefers less risk or more,
4  all else equal, then he or she should optimally hold a
5  diversified portfolio.
6          Do you see that?
7   A.  I do.
8   Q.  And what -- what information did you consider
9  with respect to Mr. Gladden's tolerance for portfolio
10  risk?
11   A.  So I don't have any -- well -- so
12  Mr. Gladden -- so I was going to say I don't -- yeah, I
13  think the -- so the overall idea is that we believe all
14  people are risk averse until sort of proven otherwise.
15  So I start from the basis that he is risk averse.  There
16  is some discussion, if I recall correctly, through an
17  email chain, about what kind of a weight in his
18  portfolio he's -- he's thinking about holding Dell
19  stock.  That would also shed some light on his risk
20  tolerance or the way he thinks about the role of Dell
21  stock in his portfolio.
22   Q.  Okay.  And is there any information that you
23  considered with respect to Mr. Felice and his tolerance
24  for a portfolio risk?
25   A.  Mr. Felice, I think that, yeah, again, I --

Dr. Jay Hartzell

City of Pontiac General Employees'
Retirement System vs. Dell Inc., et al.

Page 61

1  like Mr. Gladden, I would start from the idea that he's
2  risk averse and know that he's, like -- like all the
3  executives in this case, is -- is overweight in Dell
4  stock.  And so he would have the same motives to
5  diversify, all else equal.
6        But if you're asking is -- is there
7  something -- this isn't it exactly, but can I -- can I
8  talk about whether he is more or less risk averse than
9  Mr. Gladden, I don't know.
10    Q.  Okay.  I -- and I think what I'm -- what --
11  what I'm trying to understand is whether there are
12  certain assumptions that you made with respect to your
13  opinions.  And it sounds like you made the assumption
14  that -- that Mr. Gladden and Mr. Felice are risk
15  averse; is that correct?
16        MR. LATHAM:  Object to the form.  Asked and
17  answered.
18    A.  Yes, I -- we -- we generally assume two things
19  in finance:  people like more money rather than less and
20  that they're risk averse.
21    Q.  (BY MS. LARGENT)  Okay.  And -- but you didn't
22  speak to either of them about what their risk tolerance
23  was in -- in -- in connection with this engagement; is
24  that correct?
25    A.  That's correct.

Page 62

1    Q.  Okay.  And did you -- did you look at any of
2  Mr. Gladden or Mr. Felice's portfolio information,
3  overall, to ascertain whether or not they had a balanced
4  portfolio or an unbalanced portfolio?
5    A.  No.  I mean, I think there's ways to make
6  inference about what -- that lack of balance in the
7  portfolio, but I don't -- I didn't look at the portfolio
8  to tell you or to find out that it's exactly 30 percent
9  Dell or -- or 40 percent Dell.
10    Q.  Okay.  And with respect to the inference that
11  you made, you made that inference just based on the --
12  how they were compensated and the documents you looked
13  at that broke out their base salary versus their equity
14  compensation; is that right?
15    A.  That's right.
16        MR. LATHAM:  Objection.  Asked and
17  answered.
18    A.  Yeah, everything that -- as I mentioned before,
19  everything that I relied upon for that inference is --
20  is -- is here in the report.
21    Q.  (BY MS. LARGENT)  Okay.  And that -- that's
22  your basis for finding that they would have been
23  overweight in Dell's stock?
24    A.  Yes.
25    Q.  I'm going to ask you the same question about

Page 63

1  Mr. Schuckenbrock.  Did you speak to Mr. Schuckenbrock
2  personally about what his risk tolerance is, or was,
3  right before he made his -- his class period sales?
4    A.  No, I did not.
5    Q.  Okay.  And was there any specific information,
6  other than the assumption that people are risk averse,
7  that led you to believe or -- or -- or informed your
8  opinion about his level of risk tolerance?
9    A.  No.
10    Q.  You would agree that -- that risk tolerance is
11  a personal preference; right?
12    A.  I guess the way I would say it is I would agree
13  there's heterogeneity in the degree of which we're risk
14  tolerant.  Is that what you mean?
15        We may -- we may differ in -- in our degree
16  of risk tolerance.
17    Q.  Yes.  And I think -- I think you might have
18  said, in -- in paragraph 34 of your report, that,
19  ultimately, the decision to hold or sell is unique to a
20  particular executive at a particular time, given his
21  life circumstances; is that correct?
22    A.  I did say that.
23    Q.  Okay.  Including risk tolerance, current and
24  expected income expenses, and overall personal wealth.
25    A.  Yes, I did say that.

Page 64

1    Q.  Okay.  So just so I -- I understand -- so
2  you -- you didn't do any analysis of Mr. Felice's
3  portfolio, overall, right before he sold his stock or
4  before he sold his stock during the class period; right?
5    A.  I did not do any analysis.  I -- I don't -- I
6  don't know the entirety of his -- all of his holdings or
7  his -- all of his wealth.
8    Q.  Okay.  And the same is true for Mr. Gladden and
9  Mr. Schuckenbrock?
10    A.  Yes.
11    Q.  Okay.  Okay.  In paragraph 32 of your report, I
12  think it -- I -- I think it talks about another reason
13  why executives sell stock.  And the way I read it, it
14  seems that you're talking about that they might sell
15  stock because of forfeiture upon termination; is that
16  correct?
17    A.  Yes.  Yes.
18    Q.  Okay.  And were there any executive stock sales
19  you reviewed that -- that you understand were made
20  because of anticipated separation from Dell?
21    A.  No.  I mean, I know, after the fact, that
22  Schuckenbrock, for example, left not -- not too long
23  after the class period.
24    Q.  Uh-huh.
25    A.  I can't tell you today whether he sold because

Page 61..64

Dr. Jay Hartzell

City of Pontiac General Employees'
Retirement System vs. Dell Inc., et al.

Page 65

1 of that. It's consistent that -- that the fact that he
2 sold is consistent with the idea that if -- he might
3 have had that as part of his motivation, but I know -- I
4 don't know of -- I don't know for certain that that was
5 or was not.

6    **Q. Okay. And, again, you didn't talk to any of**
7 **the -- Mr. Gladden, Mr. Felice, or Mr. Schuckenbrock**
8 **about their sales or the motivation for their**
9 **sales; correct?**

10    A. I did not.

11    **Q. All right. Let's go to paragraph 35. Now,**
12 **I'm -- I'm hoping to get this right. I'm going to tell**
13 **you what I -- I -- how I read paragraph 35, and you can**
14 **tell me if I'm correct, that -- that you -- you opine,**
15 **in paragraph 35, that -- that the combined timing of new**
16 **equity-based compensation and the vesting of grants from**
17 **prior years creates a circumstance that leads to**
18 **increased sales in the quarter following a year end. Is**
19 **that right?**

20    A. I think that's basically right, yes.

21    **Q. Okay. So that would be increased sales during**
22 **the first quarter of -- of a fiscal year; correct?**

23    A. Correct. I -- and just to be clear, I -- I
24 don't think there is necessarily anything magical about
25 a quarter. That's just how we have the data.

Page 66

1    **Q. Okay.**
2    A. So it's just soon after is the economic idea.
3    **Q. Okay.**
4    A. But quarterly is often where we can tell
5 and when the data's broken up and we start to -- start
6 to track it.

7    **Q. Okay. And -- and in this case, the class**
8 **period was the first quarter of Dell's fiscal year 2013.**

9    A. Correct.

10    **Q. And so, if you turn to page 20 of your report,**
11 **you have a -- a box that has the class period sales in**
12 **there. And it looks like, just rough math, Felice,**
13 **during the class period, sold over 890,000 shares of**
14 **stock. And Schuckenbrock -- I think I -- we talked**
15 **about this before -- sold over a million during the**
16 **first quarter of 2013. Is that right?**

17    A. That's right.

18    **Q. Okay. Did you -- did you see this same pattern**
19 **of sales for Felice in the first quarter of Dell's**
20 **fiscal year 2012?**

21    A. No. I remember he had some small sales in
22 years prior, but not to this magnitude.

23    **Q. Okay. And what about in the first quarter of**
24 **fiscal year 2011 for Felice?**

25    A. Yeah. Again, I'd -- I -- I'd have to

Page 67

1 double-check, but I -- I remember some small sales
2 before, but not -- again, not to this size.

3    **Q. Okay. And what about in the first quarter of**
4 **fiscal year '10?**

5    A. Same.

6    **Q. Okay. And fiscal year -- first quarter of**
7 **fiscal year 2009?**

8    A. Did I look at '09? Yeah. I don't -- I don't
9 recall anything in between '09, '10, and '11 that was of
10 this same magnitude.

11    **Q. Okay. And with respect to Schuckenbrock, did**
12 **you see this same pattern of sales that he had in the**
13 **first quarter of fiscal year 2013 in -- in fiscal -- in**
14 **the first quarter of fiscal year 2012 or 2011 or 2010 or**
15 **2009?**

16    A. Yeah, much like Mr. Felice, these -- that was a
17 big trade relative to his previous first quarter
18 experiences.

19    **Q. Okay. Did -- did that information -- I think I**
20 **might have asked you this before, and I apologize if I**
21 **did. Did that information have any impact on your**
22 **opinion as to whether Felice or Schuckenbrock's class**
23 **period sales were suspicious?**

24    A. I -- I -- I think we talked about this before.
25 I -- I knew that information when I formed my opinion,

Page 68

1 so to that extent, I considered it. But, as I mentioned
2 in the report, I -- I think those sales are consistent
3 with other motivations, such as diversification.

4    **Q. Okay. Back to the paragraph 35, where, in the**
5 **last sentence of that paragraph, you say that (as read):**
6 **These circumstances often lead to increased stock sales**
7 **by executives in the quarter following the fiscal year**
8 **end.**

9    **Do you see that?**

10    A. I do.

11    **Q. And then you cite a -- a article titled**
12 **Decoding Insider Information that was published in the**
13 **"Journal of Finance" in 2012.**

14    A. Yes.

15    **Q. Do you see that? Okay.**

16    **And in that study that was done, that's**
17 **talked about in that paper, they define a routine trader**
18 **as an insider who placed a trade in the same calendar**
19 **month for at least three consecutive years and an**
20 **opportunistic trader as everyone else.**

21    **Do you recall that?**

22    A. I do. That's their -- that's their base
23 definition that they -- that they use for -- for the --
24 the tables that they produce.

25    **Q. Okay. And did you see any evidence in -- in**

Dr. Jay Hartzell

Page 77

1 Would -- would your opinions about Felice,
2 Gladden, or Schuckenbrock's trades be impacted if it was
3 found that they did have material nonpublic information
4 at the time they executed their trades, even though they
5 were in an open trading window?
6 MR. LATHAM: Object to the form of the
7 question.
8 A. Yes, it would be impacted. I mean, I -- again,
9 I'm -- I'm opining on their motives and to what extent
10 the -- the data lines up with one hypothesis versus
11 another. And if you tell me that the other hypothesis
12 is definitely true, that would -- that would change my
13 opinion.
14 Q. (BY MS. LARGENT) Okay. In the last sentence
15 of paragraph 40, he says (as read): It's my
16 understanding that Dell's trading window would often
17 close for certain executives during this time due to
18 pending acquisitions.
19 Do you see that?
20 A. I do.
21 Q. Okay. And do you know how many times during
22 Dell's calendar year -- or, excuse me -- fiscal year
23 2012 the trading window closed due to pending
24 acquisitions?
25 A. I don't.

Page 78

1 Q. Okay. Do you know how many times during Dell's
2 fiscal year '13 the trading window closed due to pending
3 acquisitions?
4 A. No, I don't.
5 Q. Okay. Other than -- other than the evidence
6 that you cite in footnote 24, did you see any other
7 evidence that Dell's trading window would often close
8 for certain executives during -- during pending
9 acquisitions?
10 A. I can't recall another source. There may be
11 one in -- in my -- in the documents, but
12 that's -- obviously, this one comes to mind because it's
13 in the footnote, but...
14 Q. Do you know how many acquisitions Dell made in
15 calendar year 2011?
16 A. Not -- not off the top of my head, no.
17 Q. Do you know how many they made in calendar year
18 2012?
19 A. Not off the top of my head.
20 Q. All right. Turning to paragraph 44 of your
21 report. If you go to -- actually, it's on page 23, the
22 part I want to ask you about. And you say -- it's a
23 sentence that starts (as read): Emails between
24 Mr. Gladden and his financial advisors dated
25 December 15, 2011, suggest that roughly 50 percent of

Page 79

1 Mr. Gladden's liquid net worth was exposed to Dell at
2 the time of his stock sales on March 1st, 2012.
3 And then (as read): It is my
4 understanding that Mr. Felice's Dell stock holdings also
5 represented a very large portion of his net worth at
6 that time.
7 Do you see -- I want to ask you about the
8 last phrase concerning Mr. Felice's holdings of Dell
9 stock.
10 And what -- what evidence do you have to
11 support that phrase?
12 A. Yeah, the -- the -- the evidence there -- I
13 mean, we talked this a little before, about how I -- how
14 I made that inference.
15 Q. Okay.
16 A. And it's -- it's, you know, looking at his --
17 the way he was paid over the trailing years and the
18 magnitude of that compensation, it's conceivable he has
19 some other source of massive wealth that I don't know
20 about. But based on the way he's been paid, that's why
21 it's my understanding.
22 Q. Okay. Okay. Go to paragraph 48. In
23 paragraph 48, you -- you state that (as read): It's
24 also important to note that all of the stock sales were
25 publicly disclosed through reports to the SEC.

Page 80

1 Do you see that?
2 A. I do.
3 Q. Okay. And you're referring to Form 4s
4 there; correct?
5 A. Yes.
6 Q. Okay. And is it your understanding that the
7 filing of a Form 4 is a defense to insider training?
8 MR. LATHAM: Object to the form.
9 A. That's not my understanding.
10 Q. (BY MS. LARGENT) Okay. And what's your
11 understanding of a Form 4?
12 A. It's a way that the companies or the executives
13 communicate to the market about the executives' or
14 officers' trading patterns.
15 Q. And why -- why, for purposes of your report,
16 was it important to note that all of the stock sales
17 were publicly disclosed through Form 4s?
18 A. Well, that -- that informs me about -- one is
19 that, you know, I -- based on my understanding, they
20 should have been. And so that's -- that's one part.
21 The second part, then, is that speaks to what one learns
22 from the stock price trajectory of the company over
23 the -- over the class window.
24 So, for example, the fact that the stock
25 price didn't drop dramatically after these -- as these

Dr. Jay Hartzell

City of Pontiac General Employees'
Retirement System vs. Dell Inc., et al.

Page 81

1 forms were filed is informative.

2    **Q. Informative in what way?**

3    A. Well, if -- if the plaintiff's allegations are

4 true and -- and this -- these trades were likely

5 fraudulent, then you'd expect the market to react

6 strongly and negatively when they learned about those

7 trades.

8    **Q. So are you -- is that one of your opinions in**

9 **this case, that there was no market reaction following**

10 **the Form 4s?**

11    A. So I -- I didn't conduct a statistical analysis

12 to define what was statistically significant as far as

13 the price reaction.

14    **Q. Okay.**

15    A. But I know that -- I know what the price did

16 over the -- over the period. And the fact that it

17 didn't drop dramatically the days after these trades

18 is -- is -- was part of what I knew when I wrote the

19 opinions.

20    **Q. Okay. And in -- in what -- how -- how is that**

21 **relevant to your opinions? Is that -- is that -- are**

22 **you making an opinion as to the materiality of that**

23 **information or the impact on the stock price?**

24    A. No. So back to the -- you know, again, part of

25 my discussions is these sort of competing hypotheses

Page 82

1 about why these trades might have been made. Right?

2 And one is the diversification, liquidity needs,

3 financial and economic motivations that I talk about.

4 The other is the sort of hypothesized alleged fraud.

5 And if -- and as I weigh which one is a more likely

6 explanation for the data, if the market reaction was

7 consistent with the fraud explanation, then I -- that

8 would have -- that would have been -- I might have

9 rethought my conclusions.

10    But the fact that the market didn't react that

11 way is just one more piece that lines up suggesting that

12 it's -- it's the other explanations I put forth in my

13 report.

14    **Q. Okay. So in terms of materiality of the**

15 **Form 4s and the information of the Form 4s, you're not**

16 **giving any opinions on that in this case; is that**

17 **correct?**

18    A. Tell me what -- can you tell me what you mean

19 by "materiality"? Is this, like, a legal question?

20 Like, what do you -- a definition of materiality in that

21 sense?

22    **Q. I'm asking you -- I -- I -- I'm trying to --**

23 **I'm trying to ascertain whether you are -- are making**

24 **any opinions in this case in connection with a stock**

25 **price reaction or upon the filing of the Form 4s for the**

Page 83

1 **class period trades in this case.**

2    A. I'm -- I'm -- I'm not -- I'm not offering an

3 opinion on why the stock price moved the way it did over

4 the class period.

5    **Q. Okay.**

6    A. But the fact that it moved the way it did over

7 the class period, I think, is informative.

8    **Q. Following the filing of the Form 4s, is that**

9 **what you're saying?**

10    A. For example, yes.

11    **Q. Okay.**

12    A. Yeah.

13    **Q. And then how -- how was it informative**

14 **otherwise?**

15    A. I don't know. I'd have to think through if

16 there is anything else that -- that -- that's the --

17 that's the most immediate thing that comes to mind right

18 now.

19    **Q. Okay.**

20    A. As we go -- as we go along, there may be

21 something else that comes to mind that -- where the

22 stock price also weighed in or I thought about it, but

23 the one that's immediate is that one.

24    **Q. Would you agree that an individual could be**

25 **trading on material nonpublic information and an**

Page 84

1 **investor or market analyst wouldn't know that by the**

2 **filing of a Form 4?**

3    A. Yeah, I would agree that a Form 4 may not be

4 perfectly revealing to the investor that somebody's

5 trading on --

6    **Q. Okay.**

7    A. -- on material nonpublic information.

8    **Q. Okay. And you -- you didn't conduct any event**

9 **studies in this case with respect to the stock price**

10 **reaction following the filing of any Form 4s in this**

11 **case?**

12    A. I did not.

13    **Q. Okay. All right. And in paragraph 48, you**

14 **also state that Mr. Schuckenbrock sold his Dell shares**

15 **during the class period to help fund the building of a**

16 **house; is that correct?**

17    A. I do see that, yes.

18    **Q. Okay. And -- and that's based on the**

19 **declaration that -- that you reviewed from**

20 **Mr. Schuckenbrock; correct?**

21    A. Yes. And which, to my knowledge, wasn't a -- I

22 haven't seen any -- any counterargument against that, so

23 that's -- that's all I have, yes.

24    **Q. Okay. Would it be -- would you agree with me**

25 **that, if Mr. Schuckenbrock had material nonpublic**

Dr. Jay Hartzell

City of Pontiac General Employees'
Retirement System vs. Dell Inc., et al.

Page 85

1 information at the time that he sold his stock, that the
2 fact that he wanted to use the money to build a house in
3 Plano wouldn't be a defense to insider trading?
4          MR. LATHAM:  Object to the form of the
5 question.  Calls for a legal conclusion.
6     A.  Yeah, based -- based on my economist
7 understanding of insider training, it would not be a
8 defense.
9     Q.  (BY MS. LARGENT)  Okay.  Okay.  Let me see.
10 Well, now I want to go over your opinion number 4.  If
11 you'll turn to paragraph 8, so back to the front of
12 Exhibit 510.
13          Do you see the sentence that starts
14 (as read):  Based on my experience reviewing similar
15 corporate quarterly earnings calls over the course of my
16 career, I find that the scope and format of Dell's
17 February 21st, 2012, and May 22nd, 2012, earnings calls
18 were typical and that the topics covered and the types
19 of information conveyed on the calls were not out of the
20 ordinary?
21          Do you see that?
22     A.  Yes.
23     Q.  Okay.  Are you giving any opinions in this case
24 as to whether Dell's February 21st, 2012, earnings call
25 contained any false and misleading statements?

Page 86

1     A.  No, I'm not.
2     Q.  Okay.  And are you giving any opinions in this
3 case as to whether Dell's May 22nd, 2012, earnings call
4 contained any false and misleading statements?
5     A.  No, I'm not.
6     Q.  Okay.  And I think you testified earlier, but
7 you're not giving any opinions in this case as to
8 whether Dell's May 22nd, 2012, earnings call corrected
9 any misinformation in the market.
10          MR. LATHAM:  Object to the form.
11     Q.  (BY MS. LARGENT)  Is that correct?
12          MR. LATHAM:  Object to the form of the
13 question.
14     A.  Yes, I'm -- I'm not -- I think I recall your
15 question correct -- correctly.  I'm not opining on
16 whether the May call was a corrective disclosure to
17 something else that they had previously said.
18     Q.  (BY MS. LARGENT)  Okay.  Are you giving any
19 opinions in this case as to whether the two earnings
20 calls you reviewed complied with any applicable law or
21 regulation?
22     A.  No, I'm not.
23     Q.  And are you giving any opinions in this case as
24 to whether the earnings calls were consistent with
25 standards of corporate governance?

Page 87

1     A.  I would say I am -- standards from a -- from a
2 common or best practices standpoint, not necessarily
3 from a legal, what one must or must not do on an
4 earnings call standpoint.
5     Q.  What is your experience in reviewing similar
6 corporate quarterly earnings calls, as you talk about in
7 here?
8     A.  Yeah.  I've -- I've -- just over the course of
9 research and probably a little bit in consulting, but
10 both -- both reasons and teaching, over the years, I've
11 read transcripts, I've reviewed, you know, many calls,
12 as well as read papers that deal with calls.
13     Q.  And -- and what do you mean by "not out of the
14 ordinary"?  Is that -- is that a standard that's used in
15 the field of corporate governance?
16     A.  I think, much like the word "illogical," it's a
17 standard that -- it's a -- I think, a phrase that has
18 some clear meaning to me, that they're sort of ordinary,
19 and this is -- this is -- looks -- these look ordinary.
20     Q.  Okay.  Is there any connection between your
21 opinions about or your findings about these two
22 quarterly earnings calls and Defendants' stock sales?
23     A.  Yeah, maybe -- maybe implicitly.  So you think
24 if the plaintiff's allegations were true and then
25 perhaps I might have expected to see different kinds of

Page 88

1 things on the earnings calls.  And that probably
2 partially informed the way I weighed the evidence for
3 the plausible or likely motives for the stock sales.
4     Q.  Like what would you have expected to see?
5     A.  Well, for example, if -- if -- if Dell, in the
6 early call, were trying to inflate the price to motivate
7 later sales, then I would expect less coverage and
8 discussion of the weak spots and the results, all else
9 equal.
10     Q.  Are you -- are you giving any opinions in this
11 case as to whether -- I'm sorry -- strike that.
12          Are you familiar with the term "truth on
13 the market" in -- in the legal context?
14     A.  I've -- I've heard that phrase, but I couldn't
15 define it.
16     Q.  Okay.  And you're not giving any opinions on
17 whether there is a adequate truth on the market defense
18 in this case; is that right?
19     A.  Given that I can't define it, I'm not opining
20 on it.
21     Q.  Okay.  Okay.  In para- -- going to
22 paragraph 56, which, I think, is another version of this
23 same opinion, in the last sentence, you say that
24 (as read):  Overall, both calls were very typical, much
25 like I have reviewed over my career.

# EXHIBIT 5 - 9
# [Filed Under Seal]

# EXHIBIT 10

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

|  |  |  |
|---|---|---|
| CITY OF PONTIAC GENERAL EMPLOYEES' RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, | : : : : | Case No. 1:15-cv-00374-LY |
| Plaintiff, | : : | CLASS ACTION |
| vs. | : : : | |
| DELL INC., et al., | : : | |
| Defendants. | : : | |

## DECLARATION OF STEPHEN F. SCHUCKENRBROCK

Pursuant to 28 U.S.C. § 1746, I, Stephen F. Schuckenbrock, hereby declare as follows:

1.     I am over eighteen years of age and competent to make this Declaration.  I have personal knowledge of the facts set forth herein.

2.     I was employed at Dell Inc. ("Dell" or the "Company") from January 2007 to January 2013.  I served as President of Global Services and Chief Information Officer from January 2007 through January 2009, as President of Dell's Large Enterprise business unit from January 2009 through January 2011, and again as President of Global Services from January 2011 through January 2013.

3.     I voluntarily resigned my position at Dell in January 2013.  In April 2013, I became President and Chief Executive Officer of Accretive Health, Inc., a leading healthcare services company.  Since then, I have served on the boards of directors for various public companies, and I am currently Chief Executive Officer of Crossmark, Inc., a sales and marketing services company that operates within the consumer goods industry.

HARTZELL_0000001

4.     I have reviewed the Amended Complaint for Violation of the Federal Securities Laws (the "Complaint") filed by City of Pontiac General Employees' Retirement System ("PGERS") in the above-captioned lawsuit, and I see that my name appears in paragraph 79 of the Complaint.

5.     During my time at Dell and due to my position as an executive of the Company, I was awarded shares of restricted Dell common stock ("RSUs") and options to purchase Dell common stock ("stock options") on a regular basis pursuant to the Company's long-term incentive compensation plan.  It was not unusual for me to sell unrestricted shares of Dell common stock ("unrestricted stock") or exercise stock options once the RSUs had vested (and were converted into unrestricted stock) or the stock options had become exercisable.  Prior to their vesting or becoming exercisable, I was not allowed to sell or exercise the RSUs and stock options.

6.     In early 2011, I agreed to move from Austin, Texas to Plano, Texas to lead the Company's Services organization.  To compensate me for the expenses I incurred in connection with this move, including a loss on the sale of my house, Dell awarded me a cash bonus of $1.5 million and 90,745 RSUs, which were issued on July 13, 2011.  Approximately six months later, on February 15, 2012, I was awarded 248,565 RSUs under the Company's long-term incentive compensation plan, and on March 1, 2012, I was awarded an additional 143,844 RSUs.

7.     On January 8, 2012, 30,000 of the RSUs I held at that time vested and were converted into unrestricted stock.  On March 5, 2012, an additional 358,762 of the RSUs I held at that time vested and were converted into unrestricted stock.  One week later, on March 12, 2012, I sold 87,364 shares of unrestricted stock at a sales price of $17.24 per share.

8.     In early March 2012, a large portion of the stock options I held at the time became exercisable.  On March 15, 2012, I exercised 627,630 of these stock options at an average

CONFIDENTIAL                                    HARTZELL_0000002

weighted exercise price of $10.91 per share.  After I exercised the stock options, the stock options were converted into 627,630 shares of unrestricted stock.  That same day, I sold 952,480 shares of unrestricted stock at a sales price of $17.25 per share.[1]

9.      The table set forth below lists all of these transactions and includes the following information for each: (1) the date of each transaction; (2) the type of each transaction; (3) the number of shares involved in each transaction; (4) the exercise, sales or purchase price of each transaction; and (5) the number of shares of Dell common stock I beneficially owned before and after each transaction:

| Date | Type | Shares | Price | Shares Owned Before | Shares Owned After |
|---|---|---|---|---|---|
| 07/13/2011 | Award | 90,745 | $0.00 | 393,105 | 483,850 |
| 01/09/2012 | Surrender for Tax | 8,159 | $15.29 | 483,850 | 475,691 |
| 02/15/2012 | Award | 244,339 | $0.00 | 475,691 | 720,030 |
| 02/15/2012 | Award | 4,226 | $0.00 | 720,030 | 724,256 |
| 03/01/2012 | Award | 143,844 | $0.00 | 724,256 | 868,100 |
| 03/05/2012 | Surrender for Tax | 127,631 | $17.24 | 868,100 | 740,469 |
| 03/12/2012 | Sale | 87,364 | $17.25 | 740,469 | 653,105 |
| 03/15/2012 | Options Exercise | 395,948 | $8.39 | 653,105 | 1,049,053 |
| 03/15/2012 | Options Exercise | 108,428 | $14.99 | 1,049,053 | 1,157,481 |
| 03/15/2012 | Options Exercise | 123,254 | $15.44 | 1,157,481 | 1,280,735 |
| 03/15/2012 | Sale | 952,480 | $17.25 | 1,280,735 | 328,255 |

10.      Prior to the transactions set forth above, I beneficially owned 393,105 shares of Dell common stock.  Following the transactions set forth above, I beneficially owned 328,255 shares of Dell common stock.

11.      All of these transactions were publicly disclosed on SEC Form 4s that were filed on my behalf with the U.S. Securities and Exchange Commission on or shortly after the date of each transaction.  True and correct copies of these SEC Form 4s are attached hereto at Exhibits A through G.

---

[1] During this same time period, I surrendered a total of 135,790 shares of unrestricted stock for tax liability purposes.

3

12.     I chose to sell shares of unrestricted stock and exercise stock options in March 2012 to help pay for a new house that my wife and I were building in Plano, Texas at the time and also to diversify my investments since my equity holdings in Dell represented well over 50% of my total net worth at the time.

13.     The Company's Global Services business, which I was in charge of at the time, had very strong revenue growth throughout this time period.  The Global Services business grew 12% year-over-year in the fourth quarter of fiscal year 2012 (with 8% year-over-year growth for the entire fiscal year) and 5% year-over-year in the first quarter of fiscal year 2013.

14.     If asked to do so, I am willing and able to attend trial and testify under oath as to the facts set forth herein.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on this _10_ day of _September_, 2018, in _Plano, TX_____ (City, State).

_____
STEPHEN F. SCHUCKENBROCK

CONFIDENTIAL

HARTZELL_0000004

# EXHIBIT 11
# [Filed Under Seal]

# EXHIBIT 12

**Exhibit 5 to the Expert Report of Zachary Nye, Ph.D., Dated July 30, 2018**

**UNITED STATES DISTRICT COURT**

**WESTERN DISTRICT OF TEXAS**

**AUSTIN DIVISION**

| | |
|---|---|
| CITY OF PONTIAC GENERAL EMPLOYEES' RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated,<br><br>                              Plaintiff,<br><br>        vs.<br><br>DELL INC., et al.,<br><br>                              Defendants. | Case No. 1:15-cv-00374-LY |

REBUTTAL REPORT OF ZACHARY NYE, PH.D.

July 13, 2017

**Exhibit 5 to the Expert Report of Zachary Nye, Ph.D., Dated July 30, 2018**

**Table of Contents**

I.  Background and Qualifications ...........................................................................1

II.  Scope of Engagement ......................................................................................1

III.  Bases for Opinions ........................................................................................1

IV.  Market Efficiency ..........................................................................................2

    A.  *Ms. Allen Fails to Address the Majority of the Efficiency Factors Considered in the Nye Report and She Has Provided No Evidence Contradicting My Conclusion That the Market for Dell Stock Was Efficient Throughout the Class Period* ...........................................................................................2

    B.  *The Nye Report Provides a Reliable Analysis of the Cause-and-Effect Relationship Between News and Dell Stock That Existed During the Class Period; Ms. Allen's Critique of My Objective, Ex-Ante, Event-Selection Criteria Is Unfounded* .................................................................................4

V.  **Allen Has Failed to Prove the Absence of Price Impact; Dell's Stock Price Reaction to the Alleged Corrective Disclosure Demonstrates Price Impact** .............12

    A.  *Dell's Company-Specific May 23, 2012 Stock Price Decline* ....................................13

    B.  *Allen's Analysis of Price Impact on the Dates of Alleged Misstatements is Flawed—When Statements Are Alleged to Have Omitted Material Information, Price Impact is Measured at the Time of the Corrective Disclosure* ...............................................................................................14

    C.  *The Company-Specific Disclosures on May 22, 2012 and Resulting Stock Price Decline on May 23, 2012 are Related to the Allegedly Omitted Information* .................................................................................................19

    D.  *Ms. Allen's Opinions Regarding the "Other Factors" That Could Have Caused Dell's Stock Price Decline on May 23, 2012 Are Flawed* ............................27

VI.  Conclusion ....................................................................................................45

**Exhibit 5 to the Expert Report of Zachary Nye, Ph.D., Dated July 30, 2018**

## I.      Background and Qualifications

1.      Previously in this matter, I submitted the Expert Report of Zachary Nye, Ph.D., dated March 9, 2017 (the "Nye Report").  In the Nye Report, I opined that the common stock of Dell, Inc. ("Dell," or the "Company") traded in an efficient market throughout the period February 22, 2012 to May 22, 2012, inclusive (the "Class Period").[1]

2.      My qualifications are contained in ¶1 to the Nye Report.  My curriculum vitae, which includes my academic research, publications in the past ten years, and prior expert testimony in the past four years, is attached as Exhibit 1 to the Nye Report.

3.      My current hourly rate is $600.  I have received assistance from individuals at SCG, who worked under my direction; their fees charged for this project are their standard hourly rates. Neither my compensation nor that of any individual at SCG is contingent on the outcome of this litigation.

## II.      Scope of Engagement

4.      In addition to the scope of engagement contained in ¶3 to the Nye Report, I have been retained by Counsel for Plaintiff in this matter to reply to the Expert Report of Lucy P. Allen, dated May 30, 2017 (the "Allen Report").[2]

## III.      Bases for Opinions

5.      My opinions are based upon my professional knowledge and experience, my review of documents and information relevant to this matter, and the analyses described in this report and its exhibits.  Documents, data, and other information that I have relied upon as bases for my opinions are cited in the Nye Report, as well as this report and its exhibits.

---

[1] The claims in this action are set forth in the Amended Complaint for Violation of the Federal Securities Laws, dated July 27, 2015 (the "Complaint").

[2] Ms. Allen was deposed in this matter on July 7, 2017 (the "Allen Deposition").

**Exhibit 5 to the Expert Report of Zachary Nye, Ph.D., Dated July 30, 2018**

6.      Counsel for Plaintiff has informed me that the record in this matter continues to be developed.  To the extent they are relevant, I would expect to review additional facts that may become available through discovery, as well as the reports and depositions of other expert witnesses.  The opinions offered in this report are subject to refinement or revision based on continuing analysis of the documents and information listed above, as well as new or additional information that may be provided to or obtained by me in the course of this matter.

IV.     **Market Efficiency**

        A.      **Ms. Allen Fails to Address the Majority of the Efficiency Factors Considered in the Nye Report and She Has Provided No Evidence Contradicting My Conclusion That the Market for Dell Stock Was Efficient Throughout the Class Period**

7.      As discussed in the Nye Report, while the Supreme Court in *Halliburton II* stated that a market need only be "generally efficient" to invoke the "fraud on the market" presumption, it did not adopt any particular test of general market efficiency.[3]  Accordingly, in the Nye Report, I considered direct and indirect tests of efficiency that have been commonly considered by experts in securities litigation when examining market efficiency.[4]  More specifically, I considered each of the five *Cammer* factors, as well as three other factors which have also been considered by

---

[3] Nye Report, ¶17, citing *Halliburton II*, 134 S. Ct. at 2404, and further stating:

> Recently, the Supreme Court clarified that *Basic* did not "endorse 'any particular theory of how quickly and completely publicly available information is reflected in market price.'"  To the contrary, the "fraud on the market" theory is based "on the fairly modest premise that 'market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices.'"  Under this theory, investors' reliance on any public material misrepresentations and/or omissions may be presumed for purposes of a Rule 10b-5 action since the effects of those misrepresentations and/or omissions will already be impounded in the market price.  (Internal citations omitted.)

[4] Nye Report, ¶¶13, 14.

# Exhibit 5 to the Expert Report of Zachary Nye, Ph.D., Dated July 30, 2018

courts in evaluating market efficiency.[5]  These factors are recognized by economists and have

been widely adopted by courts for evaluating market efficiency in "fraud on the market" cases.

These factors demonstrate that investors were informed from a number of sources about Dell's

financial condition and prospects throughout the Class Period, including analyst reports, the

press, and SEC filings.  These factors also demonstrate that there was a substantial amount of

trading in Dell stock.  Other indicia of market efficiency discussed in the Nye Report (*e.g.*,

listing on the NYSE, the presence of market makers, short interest, institutional holdings, bid/ask

spreads, and float) demonstrate that the market for Dell stock was open and developed, thereby

facilitating informed trading.  Moreover, my analysis of *Cammer* Factor 5 demonstrates that

there was a cause-and-effect relationship between new, material Company-specific information

and the price of Dell stock before, during, and after the Class Period.

8.     While conceding market efficiency and adopting the results of my event study in order to

conduct her analysis of price impact,[6] Ms. Allen nonetheless claims that I "do[] not offer any

reliable conclusions on whether the market for Dell stock was efficient" during the Class Period.

---

[5] Nye Report, ¶¶13, 14 (citing *Cammer v. Bloom*, 711 F. Supp. 1264, 1273 n.11 (D.N.J. 1989); *Unger v. Amedisys Inc.*, 401 F.3d 316, 323 (5th Cir. 2005); *Bell v. Ascendant Solutions, Inc.*, 422 F.3d 307, 313 n.10 (5th Cir. 2005); *Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tex. 2001)).

The factors considered in the Nye Report are: (i) whether the security trades at a large weekly volume; (ii) whether analysts follow and report on the security; (iii) whether the security has market makers and whether there is a potential for arbitrage activity; (iv) whether the company is eligible to file SEC Form S-3; (v) whether there are empirical facts showing a cause-and-effect relationship between unexpected corporate events or financial information releases, and an immediate response in the security's price; (vi) the Company's market capitalization; (vii) the bid/ask spread for stock sales; and (viii) the security's public float.

[6] Allen Report, ¶13: "Plaintiff and Dr. Nye claim that the market for Dell securities was efficient and thus, that the price of Dell stock 'reflect[ed] all publicly-available information.'  To analyze price impact, I have assumed Plaintiff's claim of market efficiency and adopted the event study methodology put forward by Dr. Nye."

**Exhibit 5 to the Expert Report of Zachary Nye, Ph.D., Dated July 30, 2018**

Notably, Ms. Allen does *not* opine that the market for Dell stock was inefficient, because, as she has testified, she did not analyze any of the relevant efficiency factors.[7]  Of the market efficiency factors considered in the Nye Report, Ms. Allen addresses only one, *Cammer* Factor 5.[8]  Ms. Allen does not dispute that the other factors examined in the Nye Report are conditions that are conducive to market efficiency, and she has no apparent disagreement with my findings with respect to these factors.[9]  As explained below, the methodologies used in the Nye Report are appropriate and fully consistent with the standards of my profession, and a close examination of the relevant facts and data reveal that Ms. Allen's limited criticisms of my event study are unfounded.

> **B.  The Nye Report Provides a Reliable Analysis of the Cause-and-Effect Relationship Between News and Dell Stock That Existed During the Class Period; Ms. Allen's Critique of My Objective, *Ex-Ante,* Event-Selection Criteria Is Unfounded**

9.    Ms. Allen asserts that my analysis of *Cammer* Factor 5 "does not offer any conclusions on whether the market for Dell's stock was efficient during the alleged class period."[10] However, her opinion rests solely on criticisms of my objective, *ex-ante*, event-selection criteria.[11]  Contrary to Ms. Allen's assertions, my event study is objective and consistent with the methodologies used in the academic literature.[12]  It is also the same methodology that has been

---

[7] Allen Deposition, 92:7–96:11.

[8] Allen Report, ¶2.

[9] Allen Deposition, 92:7–96:11.

[10] Allen Report, ¶66.

[11] Allen Report, ¶¶67, 68.

[12] *See*, *e.g.*, Fama, Eugene F., 1991, "Efficient Capital Markets: II," *The Journal of Finance*, Vol. 46, Issue 5, pp. 1575–1617; and Mitchell, Mark L. and Jeffry M. Netter, 1994, "The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission," *The Business Lawyer*, Vol. 49, pp. 545–590.

**Exhibit 5 to the Expert Report of Zachary Nye, Ph.D., Dated July 30, 2018**

widely accepted in securities litigation, whereby I reviewed news, analyst reports, and changes in

Dell's stock price in an effort to determine if a cause-and-effect relationship existed between

new, material, Company-specific information and the price of Dell stock before, during, and

after the Class Period.  Indeed, while Ms. Allen criticizes the way in which I performed my event

study, she performed no event study of Dell stock at all.

10.     Supporting the reliability of my event study methodology, numerous United States

district courts have accepted similarly constructed event studies I have submitted in connection

with class certification as evidence of market efficiency.  For example, my event study

methodology was received favorably by the court in the *Heckmann Corporation Securities*

*Litigation*, which was granted class certification on June 6, 2013.  Finding that the market was

efficient, the court commented:

> Dr. Nye executed an event study, which is a generally accepted practice in
> determining market efficiency in securities litigation.  He also constructed a
> regression analysis, a proper control period, and selected relevant dates to
> demonstrate the requisite cause and effect.  While defendants suggest other dates
> to include in his event study, none are necessary for the study to be admissible.
> Dr. Nye's study included earnings-related announcements, which, in his opinion,
> would impact the market, and thus demonstrate market efficiency.  Defendants
> [*sic*] argument that these dates were not objective go to weight.  Their critique
> attacks Dr. Nye's conclusions, rather than his application of the accepted
> methodology.[13]

11.     Recently, my event study methodology was also received favorably by the court in the

*Richard Thorpe, et al. v. Walter Investment Management, Corp., et al.* securities litigation, which

was granted class certification on March 16, 2016.[14]  My event study in that case was adopted by

---

[13] Report and Recommendations of Magistrate Judge Mary Pat Thynge, *In Re Heckmann Corporation Securities Litigation,* Case 1:10-cv-00378-LPS-MPT, Docket No. 236, filed June 6, 2013, pp. 17, 18.

[14] Order of United States District Judge Ursula Ungaro, *Richard Thorpe et al. v. Walter Investment Management, Corp., et al.*, Case No. 1:14-cv-20880-UU, Docket No. 132, filed March 16, 2016, pp. 25, 26.

**Exhibit 5 to the Expert Report of Zachary Nye, Ph.D., Dated July 30, 2018**

Dr. Kenneth M. Lehn, the Samuel A. McCullough Professor of Finance in the Joseph M. Katz School of Business at the University of Pittsburgh, who was retained by defendants in that matter to review and respond to my report and deposition testimony.  Specifically, Dr. Lehn commented that:

> [a]fter reviewing Dr. Nye's report and analyses, I do not disagree with Dr. Nye's opinion that the market for Walter's stock was efficient during the Class Period …. In addition, I have performed my own independent event study analysis and find that the results are qualitatively similar to Dr. Nye's results.  Hence, in this report, I report the results based on Dr. Nye's event study results.[15, 16]

12.     As described in the Nye Report, I analyzed the cause-and-effect relationship between new, material, Company-specific information and the reaction of Dell's stock price by conducting an event study commonly employed in both the academic literature and securities litigation.[17]  Relying on a large body of event study literature that finds that changes in corporate earnings affect stock prices, I identified a set of dates (events) on which Dell released quarterly or year-end financial results and/or earnings guidance.[18]  Given that Dell's earnings releases

---

[15] Expert Report of Kenneth M. Lehn, dated September 30, 2015, *Richard Thorpe et al. v. Walter Investment Management, Corp. et al.*, United States District Court, Southern District of Florida, Case No.: 14-cv-20880-UU, Docket No. 123-8, footnote 23.

[16] In numerous other cases where market efficiency was found and class certification was granted, my event studies were based on the same methodology used in the Nye Report.  (*See* the Expert Report of Zachary Nye, Ph.D., *Richard Hayes, et al. v. MagnaChip Semiconductor Corp., et al.*, submitted July 8, 2016; the Expert Report of Zachary Nye, Ph.D., *In Re Ocwen Financial Corporation Securities Litigation*, submitted August 11, 2016; the Declaration of Zachary Nye, Ph.D., *David Shapiro, et al. v. Matrixx Initiatives, Inc., et al.*, submitted February 20, 2012; and the Declaration of Zachary Nye, Ph.D., *In Re IndyMac Bancorp, Inc. Securities Litigation,* submitted August 29, 2011).

[17] Nye Report, ¶¶48, 49.

[18] *See, e.g.*, Ball, R., and P. Brown, 1968, "An Empirical Evaluation of Accounting Income Numbers," *Journal of Accounting Research*, pp. 159–178; Foster, G., "Quarterly Accounting Data: Time-Series Properties and Predictive-Ability Results," *Accounting Review*, Vol. 52, pp. 1–20; Brown, S. L., 1978, "Earnings Changes, Stock Prices, and Market Efficiency," *Journal of Finance*, Vol. 33, pp. 17–28; Watts, R., 1978, "Systematic 'Abnormal' Returns after Quarterly

**Exhibit 5 to the Expert Report of Zachary Nye, Ph.D., Dated July 30, 2018**

occur on a quarterly basis, and that the Class Period spans just three months, there are only two earnings announcements by Dell during the Class Period: the start of the Class Period (February 21–22, 2012), and the end of the Class Period (May 22–23, 2012).  In consideration of the relatively short Class Period in this matter, I also examined Dell's most recent financial results released prior to the Class Period, and its earliest financial results released after the Class Period.[19]  In total, I evaluated four event dates and tested whether the price of Dell stock reacted in a manner consistent with how the information was received by investors.[20]

13.     Ms. Allen argues that my examination of the alleged corrective disclosure date (May 22, 2012), as well as dates outside the Class Period, "does not provide a reliable analysis of a cause-and-effect relationship between news and Dell stock during the alleged Class Period."[21]  Citing only a 2004 law review article written by a lawyer who represents defendants in securities fraud cases and two of her NERA colleagues, Ms. Allen states:

> An analysis of events outside of the alleged class period cannot reliably inform regarding market efficiency during the alleged class period.  In addition, because alleged corrective disclosures are a biased sample of events, an analysis of the alleged corrective disclosure is not a reliable test of market efficiency.[22]

---

Earnings Announcements," *Journal of Financial Economics*, Vol. 6, pp. 127–150; and Rendleman, R. J., C. P. Jones, and H. A. Latane, 1982, "Empirical Anomalies Based on Unexpected Earnings and Importance of Risk Adjustment," *Journal of Financial Economics*, Vol. 10, pp. 269–287.

[19] Nye Report, ¶49.  Namely, after market close on November 15, 2011, and after market close on August 21, 2012.

[20] Nye Report, ¶50 and Exhibit 10.

[21] Allen Report, Section VII.

[22] Allen Report, ¶67, referencing Paul A. Ferrillo, Frederick C. Dunbar, and David Tabak, 2004, "The 'Less Than' Efficient Capital Markets Hypothesis: Requiring More Proof from Plaintiffs in Fraud-on-the-Market Cases," *St. John's Law Review*, Vol. 78, No. 1 ("Ferrillo, *et al.* (2004)").

**Exhibit 5 to the Expert Report of Zachary Nye, Ph.D., Dated July 30, 2018**

14.     With respect to my inclusion of an alleged corrective disclosure date, Ms. Allen's critique is unfounded.  First, as is clear from the Nye Report, May 22, 2012 was objectively chosen for inclusion in my event study on the basis that it is an earnings-related date.  The fact that May 22, 2012 is also an alleged corrective disclosure date does not change the objective basis for its inclusion.  Second, the law review article cited by Ms. Allen does ***not*** state that an alleged corrective disclosure date is inherently biased or cannot be used to test for a cause-and-effect relationship between news and a company's stock price.[23]  The article simply provides that "[o]ne way" to test for a cause-and-effect relationship is to broadly sample "news days" other than days alleged to be corrective disclosures.[24]  Continuing, however, the article discusses the ability to "refine the search to only focus on particular types of news stories (e.g. earnings announcements)."[25]  As set forth in the Nye Report, my objective selection and testing of Dell's earnings announcements demonstrates a cause-and-effect relationship between new, material, Company-specific information and resulting movements in Dell's stock price.  Third, courts have routinely accepted event studies submitted by economists that included alleged corrective

---

[23] As Ms. Allen conceded when asked "whether the Ferrillo article you mention there, does it actually say that an alleged corrective disclosure date would be a biased event": "I don't know if the - - I don't know if that - - the Law Review Article says that."  Allen Deposition, 90:4–9.

[24] Ferrillo, *et al.* (2004), at p. 119.

[25] *Id.*, at p. 120.

**Exhibit 5 to the Expert Report of Zachary Nye, Ph.D., Dated July 30, 2018**

disclosures as event dates.[26, 27]  Indeed, the *Cammer* court specifically contemplates that

corrective disclosure dates can be "convincing" evidence of a cause-and-effect relationship:

> … one of the most convincing ways to demonstrate efficiency would be to
> illustrate, over time, a cause and effect relationship between company disclosures
> and resulting movements in stock price.[28]

Ms. Allen's criticism of my inclusion of the May 22, 2012 earnings announcement as an event

date is unsupported and unpersuasive.

15.     Ms. Allen's criticism of my use of event dates outside the Class Period is also flawed.

Indeed, the only support Ms. Allen offers for her proposition that testing events outside the Class

Period "cannot reliably inform regarding market efficiency during the alleged class period" is my

---

[26] *See, e.g.*, *Willis v. Big Lots, Inc.*, 2017 U.S. Dist. LEXIS 38926 (S.D. Ohio Mar. 17, 2017) (noting "[t]hat the objective criterion [used to determine event dates] incorporated corrective disclosure dates does not undermine the reliability of the methodology employed in the event study."); and *W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*, No. CV 13-6731, 2016 WL 4138613, at *13 (E.D. Pa. Aug. 4, 2016) (approving of expert study which included corrective disclosure dates as event dates, and noting "[w]hile Defendants' strategy here appears to call into question Plaintiffs' expert's conclusions, Defendants have not tried to show that the market . . . was inefficient.  Moreover, without an attack on the underlying numbers, the Court ultimately concludes that the fifth Cammer factor points toward market efficiency.  [Plaintiff's expert's] report includes data to support the conclusion that abnormal returns were experienced on dates that included corrective disclosures.  Essentially, the experts are talking over each other, but [Plaintiff's expert] has data underlying his conclusions and [Defendants' expert] just has noise.").

[27] In addition, my event studies in the following cases included corrective disclosure dates and were accepted by courts as evidence of market efficiency: *In Re Heckmann Corporation Securities Litigation,* Case 1:10-cv-00378-LPS-MPT, Docket No. 236, filed June 6, 2013; *Richard Thorpe et al. v. Walter Investment Management, Corp., et al.*, Case No. 1:14-cv-20880-UU, Docket No. 132, filed March 16, 2016; and *Richard Hayes, et al. v. MagnaChip Semiconductor Corp., et al.*, Case No. 14-cv-01160-JST, Docket No. 286, filed December 22, 2016.

[28] *Cammer,* 711 F.Supp. at 1291.  At her deposition, Ms. Allen was unable to identify any academic literature or case law for the proposition that it is improper to include an alleged corrective disclosure date in an event study designed to test for a cause-and-effect relationship between news and stock price movements.  Allen Deposition, 90:10–91:8.

**Exhibit 5 to the Expert Report of Zachary Nye, Ph.D., Dated July 30, 2018**

deposition testimony.[29]  However, Ms. Allen mischaracterizes my testimony.  As I testified, the

selection of dates outside the Class Period is appropriate here, given the short length of the Class

Period:

> Q. Have you ever in your prior event study work included in your event study
> events outside the class period in the case?
>
> A. I don't -- I don't think so.  **But I would say this is probably the shortest
> class period I have encountered to date**, so as far as writing a report is
> concerned.
>
> Q. And that was sort of going to be my next question, is why did you include
> events outside the class period in your event study in this case?
>
> A. **Yeah, I felt that it was still within, you know, they are what,
> approximately three months before and three months after, I think it
> demonstrates a continuity of -- of market efficiency throughout this -- this
> year, basically, of which the class period is the middle portion**.[30]

16.    The analysis of time periods both before and after a class period is also well supported in

the academic literature.  For example, in both legal and economic discussions of event studies,

the literature specifically endorses examining estimation periods outside of the period to be

tested.[31]  Even the law review article Ms. Allen purports to rely on in footnote 102 of her Report

specifically endorses the use of event dates outside of the class period:

---

[29] Allen Report, ¶67, footnote 101.

[30] Nye Deposition, p. 44 (emphasis added).

[31] *See*, *e.g.*, Mitchell, Mark L. and Jeffry M. Netter, 1994, "The Role of Financial Economics in
Securities Fraud Cases: Applications at the Securities and Exchange Commission," *The Business
Lawyer*, Vol. 49, pp. 545–590 at p. 568:

> The market model is estimated with regression analysis.  The estimation period
> for this market model equation typically ranges from 100 to 300 trading days
> preceding the event under study.

*See also*, MacKinlay, A. Craig, 1997, "Event Studies in Economics and Finance," *Journal of
Economic Literature*, Vol. 35, pp. 13–39 at p. 15; and Tabak, David I. and Frederick C. Dunbar,
"Materiality and Magnitude: Event Studies in the Courtroom," <u>Litigation Services Handbook,</u>

**Exhibit 5 to the Expert Report of Zachary Nye, Ph.D., Dated July 30, 2018**

> Because stock prices move all the time, one must compare the movements in response to news stories with a control group of prices.  One way to do this would be to look at a sample of days in a class period exclusive of those days alleged to be corrective disclosure(s) and perform a news search.  **An alternative would be to look at a sample just before the class period**.[32]

Ms. Allen's suggestion that time periods before and after the Class Period cannot be used to draw conclusions for days within the Class Period, is unfounded and incorrect.

17.    Last, Ms. Allen fails to recognize that the critical factor when conducting an event study is whether the event selection criteria is applied objectively and consistently, not the number of days the definition yields.  As Ms. Allen recognized at her deposition, there is no bright-line rule dictating the minimum number of event days necessary for an event study to appropriately test for the presence of a cause-and-effect relationship.[33]  More important is that the events to be tested are objectively selected.  The Nye Report does not veer from objective criteria established at the outset of my event study.   Indeed, other than noting that I could have analyzed "news other than earnings announcements,"[34] Ms. Allen never opines as to any additional dates she feels should have been analyzed.

---

The Role of the Financial Expert, 3rd ed., Ed. Roman L. Weil, Michael J. Wagner, and Peter B. Frank, John Wiley & Sons, Inc., 2001, p. 19.5:

> Three general choices for the placement of an estimation window are before the event window, surrounding the event window, and after the event window.  The most common choice places the estimation window before the event.  Analysts sometimes place the estimation window after the event or split the estimation window to cover periods before and after the event window.  When the analysis studies multiple events, the estimation window may cover the periods around the event windows, including the period(s) between event windows.

[32] Paul A. Ferrillo, Frederick C. Dunbar, and David Tabak, 2004, "The 'Less Than' Efficient Capital Markets Hypothesis: Requiring More Proof from Plaintiffs in Fraud-on-the-Market Cases," *St. John's Law Review*, Vol. 78, No. 1, pp. 81–129 at 118.  (Emphasis added.)

[33] Allen Deposition, 79:4–10.

[34] Allen Report, footnote 101.

**Exhibit 5 to the Expert Report of Zachary Nye, Ph.D., Dated July 30, 2018**

18.     Ms. Allen's criticism of the event dates tested in the Nye Report is illogical and unfounded in both law and financial economics.

**V.      Allen Has Failed to Prove the Absence of Price Impact; Dell's Stock Price Reaction to the Alleged Corrective Disclosure Demonstrates Price Impact**

19.     I understand that in the context of cases like this, to rebut the presumption of reliance under *Basic,* the burden is on defendants to prove that none of the alleged misrepresentations or omissions could have impacted the price of Dell stock during the Class Period.[35]   The circuit court decision on appeal in *Halliburton II* defined "price impact" as follows: "Price impact can be shown either by an increase in price following a fraudulent public statement or a decrease in price following a revelation of the fraud."[36]   Ms. Allen opines that she finds "no price impact from the alleged misrepresentations."[37]   However, as described below, her analysis is flawed and unreliable.   In fact, my event study and the materials Ms. Allen considered in this matter show that Dell's stock price suffered a statistically-significant, Company-specific decline of 17.50% on May 23, 2012 in response to disclosures of information Plaintiff alleges were not disclosed during the Class Period.

---

[35] *Erica P. John Fund, Inc. v. Halliburton Co.*, 309 F.R.D. 251, 260 (N.D. Texas July 25, 2015) (defendants have both the burden of production and persuasion to prove lack of price impact and therefore must prove lack of price impact by evidence that is more probative of lack of price impact than not); *In re Goldman Sachs Grp., Inc. Sec. Litig.*, 2015 U.S. Dist. LEXIS 128856, at *12 fn. 3 (S.D.N.Y. Sept. 24 , 2015) ("Defendants must demonstrate a lack of price impact by a preponderance of the evidence.").

[36] *Erica P. John Fund, Inc. v. Halliburton Co.,* 718 F.3d 423, 434 (5th Cir. 2013) *vacated and remanded on other grounds,* 134 S. Ct. 2398 (U.S. 2014).  This definition was not challenged in the appeal.

[37] Allen Report, ¶3.

**Exhibit 5 to the Expert Report of Zachary Nye, Ph.D., Dated July 30, 2018**

### A.    Dell's Company-Specific May 23, 2012 Stock Price Decline

20.    In assessing Ms. Allen's opinion regarding price impact, it is important to note what is not in dispute.  While my event study tested the reaction to Dell's May 22, 2012 disclosures based on the objective criteria that it was an earnings announcement, the results of my event study, which Ms. Allen does not dispute and assumed were accurate for the purposes of her Report, are relevant to an analysis of price impact.

21.    As set forth in the Nye Report, I conducted an event study to determine whether new, material, Company-specific information promptly cause a measurable stock price reaction after accounting for contemporaneous market and industry effects.[38]  The analysis measured the relationship between Dell stock returns and 1) changes in market-wide factors that would be expected to impact all stocks; and 2) changes in industry-wide factors that would be expected to impact stocks in the "Information Technology" industry.[39]  Expected returns from this analysis are those changes in Dell's stock price that are due to market and industry factors that change the values of all stocks in an economy (market effects) or in the technology sector (industry effects).[40]  Residual returns (*aka* Company-specific returns) from my analysis are the measure of change in Dell's stock price due to Company-specific events and are calculated as the difference between Dell's actual return and its expected return.[41]  In addition, I measured the statistical significance of Dell's Company-specific return on each event date.[42]

---

[38] Nye Report, ¶59.

[39] Nye Report, ¶¶61–62.

[40] Nye Report, ¶63.

[41] Nye Report, ¶63.

[42] Nye Report, footnote 80.

**Exhibit 5 to the Expert Report of Zachary Nye, Ph.D., Dated July 30, 2018**

22.     The undisputed results of my event study establish that Dell's Company-specific return on May 23, 2012—*i.e.*, the portion of Dell's stock price movement that cannot be explained by any market and industry effects that day—is -17.50%, a decline of $2.64 per share.  This result is statistically significant at the 99.9999% confidence level, meaning that the conditional probability of observing a Company-specific return as extreme (in terms of absolute magnitude) as that observed on May 23, 2012 is approximately 0.0001%.

       **B.**      **Allen's Analysis of Price Impact on the Dates of Alleged Misstatements is Flawed—When Statements Are Alleged to Have Omitted Material Information, Price Impact is Measured at the Time of the Corrective Disclosure**

23.     A fatal flaw of Ms. Allen's price impact analysis is her presumption that price impact is best measured at the time of an alleged misrepresentation.  In her Report, Ms. Allen states that "the price impact of an alleged misrepresentation can be analyzed in at least two ways: (1) directly by analyzing market reaction in response to an alleged misrepresentation or (2) indirectly by analyzing the market reaction to a disclosure corrective of an alleged misrepresentation."[43]  However, the distinction Ms. Allen attempts to make between "direct" and "indirect" analyses of price impact is not correct.  Analyzing the market reaction to a disclosure of corrective information is not only a direct measure of price impact, but in the case of material information that was not disclosed, it may be the only appropriate means to measure price impact.[44]

---

[43] Allen Report, ¶12.

[44] Ms. Allen cites to the Supreme Court decision in *Halliburton II* for her comment on "direct" versus "indirect" analyses of price impact.  In *Halliburton II*, however, the Supreme Court noted that a finding of market efficiency, which is not disputed here, is "indirect price impact evidence."

**Exhibit 5 to the Expert Report of Zachary Nye, Ph.D., Dated July 30, 2018**

24.     In her Report, Ms. Allen argues that, based on my event study, Dell's stock price reactions immediately after the alleged misrepresentations were made do not support price impact because there were no statistically significant stock price increases.[45]  However, Ms. Allen has misapplied the event study and, therefore, her conclusions are unreliable.  An event study is designed to quantify the effect of the disclosure of new, material information on the price of a security.[46]

25.     Here, Plaintiff specifically alleges that Defendants' statements were false and misleading because they did not disclose the "true facts, which were then known to or recklessly disregarded by defendants…" and there was "material omitted information that was required to be disclosed to investors.…"[47]  In its motion for class certification, which Ms. Allen said she considered,[48] the Plaintiff reiterated that its claims "are primarily premised on Defendants' failure to disclose material information,"[49] and in the order denying the motion to dismiss in this case, which Ms. Allen testified that she did not consider,[50] the Court stated that the case concerned Defendants' "failure to reveal known, material adverse facts regarding Dell's PC market and PC-sales

---

[45] *See*, *e.g.*, Allen Report, ¶¶3, 39, 42, 50, 53, 64.

[46] Mitchell, Mark L. and Jeffry M. Netter, 1994, "The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission," *The Business Lawyer*, 49, pp. 545–590 at pp. 545, 546: "An event study, a technique developed and refined by financial economists, can be very useful in securities fraud cases.  An event study relates changes in stock prices to the release of new information."

[47] Complaint, ¶¶69, 72, 77, 84.

[48] Allen Deposition, 16:19–24.

[49] Lead Plaintiff's Motion for Class Certification and Appointment of Class Representative and Class Counsel Pursuant to Fed. R. Civ. P. 23(a) and (b)(3) at 9.

[50] Allen Deposition, 37:19–25.

**Exhibit 5 to the Expert Report of Zachary Nye, Ph.D., Dated July 30, 2018**

prospects."[51]  Thus, the alleged misrepresentations would not be expected to coincide with significant stock price increases, and the absence of a statistically significant stock price increase on dates of alleged misrepresentations does not negate the presence of price impact during the Class Period.

26.     It is both logical and well understood by economists that the lack of disclosure of material information would not be expected to impact a stock price at the time the non-disclosure is made.[52]  Simply put, the market cannot respond to what it does not know.  Indeed, a paper published by Ms. Allen's employer, NERA Economic Consulting, explains "one would ***not*** expect the stock price to move when defendants did not make a statement, so ***there is no reason to examine the stock price at the time of an alleged omission***."[53]  I have also been informed that the same principle—*i.e.*, that stock price movements at the time of an alleged misrepresentation are not necessarily informative—is widely-recognized in legal cases addressing event studies in various contexts.[54]

---

[51] *Dell*, 2016 U.S. Dist. LEXIS 126219, *11.

[52] Frank Torchio, *Proper Event Study Analysis in Securities Litigation*, 35 Iowa J. Corp. L. 159, 164 (2009), Ex. 71 ("It is an oxymoron to have an event study of an omitted piece of information.  Consequently, ***it is incorrect and improper to use an event study to analyze or quantify the effect of information that was alleged to have been omitted***.").  (Emphasis added.)

[53] Tabak, David, 2004, "Loss Causation and Damages in Shareholder Class Actions: When it Takes Two Steps to Tango," NERA Economic Consulting.  (Emphasis added.)

[54] *See Erica P. John Fund, Inc. v. Halliburton Co.*, 309 F.R.D. 251, 262 (N.D. Tex. 2015) (analyzing price impact "at the time of the corrective disclosure, rather than at the time of the corresponding misrepresentation, allows for the fact that many alleged misrepresentations conceal the truth."); *In re Goldman Sachs Grp., Inc. Sec Litig,* 2015 U.S. Dist. LEXIS 128856, *19 (S.D.N.Y. Sept. 24, 2015) ("analysis of price impact usually focuses on stock price movement at the time the truth is disclosed."); *In re Intuitive Surgical Sec. Litig.,* 2016 U.S. Dist. LEXIS 178148, *38 (N.D. Cal. Dec. 22, 2016) (in omission case price impact should be analyzed at time of corrective disclosure); *City of Livonia Employees' Ret. Sys. v. Wyeth,* 284 F.R.D. 173, 182 (S.D.N.Y. Sept. 17, 2012) ("in an omission case, the impact of the defendants' misrepresentation should be measured by the stock price reaction following the truth being

**Exhibit 5 to the Expert Report of Zachary Nye, Ph.D., Dated July 30, 2018**

27.     While Ms. Allen recognizes in her summary of the allegations that the "allegations in the case 'arise from Defendants' alleged failure to disclose material information about Dell's PC business,'"[55] her price impact opinions are premised on the incorrect assumption that the case concerns affirmative, false statements, as opposed to omissions.  Ms. Allen opines that the "price reactions at the time of the alleged misrepresentations does not support price impact."[56] However, as discussed above, in a case like this concerning omissions, the lack of price movement at the time of an alleged misrepresentation is not relevant to price impact.  In her deposition, Ms. Allen confirmed that she assumed, incorrectly, that the allegations in this case concerned affirmative, false statements and not omissions.[57]  Thus, her opinions regarding price impact are not reliable.

28.     Ms. Allen's incorrect assumption also leads her to the conclusion that the alleged misstatements regarding Dell's PC revenue were "'disappointing' to the market" and therefore could not have been "unrealistically positive" or led to any price impact.[58]  Ms. Allen misses, or ignores, the point of the allegations.  The statements are not alleged to be "unrealistically

---

disclosed to the market."); *Silverman v. Motorola, Inc.*, 798 F. Supp. 2d 954, 976 (N.D. Ill. 2011) ("this case concerns omissions . . . .  The fact that [the] stock price did not increase in value after the [alleged false statement] is therefore of no moment. . . .  The relevant change in stock price occurs when the information is revealed to the market."  Emphasis added.); *In re HealthSouth Corp. Sec. Litig.*, 257 F.R.D. 260, 282 (N.D. Ala. 2009) ("'[T]he mere absence of a statistically significant increase in the share price in response to fraudulent information does not "sever the link" between the material misstatements and the price of the stock.  Rather, price stability may just as likely demonstrate the market consequence of fraud where the alleged fraudulent statement conveys that the company has met market expectations, when in fact it has not.'").

[55] Allen Report, ¶10.

[56] Allen Report, ¶¶34, 39, 42, 47, 50, 53.

[57] Allen Deposition, 75:12–17; 76:2–11; 198:20–199:13; 207:23–208:10; 213:1–8; 226:21–227:14.

[58] Allen Report, ¶26

**Exhibit 5 to the Expert Report of Zachary Nye, Ph.D., Dated July 30, 2018**

positive" standing alone, but are alleged to be "unrealistically positive" in the context of the material information Defendants are alleged to have failed to disclose.[59]  For example, while an expected 7% decline in revenue could be considered to be negative news, it is undoubtedly more positive than an expected 10% decline in revenue.

29.     Ms. Allen is also erroneous when she argues that there must be a lack of price impact because Dell's stock price did not decline at the time a Jefferies report was published on March 15, 2012.[60]  Again, Ms. Allen ignores the allegations that Defendants did not disclose material information to investors.  Ms. Allen claims that the Jefferies report "revealed the information Plaintiff claims was correctively disclosed at the end of the alleged class period regarding Dell's PC growth."[61]  However, the Jefferies report was identified as a single analyst's speculation that was not based on any information from Dell.[62]  Furthermore, disagreement among analysts is entirely consistent with market efficiency,[63] and the Jefferies analyst conceded that his view of PC growth rates was a "a non-consensus view."[64]  The Jefferies report also was quickly followed by other analyst reports that defended Dell and repeated the Company's more positive

---

[59] Complaint, ¶69.

[60] Allen Report, ¶33.

[61] *Ibid*.

[62] Jefferies, "Computer Hardware Cutting HP and Dell Estimates: Checks Indicate PC Sales Slowing Materially," March 15, 2012.

[63] Fama, Eugene F., 1970 "Efficient Capital Markets: A Review of Theory and Empirical Work," *Journal of Finance,* Vol. 25, Issue 2, pp. 388:

> "disagreement among investors about the implications of given information does not in itself imply market inefficiency unless there are investors who can consistently make better evaluations of available information than are implicit in market prices."

[64] *Supra*, note 62.

**Exhibit 5 to the Expert Report of Zachary Nye, Ph.D., Dated July 30, 2018**

sentiment.[65]  In fact, prior to the alleged May 22, 2012 corrective disclosure, the consensus

estimate for Dell's first quarter revenue remained at approximately $14.9 billion, essentially

unchanged from the consensus following Defendants' February 21, 2012 statements.[66]  Given

this consistency, the lack of a statistically significant stock price movement in response to a

single "non-consensus" analyst report is not unexpected and does not establish a lack of price

impact.

30.    Ms. Allen's opinion that there is an absence of price impact because Dell's stock price

did not increase at the time of the alleged misrepresentations (or decrease at the time of the

Jefferies report) is based on incorrect assumptions about the allegations and is not persuasive.

Where, as here, the alleged misrepresentations omitted material information, the appropriate

methodology to measure price impact is to analyze any stock price change in response to the

alleged corrective disclosure.  As discussed above and below, the alleged corrective disclosure in

this case was on May 22, 2012 and that disclosure was immediately followed by a statistically

significant 17.50% Company-specific decline in Dell's stock price.

> **C.    The Company-Specific Disclosures on May 22, 2012 and Resulting Stock Price Decline on May 23, 2012 are Related to the Allegedly Omitted Information**

31.    Ms. Allen confirmed in her deposition that an understanding of the allegations is

necessary to appropriately analyze price impact.[67]  Ms. Allen also testified that she did not

---

[65] *See, e.g.*, Brean Murray Carret & Co., "Defending Dell – Raising 2012 Estimates, Buying On Weakness And Adding To Our Long-Term Conviction Focus List – Our Framework For EPS Upside," March 26, 2012; and UBS Investment Research, "Meeting Reinforces Our Thesis; Own For 2H," March 30, 2012.

[66] Bloomberg, "EE HIST" function.

[67] Allen Deposition, 20:10–25.

**Exhibit 5 to the Expert Report of Zachary Nye, Ph.D., Dated July 30, 2018**

perform an event study of Dell stock,[68] and in order to determine what caused the 17.50%

decline in the Company's stock price on May 23, 2012, she reviewed Dell's disclosures on May

22, 2012 and analyst reports following those disclosures.[69]  As discussed above, as a result of

Ms. Allen's failure to recognize that this case concerns the alleged omission of material

information, Ms. Allen did not analyze whether the information Plaintiff alleges was omitted was

related to Dell's disclosures on May 22, 2012.  Following from that error, Ms. Allen also fails to

account for the factors that analysts covering Dell identified as the reasons for the Company's

unexpected first-quarter 2013 drop in revenue and the May 23, 2012 stock price decline.  A

review of the alleged material omissions, Dell's May 22, 2012 disclosures, and analyst and news

reports regarding those disclosures, shows that the May 23, 2012 stock price decline was due to

Company-specific disclosures that are directly related to the information Plaintiff alleges the

Defendants omitted during the Class Period.  That invalidates Ms. Allen's opinion that there is

no price impact associated with the alleged misrepresentations.  To the contrary, it evidences that

the misrepresentations did impact the price of Dell stock during the Class Period.

32.     In sum, Plaintiff has alleged that Dell failed to disclose significantly declining PC sales

growth in Dell's EMEA and Asian markets due to shifting customer demands, increasing

competition from low cost competitors which led to Dell making the decision during the quarter

to not compete in those markets, and operational deficiencies within its sales division, all of

which were negatively impacting Dell's PC demand and revenue.[70]  As the court in this matter

summarized, "Defendants fail[ed] to reveal known, material facts regarding Dell's PC market

---

[68] Allen Deposition, 21:6–10, 230:21–233:11.

[69] Allen Deposition, 97:2–9, 237:18–238:9.

[70] Complaint, ¶¶69, 72, 77, 84, 88.

**Exhibit 5 to the Expert Report of Zachary Nye, Ph.D., Dated July 30, 2018**

and PC-sales prospects in the future."[71]  The question then is whether Dell's May 22, 2012 press release and conference call statements revealed facts about Dell's prospects as a result of declining PC sales growth that, as alleged, had previously been omitted from Defendants' statements.  As Ms. Allen concedes, the only Company-specific disclosures that could have caused the 17.50% Company-specific price decline on May 23, 2012 would have been the May 22, 2012 press release and conference call statements.[72]

33.     Dell's May 22, 2012 press release disclosed that the Company's revenue was $14.4 billion, a quarter-over-quarter decline of 10%, including a 12% revenue decline in the Company's Consumer segment.[73]  The quarter-over-quarter revenue decline was, as alleged, significantly worse than the Company had led investors to believe would be the case on February 21, 2012.[74]  In the conference call following the press release, Dell's Senior Vice President and Chief Financial Officer, Brian Gladden and Steve Felice, the President of Dell's Consumer and Small and Medium Business segments, identified the factors that led to Dell's revenue being "below our outlook" due to PC demand:

> Brian Gladden - Dell Inc - SVP, CFO
> For the quarter, we delivered revenue of $14.4 billion, down 4%.  This was below our outlook.  There are a few key causes to the shortfall.  **Our sales execution was not up to our expectations** and we've made changes to improve this as we head into the second quarter.  Additionally**, the demand environment was tougher than we had planned.**  And I would specifically highlight **weaker demand in markets like EMEA and parts of Asia, in addition to public markets**.  Finally, we are seeing a **more challenging competitive environment** in a few areas of the business….
>
> Steve Felice - Dell Inc - Pres. - Consumer, Small and Medium Business

---

[71] *Dell*, 2016 U.S. Dist. LEXIS 126219, *11.

[72] Allen Deposition, 235:13–21.

[73] *Business Wire*, "Dell Reports First Quarter Financial Results," May 22, 2012, 4:01 PM.

[74] Complaint, ¶¶90–92.

**Exhibit 5 to the Expert Report of Zachary Nye, Ph.D., Dated July 30, 2018**

Before get into the results by business unit, I want to provide a more detailed view of factors which impacted Q1 results, as well as some proof points supporting progress in our transformation. We believe these changes will position us for long-term success. Let's start with **sales force productivity, where execution was below our expectations** and impacted our Q1 results. As you all know, we took action last year to accelerate our transformation by hiring sales specialists to focus on our enterprise business solutions. While we've seen progress here, we still have more to do to improve our sales execution. Exiting the quarter, we have made some modifications to our selling model that will improve results going forward.…

Now looking externally, **the environment remains challenging. Consumer spending on desktops and notebooks continues to be under pressure and much of the growth in Consumer has migrated to entry-level products in emerging markets, where we've chosen not to participate.** We are also seeing some IT spending prioritized to purchase other mobile devices. Now this is mostly a Consumer dynamic, but there is clearly some impact in areas of Commercial, as well. Growth markets were flat despite growth in China of 9%. We navigated these emerging markets more cautiously in Q1 and we are optimizing for profit, given the economic uncertainty.

…**The Consumer business was our biggest challenge in the quarter,** with Consumer notebook revenue down 15%, **as we limited our participation in the profit-challenged entry-level systems**.…[75]

34.    Regarding the Company's outlook for the year, Brian Gladden reiterated concerns over

the competitive pricing environment:

Despite the good progress we are making with our Enterprise Solutions and Services, **our overall revenue performance wasn't where it needed to be in the first quarter.** As Steve said, we are confident that we have action plans in place to fix our execution and improve our top line growth as we move through the year. In addition, the investments we've made position us well, as we strengthen our execution. While we believe spending has been delayed in some areas, we have a healthy pipeline of business and expect to gain growth momentum as the year progresses. We do have concerns about the impact of the **competitive pricing environment**. We'll continue to monitor these dynamics and adjust our tactics to optimize operating income and cash flow for the Company based on how the market plays out.

---

[75] *Thomson Reuters StreetEvents,* "Edited Transcript; DELL – Q1 2013 Dell Inc. Earnings Conference Call, Event Date/Time: May 22, 2012 / 9:00PM GMT."  (Emphasis added.)

**Exhibit 5 to the Expert Report of Zachary Nye, Ph.D., Dated July 30, 2018**

> **While we are not off to the start we expected for the year**, it is too early in the year to adjust our FY13 EPS outlook.  We intend to provide an update on the total year outlook during our second quarter earnings call in August.  For the second quarter, we expect revenue to be in line with normal seasonality of the sequential increase of 2% to 4%, mostly driven by our Public business seasonality.[76]

35.   Based on a plain reading of the Plaintiff's allegations and the disclosures, the factors identified by Dell's representatives as the cause of the first-quarter 2013 revenue shortfall, as well as reduced second-quarter 2013 revenue guidance, are directly related to the information about declining PC sales growth in Dell's EMEA and Asian markets due to shifting customer demands, increasing competition from low cost competitors which led to Dell making the decision during the quarter to not compete in those markets, and operational deficiencies within its sales division, all of which were negatively impacting Dell's PC demand and revenue, that Plaintiff alleges was omitted during the Class Period.

36.   A review of the analyst and news reports on and immediately after the May 22, 2012 disclosures confirms that the market was focused on and negatively reacting to the information about Dell's PC demand and revenue, that Plaintiff alleges was omitted during the Class Period. For example, a May 22, 2012 **Deutsche Bank** report identified that Dell's first-quarter 2013 "profit fumble" was due to "sales execution issues, competitive pressure in client and deteriorating macro," as well as "aggressive pricing/weakness in client PCs which negatively impacted margins as Dell opted to walk away from LE/less profitable business."[77]  An **RBC** report the same day reported that "[s]ales were -10% q/q, below guidance of a sequential decrease" and cited negative factors that had been disclosed, including "return of competitive

---

[76] *Id.*  (Emphasis added.)

[77] Deutsche Bank, "Another profit fumble; cutting est's and PT to $17," May 22, 2012.

**Exhibit 5 to the Expert Report of Zachary Nye, Ph.D., Dated July 30, 2018**

environment," "softness in desktops and notebooks that may accelerate into the Win8 refresh," and "potential softness in EMEA & Public."[78]

37.     On May 23, 2012, analysts again reported that Dell's below-guidance revenues, and resulting negative stock price response, were due to factors Plaintiff alleges were not disclosed during the Class Period.  For example: **Brean Capital** reported that "revenue of $14.4B was 3% softer than Street of $14.9B" and that "[r]evenue softness was driven by – Lack of crisp sales execution in Enterprise and Public, which also dampened operating margins ….  Aggressive consumer PC pricing particularly in Asian markets although broadly as well, in which Dell declined to participate, leading to unabsorbed costs. … [And,] [c]ustomers spent more on tablets than anticipated during the quarter – primarily in consumer but also in Financial Services and Education.[79]  **Evercore** reported Dell's quarterly results were "even weaker than expected," and that the Company "continues to walk away from just too much business in the name of margin stability."[80]  **J.P. Morgan** expected Dell shares to be under pressure, stating that PC revenue weakness and Dell's "poor execution in its sales coverage" overshadowed improvements in "value-add sales."[81]  **Morningstar** said the Company's first quarter results were disappointing "as the firm struggled to deal with weak demand in Europe and stiff headwinds facing the PC

---

[78] RBC Capital Markets, "Dell, Inc.; More Pain Ahead.  Remain on the Sidelines," May 22, 2012.

[79] Brean Murray Carret & Co., "Dell, Inc.; Sales Mis-Steps & Soft PC Revenue Pressure Results; Removing DELL From Focus List," May 23, 2012.

[80] Evercore, "Dell, Inc.; Struggling to Offset PC Erosion," May 23, 2012.

[81] J.P. Morgan, "Dell, Inc.; A Hard Rain: Weak PCs and Sales Force Refinement Overshadow Improvements in Value-add Sales," May 23, 2012.

**Exhibit 5 to the Expert Report of Zachary Nye, Ph.D., Dated July 30, 2018**

market."[82]  Regarding the Company's guidance, **Maxim Group** stated that "Dell guided F2Q13 revenue growth of 2%-4% q/q, implying revenues of $14.7 billion to $15.0 billion, less than consensus at $15.4 billion.  Dell mentioned that the demand environment in the United States and Europe remain weak, combined with shrinking consumer sales."[83]

38.    Financial news stories also attributed Dell's stock price decline on May 23, 2012 to the Company's reported revenue results and the previously undisclosed problems impacting revenue and PC demand.  For example, *MarketWatch* reported:

> Dell Inc.'s disappointing first quarter results were even worse than investors had expected, and one big factor was a big decline in its consumer business.
>
> Out of its total first quarter revenue of $14.4 billion, which fell 4% in its fiscal first quarter, consumer revenue was $3 billion, a drop of 12%.  Dell (DELL, US) said that it decided not to participate in consumer notebook price wars that were raging in Asia, and it left business on the table and "backed off" as competitors fought it out for shelf space.
>
> It also said another factor in the consumer arena was more consumer adoption of "alternative mobile devices" a euphemism that was a reference to Apple Inc.'s (AAPL, US) iPad.  Dell said it is on target to unveil a tablet with Microsoft Corp.'s (MSFT, US) next version of Windows.
>
> On the company's conference call with Wall Street, analysts appeared to be questioning Dell's decision to leave some revenue on the table, as well as its decision to not yet revise its full year estimates, when its forecast for its fiscal second quarter was weaker than expected.
>
> Investors were not as confident as Dell and its shares fell 12% in after hours trading.[84]

---

[82] Morningstar, "Dell, Inc.; Dell's Results Take a Hit as the Firm Walks Away from Tough PC Pricing," May 23, 2012.

[83] Maxim Group, "Dell, Inc., Steering a tough competitive environment; Maintain Buy; Reducing Price Target from $20 to $16," May 23, 2012.

[84] *MarketWatch*, "Dell gets hurt in part by Asia, iPad; Commentary: Street lacks confidence it can meet year estimates," May 22, 2012, 5:59PM.

## Exhibit 5 to the Expert Report of Zachary Nye, Ph.D., Dated July 30, 2018

*Forbes* also attributed the May 23 stock price decline to the Company's "failure to meet expectations":

> Tuesday, Dell reported drops in sales and profits. Its fiscal first fiscal quarter revenue was down 4% to $14.4 billion while its net income fell 33% to $635 million. That revenue slide included a 12% fall in consumer revenue, and smaller declines in both business and government sales.
>
> And its failure to meet expectations drove down Dell stock 17% on Wednesday -- bringing its market capitalization down 78% to $22 billion since its $100 billion peak in March 2000.[85, 86]

39.     Based on a review of Dell's disclosures, analyst reports and news reports that Ms. Allen asserted that she considered and would be relevant to an analysis of price impact, it is apparent that Dell representatives attributed the Company's declining revenue in first-quarter 2013 to factors directly related to the information Plaintiff alleges was not disclosed during the Class Period. It is also apparent that market participants, including analysts and financial news reporters, reacted to the disclosures negatively and that the disclosures resulted in the statistically significant, Company-specific stock price decline identified in my event study. These facts are

---

[85] *Forbes*, "No End in Sight for Dell's Lost Decade," May 24, 2012, 8:48 AM.

[86] *See also*, *Silicon Valley/San Jose Business Journal Online*, "Dell's stock continues to dive on earnings," May 23, 2012; *The New York Times*, Dell Misses Estimates as Computer Sales Slump," May 23, 2012; *Dow Jones News Service*, "WSJ BLOG/MarketBeat: Dell Posts Weak First-Quarter, Shares Slide," May 22, 2012, 4:24 PM; *Dow Jones News Service*, "Dell 1Q Profit Down 33% As Revenue Slips," May 22, 2012, 4:17 PM; *The Wall Street Journal*, "WSJ: Dell's PC Struggles Continue," May 22, 2012, 7:12 PM; *Reuters News*, "UPDATE 3-Dell results disappoint Street, shares dive," May 22, 2012, 4:09 PM; *MarketWatch*, "Dell shares fall on disappointing results; Consumer business has become more challenging, CFO says," May 22, 2012, 7:20 PM; *Dow Jones News Service*, "Dell Shares Hit New 52-Week Low On Worries About Tech Spending," May 23, 2012, 11:58 AM; *The Globe and Mail*, "Investors clobber Dell, tee up for HP; HP shares declining ahead of after-market quarterly results," May 23, 2012; and *The Wall Street Journal Online*, "Dell Shares Plunge on Tech Spending Worries," May 23, 2012, 2:58 PM.

**Exhibit 5 to the Expert Report of Zachary Nye, Ph.D., Dated July 30, 2018**

contrary to Ms. Allen's opinion that there is no price impact associated with the alleged misrepresentations and renders her opinion unsupportable.

> **D.    Ms. Allen's Opinions Regarding the "Other Factors" That Could Have Caused Dell's Stock Price Decline on May 23, 2012 Are Flawed**

40.     In order to reach the opinion that the undisputed 17.5% Company-specific decline in Dell's stock price on May 23, 2012 does not provide any evidence of price impact, Ms. Allen asserts that that price decline "can be attributed to other factors."[87]  In her Report, Ms. Allen states that none of the statistically significant stock price decline on May 23, 2012 was due to any disclosure related to the fraud and that it was instead due to the following "other factors:" (1) "confusion in the market" due to Dell's fourth-quarter 2012 being a 14-week quarter; (2) "increased uncertainty" in the technology sector; (3) "disappointment regarding both weak guidance for the second quarter and lack of guidance for the full year;" and (4) that first-quarter 2013 "revenues were at the low end of the estimated range."[88]  At her deposition, however, Ms. Allen acknowledged that she "did not parse the price decline into its various factors other than to examine whether any of it was due to the alleged misrepresentations."[89]  Ms. Allen was unable to identify what, if any, of the May 23, 2012 stock price decline was due to any of her "other factors," and she admitted that she did not try to determine if any of that stock price decline was due to anything other than her "other factors."[90]

41.     According to her testimony, the "methodology" Ms. Allen employed to reach her conclusion that other, non-fraud factors caused the May 23, 2012 stock price decline was a

---

[87] Allen Report, ¶¶57–64.

[88] *Id.*, ¶57.

[89] Allen Deposition, 205:18–206:4.

[90] Allen Deposition, 236:25–237:5, 238:15–241:8, 242:13–244:8.

**Exhibit 5 to the Expert Report of Zachary Nye, Ph.D., Dated July 30, 2018**

"review of the analysis and valuation of the analysts that [were] covering Dell" and those analysts' "commentary and thoughts about what may be affecting the market."[91]  However, as discussed below, with a single exception, Ms. Allen has now admitted that she could not identify a single analyst who attributed any, let alone all, of the May 23, 2012 stock price decline to any one or combination of Ms. Allen's "other factors."  In fact, as discussed below, these "other factors" would require the entire market to be "confused" and ignorant of obvious facts, are general to the technology sector and, thus, already accounted for in my event study, are based on an "announced" first-quarter 2013 revenue range that was never actually announced, or are actually related to the alleged omissions.

### i.   Confusion Regarding Dell's Financial Quarters

42.    Ms. Allen claims that Dell's May 23, 2012 stock price decline can be attributed in some unknown part to "confusion in the market due to the 14-week issue" (the fact that Dell's fiscal fourth-quarter 2012 was a 14-week quarter and Dell's fiscal first-quarter 2013 was a 13-week quarter).[92]  Her opinion, however, ignores the fact that before and during the Class Period, Dell repeatedly informed investors and analysts that its fourth-quarter of 2012 spanned 14 weeks, and made clear that its revenue guidance for first-quarter of 2013 was adjusted for the 14th week:

> For Q1, the company expects revenue to decline approximately 7 percent sequentially, which aligns with normal seasonality **adjusted for the fourteenth week**.[93]
>
> Over the past three years our first quarter revenue has averaged approximately a 4% sequential decline.  When **normalized for the 14th week**, this decline is

---

[91] Allen Deposition, 237:15–238:9.

[92] Allen Report, ¶¶21–25, 57, 64.

[93] *Business Wire*, "Dell Record Fiscal Year 2012 Highlighted By Enterprise Solutions and Services Strength," February 22, 2012 (emphasis added).

**Exhibit 5 to the Expert Report of Zachary Nye, Ph.D., Dated July 30, 2018**

closer to 7%.  We expect our first quarter revenue to be approximately in line with this adjusted historical decline.[94]

43.    Analysts covering Dell were not confused by the fact that Dell's fourth-quarter 2012 had 14 weeks.  In fact, numerous analysts specifically discussed the fact that there was an extra week in Dell's fourth-quarter 2012.  Prior to the Class Period, when a single analyst cited by Ms. Allen stated "the extra week phenomenon **could** create some confusion,"[95] numerous other analysts specifically noted that fourth-quarter 2012 would have an extra week compared to Dell's normal quarters.  For example:

- UBS: "the **extra week** due to it being a 53 week year may not necessarily help."[96]

- RBC Capital Markets: "We estimate the implied FQ4 guide is for 4% Q/Q revenue growth to $15.9B (300bps due to **extra week**)."[97]

- Deutsche Bank: "Management expects FY12 revenue growth to trend towards the lower end of its prior guidance of +1-5% Y/Y due to uncertainties in the macro environment (note the **extra week in 4Q** represents ~3ppt of top line growth).[98]

- Cowen: "Guidance is now at the lower end of its +1-5% y/y range (w/ the help of a **14-week F4Q)**."[99]

- Evercore: "FQ4 boosted by **extra 14th week** but constrained by soft macro and HDD supply."[100]

---

[94] *Thomson Reuters StreetEvents*, "Edited Transcript; DELL - Q4 2012 Dell Inc. Earnings Conference Call, Event Date/Time: February 21, 2012 / 10:00PM GMT.

[95] Allen Report, ¶22 (emphasis added).

[96] UBS, "Near-Term Bumps, But L-T Strategy Intact," November 2, 2011 (emphasis added).

[97] RBC Capital Markets, "Top-Line Pressures May Persist a Few More Quarters; Shares Likely Rangebound," November 15, 2011 (emphasis added).

[98] Deutsche Bank, "Margin upside yet again; raising estimates," November 15, 2011 (emphasis added).

[99] Cowen, "Dell Reports Mixed F3Q12; Macro, PC Weakness Drive Revenue Outlook Lower," November 16, 2011 (emphasis added).

[100] Evercore Partners, "EPS Beat But Limited Momentum," November 16, 2011 (emphasis added).

**Exhibit 5 to the Expert Report of Zachary Nye, Ph.D., Dated July 30, 2018**

- <u>UBS</u>: "FY4Q12 does not look overly aggressive when adjusting for the **extra week in the qtr**."[101]

- <u>Credit Suisse</u>: "The company noted **an additional week in the quarter**, which represents about 3% of growth."[102]

- <u>Maxim</u>: "Revenue guidance has been revised lower even though 4Q12 has a **14th week**, which the company estimates will add 3% in additional quarterly revenue."[103]

44.     At the start of the Class Period, analysts again overwhelmingly recognized that Dell's fourth-quarter 2012 had 14 weeks and that its first-quarter 2013 would have 13 weeks.  Indeed, not only did analysts report on and adopt the Company's guidance of a 7% decline in revenue quarter-over-quarter (which was "normalized for the 14th week"[104]), but they specifically identified the effect of the additional week in the fourth quarter:

- <u>Deutsche Bank</u>: "results benefited from an **extra week in the quarter**."[105]

- <u>Barclays Capital</u>: "Dell believes the **extra week** of sales attributed 3 points of revenue growth in the quarter…. For F1Q13, Dell expects revenue to be down 7% q/q vs. a typical sequential decline of 4% but normalized to take out the **extra week in F4Q12**."[106]

- <u>UBS</u>: "Dell expects revenues to decline 7% sequentially more than typical seasonality of 4% due to **14th week in January '12 quarter**."[107]

---

[101] UBS, "Dell 10-Q/K Picturebook – A Visual Look," November 30, 2011 (emphasis added).

[102] Credit Suisse, "F4Q12 Preview," February 16, 2012 (emphasis added).

[103] Maxim Group, "On the comeback trail, exposed to secular growth," February 17, 2012 (emphasis added).

[104] *Thomson Reuters StreetEvents*, "Edited Transcript; DELL - Q4 2012 Dell Inc. Earnings Conference Call, Event Date/Time: February 21, 2012 / 10:00PM GMT.

[105] Deutsche Bank, "PC profits bitten by the HDD bug," February 21, 2012 (emphasis added).

[106] Barclays Capital, "Backs FY13 EPS Growth, but Some Cracks in Margins," February 21, 2012 (emphasis added).

[107] UBS, "Dell Inc, Thesis Intact; Reiterate Buy Rating," February 21, 2012 (emphasis added).

**Exhibit 5 to the Expert Report of Zachary Nye, Ph.D., Dated July 30, 2018**

- <u>Wells Fargo</u>: "For Q1 of FY13 Dell expects revenue growth to decline by 7% q/q after normalizing for the **extra week in 4Q FY12**, which is roughly in line with seasonal trends when accounting for the 14th week in the January quarter."[108]

- <u>Barclays</u>: "Revenues were US$16bn (up 2% y/y and 4% q/q, which includes an **extra 14th week**), in line with consensus of US$15.96bn (our estimate: US$16.2bn)."[109]

- <u>BMO</u>: "While we concede that higher payable days due to an **additional one week in the quarter** helped contribute an incremental $450 million …"[110]

- <u>Brean Capital</u>: "revenue guidance for the Jan Q of a 7% decline is in-line with normal seasonality (after normalizing for an **extra week in the Jan Q**)."[111]

- <u>Collins Stewart</u>: "Revs of $16B, up 2% y/y but likely down 1% taking out the **extra 14th week** which added 300bp to growth."[112]

- <u>Evercore</u>: "Dell's **extra 14th week**…could not fuel more than revs slightly up and EPS slightly down."[113]

- <u>FBN Securities</u>: "DELL is coming off of a **14-week quarter** in FQ4."[114]

- <u>Jefferies</u>: "As we expected, FY13 (Jan) EPS guidance was optimistic…. Solid FY13 EPS guidance: management guided FQ1 (Apr) revenues -7% Q/Q vs. typical seasonality of -4% and St -5% due to the **extra week in FQ4**."[115]

---

[108] Wells Fargo, "DELL: Solid Progress On Transition," February 21, 2012 (emphasis added).

[109] Barclays Capital, "Dell FY4Q12 results implications for Asia: revenue in line, but EPS and next quarter sales guidance below consensus," February 22, 2012 (emphasis added).

[110] BMO Capital Markets, "Margins Matter, Wanting More," February 22, 2012 (emphasis added).

[111] Brean Murray Carret & Co., "FY13 EPS Guide Stronger Than Street; Revenue Growth A Question," February 22, 2012 (emphasis added).

[112] Collins Stewart, "Mixed Quarter," February 22, 2012 (emphasis added).

[113] Evercore, "In Line Qtr but Still Limited Reasons to Expect Any Growth in CY12," February 22, 2012 (emphasis added).

[114] FBN Securities, "DELL: FQ4 – Retain Sector Perform on Margin/Revenue Concerns, but Stock Could Be Attractive Below $17," February 22, 2012 (emphasis added).

[115] Jefferies, "FQ4 (Jan) Results: Revenues and EPS Guidance Solid but GM Pressured, EPS Light," February 22, 2012 (emphasis added).

**Exhibit 5 to the Expert Report of Zachary Nye, Ph.D., Dated July 30, 2018**

- <u>JP Morgan</u>: "Without the **extra week in Jan-Q**, the Apr-Q guide would be for a -4% QoQ decline."[116]

- <u>RBC</u>: "Dell guided for an Apr-qtr revenue decline of 7% sequentially, negatively impacted due to the **extra week in Jan-qtr**."[117]

- <u>BMO</u>: "Dell's client revenues…declined approximately 8% y/y (after adjusting for **one extra week**)."[118]

- <u>S&P Capital IQ</u>: "Sees Q1 FY 13 revenues down about 7% sequentially, which aligns with normal seasonality adjusted for the **fourteenth week**."[119]

- <u>Maxim Group</u>: "Normalized for the **14th week**, the [forecast] declines are slightly worse than historical patterns."[120]

- <u>Barclays</u>: "We note that Dell guided F1Q13 revenue to be down 7% q/q vs. a typical sequential decline of 4% but adjusted to take into account an **extra week in F4Q12**."[121]

As these reports evidence, the notion that the entire market, or even a meaningful portion of the market, was somehow confused by the 14-week quarter, a fact that Dell discussed and that was widely taken into account by analysts, is not tenable.

45.      The only analyst report issued during the Class Period that Ms. Allen relies on to support her opinion that "market was confused about quarterly revenue comparisons given the long quarter" is a February 22, 2012 report from the Danish Jyske Bank that said "[w]e do not believe that consensus has taken the extra week in Q4 fully into account."[122]  However, following Dell's

---

[116] JP Morgan, "Near-Term Bump Creates Opportunity as Mix Shift Continues; We Still Expect Positive Inflection Point," February 22, 2012 (emphasis added).

[117] RBC Capital Markets, "Thoughts on Dell's earnings report," February 22, 2012 (emphasis added).

[118] BMO Capital Markets, "Dell, Better by Compare," February 23, 2012 (emphasis added).

[119] S&P Capital IQ, "Dell, Inc," February 23, 2012 (emphasis added).

[120] Maxim Group, "Navigating a tough IT spending environment, price target reduced from $23 to $20," April 12, 2012 (emphasis added).

[121] Barclays, "Earnings Guide 7/12: HP Restructuring? Eyes on Dell Margin & NTAP Guidance too," May 14, 2012 (emphasis added).

[122] Allen Report, ¶21.

**Exhibit 5 to the Expert Report of Zachary Nye, Ph.D., Dated July 30, 2018**

February 22, 2012 statements, analysts, on average, expected Dell's first-quarter 2013 revenue to decline 7% compared to its fourth-quarter 2012 (*i.e.*, to be approximately $14.9 million),[123] which is consistent with the revenue decline guided by Dell which included the 3% decline to account for the 14th week in fourth-quarter 2012.  Accordingly, the concern expressed in the Jyske Bank report was based on an incorrect assumption regarding the consensus view of Dell's first-quarter revenue, and that consensus view demonstrates that analysts and the market took into account, and were not confused by, Dell's 14-week fourth-quarter 2012.

46.     Ms. Allen further asserts that the "experience of Apple stock during this time period shows how revenue comparisons after a 14-week quarter can create confusion, uncertainty and large price drops."[124]  She also relies on purportedly similar examples concerning The New York Times and Costco.[125]  However, Ms. Allen fails to explain how any of these purported examples is relevant to Dell.  As Ms. Allen recognizes, there are numerous companies with fiscal quarters of varying lengths, and Ms. Allen has done no analysis regarding whether any so-called confusion is common or can even be measured.[126]  Ms. Allen has also failed to undertake any appropriate analysis of whether, or to what extent, the purported confusion with Apple, The New York Times or Costco's quarter length resulted in a company-specific stock price change.[127, 128]

---

[123] Bloomberg, "EE HIST" function.

[124] Allen Report, ¶¶23, 24.

[125] Allen Report, ¶25.

[126] Allen Deposition, 168:22–169:18.

[127] Allen Deposition, 167:9–22, 171:6–11, 171:25–172:8, 177:15–179:1.

[128] Regarding Apple, Ms. Allen relies solely on select news commentators.  (Allen Report, ¶23.) She fails to consider other likely explanations for the decline in Apple's stock price on January 24, 2013, such as "Apple's decision to change the way it provides guidance" which was reportedly "sparking fears," (Wells Fargo, "AAPL: Closer To Thawing--Lower Estimates But Thesis Unchanged," January 24, 2013), or that Apple's guidance for next quarter came in "well

**Exhibit 5 to the Expert Report of Zachary Nye, Ph.D., Dated July 30, 2018**

47.     Furthermore, in an efficient market, which Ms. Allen concedes for Dell stock, informed market players would have taken advantage of any such confusion by, for example, purchasing the stock if its price were to fall below a value that reflected all publicly available information, thereby arbitraging away any price impact due to such confusion.[129]  Indeed, market efficiency ensures that there would not be a statistically significant stock price movement simply due to confusion.

48.     In the end, Ms. Allen has not identified any analyst report attributing any of Dell's May 23, 2012 stock price decline to "confusion in the market due to the 14-week issue," and she has conceded that she has no recollection of any analyst or news report attributing any of Dell's May 23 stock price decline to such confusion in the market.[130]  Based on my review, I have not identified a single analyst or news commentator that conveys confusion regarding the 14-week quarter as a reason for any of the May 23, 2012 stock price decline.  Thus, Ms. Allen has

---

short of consensus expectations."  (Cowen and Company, "Mixed F1Q13 Not Good Enough; New Guidance Parameters Push Estimates Low," January 23, 2012).  Indeed, analysts felt that "Apple delivered in-line results and like last quarter provided disappointing guidance." (Oppenheimer, "Apple inc., Just One of the Guys," January 23, 2013.)  Ms. Allen also fails to consider industry effects on Apple's stock price decline on January 24, 2013.  (Allen Report, footnote 30, Allen Deposition, 167:23–168:7.)   Regarding The New York Times and Costco, Ms. Allen did not even look at the respective company's stock price reaction to the disclosures she cites.  (Allen Deposition, 177:15–178:1, 178:22–179:1.)

[129] *See* Sharpe, William F., et al., *Investments,* Prentice Hall, 1999, 6th Ed., p. 284:

Arbitrage activity is a critical element of modern, efficient security markets.  Because arbitrage profits are by definition riskless, all investors have an incentive to take advantage of them whenever they are discovered.  Granted, some investors have greater resources and inclination to engage in arbitrage than others.  However, it takes relatively few of these active investors to exploit arbitrage situations and, by their buying and selling actions, eliminate these profit opportunities.

[130] Allen Deposition, 244:9–245:4.

## Exhibit 5 to the Expert Report of Zachary Nye, Ph.D., Dated July 30, 2018

provided no basis for her conclusion that there is a lack of price impact because the May 23, 2012 stock price decline was due to "confusion in the market due to the 14-week issue."

### ii.      Technology Sector Uncertainty

49.     Ms. Allen claims that some unknown portion of Dell's Company-specific, 17.5% stock price decline on May 23, 2012 can also be attributed to "increased uncertainty" in the technology sector.[131]  She states that this conclusion is based on the fact that "[c]ompanies other than Dell in the technology sector also experienced large price drops around the end of the alleged class period, which were attributed to the uncertain and volatile environment in the market at the time."[132]  Similar to her opinion regarding "confusion in the market due to the 14-week issue," Ms. Allen's attempt to attribute Dell's May 23, 2012 stock price decline to "increased uncertainty" in the technology sector lacks any support.

50.     First, my event study, which Ms. Allen adopts, already controls for any uncertainty in the technology sector that may have affected Dell's stock price on May 23, 2012.  As explained in the Nye Report,

> For the purposes of examining market efficiency, I have conducted an event study to determine whether new, material, Company-specific information promptly caused a measurable stock price reaction after accounting for contemporaneous market and industry effects.  **In an effort to isolate Company-specific effects that influenced Dell's stock price during the Class Period**, I performed a regression analysis to measure the relationship between Dell stock returns and 1) changes in market-wide factors that would be expected to impact all stocks; and 2) **changes in industry-wide factors that would be expected to impact stocks in the "Information Technology" industry**.  By measuring how Dell stock returns move in relation to an overall market index and an industry index, I can also measure how it responds to Company-specific news.[133]

---

[131] Allen Report, ¶¶57, 61, 62, 64.

[132] Allen Report, ¶62 (discussing a decline in Cisco's stock on May 10, 2012; a decline in Cognizant's stock on May 7, 2012; and a decline in Teradata's stock July 6, 2012).

[133] Nye Report, Appendix A, ¶59.  (Emphasis added.)

**Exhibit 5 to the Expert Report of Zachary Nye, Ph.D., Dated July 30, 2018**

51.     As Ms. Allen recognizes, all of the technology companies she cites are included in my peer index.[134]  Thus, the effects of these companies on Dell's stock price have been removed from the 17.5% statistically significant, Company-specific stock price decline on May 23, 2012 identified by my regression analysis.  Furthermore, the examples of stock price declines for other companies cited by Ms. Allen, all of which occurred on dates other than May 23, 2012, would have impacted Dell's stock price on those dates, not May 23, 2012.

52.     Second, Ms. Allen has not even attempted to determine whether any of the companies she cites to in her Report actually suffered from statistically significant stock price declines in or around May 2012, let alone identified any facts to support her conclusion that those declines were due "to the uncertain and volatile environment in the market at the time."[135]  Based on her list of materials considered,[136] Ms. Allen did not consider any analyst reports regarding the technology sector companies identified in her Report,[137] let alone attempt to determine what the stock price declines she cites were attributed to.  Indeed, Ms. Allen does not even acknowledge that each of the price declines she discusses in her Report immediately followed the release of new negative information pertaining to the company at issue.[138]

---

[134] Allen Report, footnote 96; Nye Report, Exhibit 11C.

[135] Allen Deposition, 168:11–16, 253:13–254:4.

[136] Allen Report, ¶8.

[137] Allen Report, ¶62.

[138] The decline in Cisco's stock on May 10, 2012 followed its quarterly earnings results and guidance (*ENP Newswire*, "Cisco Reports Third Quarter Earnings," May 10, 2012); the decline in Cognizant's stock on May 7, 2012 followed its quarterly earnings results and guidance *(PR Newswire*, "Cognizant Announces First Quarter 2012 Results and Expanded Share Repurchase Program," May 7, 2012, 6:00AM); the decline in Teradata's stock July 6, 2012 followed the earnings release of Informatica Corp., which reportedly had a negative impact on the shares of

**Exhibit 5 to the Expert Report of Zachary Nye, Ph.D., Dated July 30, 2018**

53.     Again, in the end, Ms. Allen does not identify any analyst report attributing any of Dell's May 23, 2012 stock price decline to uncertainty in the technology sector and in her deposition she conceded that she has no recollection of any analyst or news report attributing any of the stock price decline to any confusion in the market.[139]  Based on my review, I have not identified a single analyst or news commentator that attributes any of the May 23, 2012 stock price decline to uncertainty in the technology sector.  Thus, Ms. Allen has provided no basis for her conclusion that there is a lack of price impact because the Dell-specific May 23, 2012 stock price decline was due to uncertainty in the technology sector.

### iii.     Dell's Weak Guidance for Second-Quarter 2013, and Lack of Guidance for Full-Year 2013

54.     Next, Ms. Allen claims that some unknown portion of Dell's 17.5% Company-specific stock price decline on May 23, 2012 can be attributed to "disappointment regarding both weak guidance for the second quarter and lack of guidance for the full year."[140]  However, Ms. Allen did not analyze what factors contributed to the Company's weak guidance for second-quarter 2013 or the Company's decision to delay its full-year guidance and, thus, fails to recognize that concerns expressed by analysts and the Company were directly related to the information Plaintiff alleges the Defendants failed to disclose during the Class Period.

55.     As discussed above, when providing guidance during its conference call on May 22, 2012, Dell's Senior Vice President and Chief Financial Officer, Brian Gladden, cited concerns over the "impact of the competitive pricing environment," noted that the Company was "not off

---

business software vendors in general (*MarketWatch*, "Software, chip selloff cuts down tech issues; Informatica warning hits Teradata, VMWare, Citrix and Red Hat," July 6, 2012).

[139] Allen Deposition, 246:18–247:18.

[140] Allen Report, ¶¶57–60, 63–64.

**Exhibit 5 to the Expert Report of Zachary Nye, Ph.D., Dated July 30, 2018**

to the start we expected for the year," and that the Company needed to "fix [its] execution and improve [its] top line growth as [it] move[s] through the year."[141]   Regarding its full-year outlook, the Company discussed concerns over the "tough pricing environment," "sales execution," and the need for "better revenue growth" with analysts during the Q&A session:

> Brian Alexander - Raymond James & Associates - Analyst
> Okay and then Brian, I guess why not reduce the full-year EPS outlook, given the disappointing Q1, the tough pricing environment, which could linger, and the sales execution changes that sound like they're going to take time to play out.  I mean, it seems like you need to generate 80% of your EPS in the next three quarters, which is higher than what you've done in the past.

> Brian Gladden - Dell Inc - SVP, CFO
> Yes, no, look, I think, based on the quarter there is clearly pressure to the total year outlook.  For us to get to that outlook it's going to require improved sales execution.  It will probably require a bit of market improvement in the second half, but that is what most of the industry forecast would say right now.  We will need better revenue growth and good discipline around costs and gross margins.  But, I think, Brian, we would like to see the demand environment and our execution as we head through the second quarter before we give an update for the total year.[142]

Indeed, these are factors that contributed to Dell's first-quarter revenue shortfall and that Plaintiff alleges were misrepresented throughout the Class Period.[143]

56.    When discussing the Company's May 22, 2012 guidance, analysts echoed these same concerns.  For example:

- Maxim Group said second-quarter guidance was below consensus, relaying Company statements that "the **demand environment in the United States and Europe remain[ed] weak, combined with shrinking consumer sales.**"[144]

---

[141] *Thomson Reuters StreetEvents,* "Edited Transcript; DELL – Q1 2013 Dell Inc. Earnings Conference Call, Event Date/Time: May 22, 2012 / 9:00PM GMT.

[142] *Ibid.*

[143] Complaint, ¶¶69, 72, 77, 84, 88.

[144] Maxim Group, "Dell, Inc., Steering a tough competitive environment; Maintain Buy; Reducing Price Target from $20 to $16," May 23, 2012 (emphasis added).

**Exhibit 5 to the Expert Report of Zachary Nye, Ph.D., Dated July 30, 2018**

- <u>Barclays</u> lowered its price target for the Company to $16 from $19, stating that "[w]hile we acknowledge Dell's enterprise strategy, we still have fundamental concerns around whether it can ramp up fast enough and successfully enough to offset **pressures in the PC business** (still accounts for over 50% of revenues)."[145]

- <u>Cowen</u>, discussing the Company's guidance, stated that it "continue[d] to lack conviction in DELL given [its] **worries about PC pricing and sales environments** through C3Q12."[146]

- <u>Jefferies</u> likewise said that it "see[s] **continued PC weakness**" and "**expect[s] PC sell-through (particularly on the consumer side) to remain weak** this summer due to tablet cannibalization & the timing of Windows 8.[147]

57.     During her deposition, Ms. Allen admitted that she did not try to identify what factors led to the Company's disappointing guidance and she has not identified any analyst commentary as to why that guidance was disappointing.[148]  As a result, she fails to recognize that any disappointment with Dell's guidance was based on the disclosure of information related to what Plaintiff alleged was previously omitted.[149]

---

[145] Barclays, "Dell, Inc.; Dell Acknowledges the 'Apple Effect'," May 22, 2012 (emphasis added).

[146] Cowen and Company, "Dell; DELL Reports F1Q13 Miss; Outlook for Growth Increasingly Hinges on Windows 8," May 22, 2012 (emphasis added).

[147] Jefferies, "Dell; FQ1 (Apr) Results Poor; We Expect Continued PC Weakness," May 23, 2012 (emphasis added).

[148] Allen Deposition, 263:23–264:22.

[149] I also note that the academic article cited by Ms. Allen in support of her opinion that "stocks tend to have large price declines after management stops providing financial guidance" is limited to situations in which a company "publicly renounced quarterly EPS guidance" as a policy. (Allen Report, ¶60, citing Shuping Chen, *et al.*, "Is silence golden?  An empirical analysis of firms that stop giving quarterly earnings guidance," *Journal of Accounting and Economics*, Vol. 51, Issue 1, 2011, pp. 134–150; Allen Deposition, 261:15–20; 261:24–262:2.)  As Ms. Allen recognizes, that is not the case here.  Here, Dell continued to provide quarterly guidance, and delayed its full-year guidance. (Allen Report, ¶58; Allen Deposition, 261:21–23.)  At her deposition, Ms. Allen could not identify any academic research concluding that companies suffer large stock price declines just on the basis that they delayed their annual guidance.  (Allen Deposition, 261:8–14.)

**Exhibit 5 to the Expert Report of Zachary Nye, Ph.D., Dated July 30, 2018**

> iv.    **Reported Revenue for Fiscal First-Quarter 2013 "In Line" With Guidance**

58.    Ms. Allen concedes that the decline in Dell's stock price on May 23, 2012 was due, at least in some part, to the disclosure of the Company's 10% quarter-over-quarter revenue decline in its first quarter of 2013.[150]  Ms. Allen argues that Dell's reported revenue for first-quarter 2013 was actually

> within the range of 3% and 11% that the Company had announced given the adjustments for seasonality and the 14-week quarter.  Since the market did not learn from the alleged corrective disclosure that the decline in revenues in Q1 FY13 *was not in-line* with the average adjusted historical decline, the price reaction at the end of the alleged class period cannot be evidence of price impact from the alleged misrepresentation.[151]

However, this 3%-to-11% range is entirely fabricated by Ms. Allen.  No such range was ever announced and no such range was ever identified in any analyst or news report.

59.    The revenue guidance provided by the Company in its press release on February 22, 2012 was as follows: "For Q1, the company expects revenue to decline approximately 7 percent sequentially, which aligns with normal seasonality adjusted for the fourteenth week."[152]  During its conference call, the Company clarified that: "Over the past three years our first quarter revenue has averaged approximately a 4% sequential decline.  When normalized for the 14th week, this decline is closer to 7%.  We expect our first quarter revenue to be approximately in

---

[150] Allen Deposition, 269:17–270:20.

[151] Allen Report, ¶20 (emphasis in original).

[152] *Business Wire*, "Dell Record Fiscal Year 2012 Highlighted By Enterprise Solutions and Services Strength," February 22, 2012.

**Exhibit 5 to the Expert Report of Zachary Nye, Ph.D., Dated July 30, 2018**

line with this adjusted historical decline."[153]  Ms. Allen admitted at her deposition that there was

no announcement of the purported revenue range she discusses in her Report.[154]

60.      I have not identified, and Ms. Allen was unable to identify, a single analyst that stated

that Dell had guided first-quarter 2013 revenue to be in the range of -3% and -11% quarter-over-

quarter, let alone any range.[155]  To the contrary, on and immediately after February 22, 2012,

analysts repeatedly relayed the Company's guidance for a 7% quarter-over-quarter decline in

revenue:

- Barclays Capital: "For F1Q13, Dell expects revenue to be **down 7% q/q** vs. a typical sequential decline of 4% but normalized to take out the extra week in F4Q12."[156]  The next day, Barclay reiterated, "Sales guidance of **US$14.9bn (down 7% q/q)** is below consensus of US$15.2bn (our estimate: US$15.4bn)."[157]

- UBS: "Dell expects revenues to **decline 7% sequentially** more than typical seasonality of 4% due to 14th week in January '12 quarter."[158]

- Wells Fargo: "For Q1 of FY13 Dell expects revenue growth to **decline by 7% q/q** after normalizing for the extra week in 4Q FY12, which is roughly in line with seasonal trends when accounting for the 14th week in the January quarter."[159]

- Brean Capital: "revenue guidance for the Jan Q of a **7% decline** is in-line with normal seasonality (after normalizing for an extra week in the Jan Q)."[160]

---

[153] *Thomson Reuters StreetEvents*, "Edited Transcript; DELL - Q4 2012 Dell Inc. Earnings Conference Call, Event Date/Time: February 21, 2012 / 10:00PM GMT."

[154] Allen Deposition, 120:7–11, 121:7–122:6; 122:23–124:10, 126:9–127:22, 128:13–18.

[155] Allen Deposition, 128:20–129:7, 129:18–132:3, 265:18–22, 267:6–12.

[156] Barclays Capital, "Backs FY13 EPS Growth, but Some Cracks in Margins," February 21, 2012 (emphasis added).

[157] Barclays Capital, "Dell FY4Q12 results implications for Asia: revenue in line, but EPS and next quarter sales guidance below consensus," February 22, 2012 (emphasis added).

[158] UBS, "Dell Inc, Thesis Intact; Reiterate Buy Rating," February 21, 2012 (emphasis added).

[159] Wells Fargo, "DELL: Solid Progress On Transition," February 21, 2012 (emphasis added).

[160] Brean Murray Carret & Co., "FY13 EPS Guide Stronger Than Street; Revenue Growth A Question," February 22, 2012 (emphasis added).

**Exhibit 5 to the Expert Report of Zachary Nye, Ph.D., Dated July 30, 2018**

- <u>Cowen</u>: "Dell guided to a below-consensus **7% q/q decline** in F1Q13 revenue **(~$14.9B**, in-line with our estimate), citing continuing hard disk drive supply and pricing challenges (impacting mix) and the return to a 13-week quarter."[161]

- <u>Indigo</u>: "Guidance was weaker than expected, for revenues next Q to **fall 7% sequentially** (-1% YoY)."[162]

- <u>Jefferies</u>: "Solid FY13 EPS guidance: management guided FQ1 (Apr) revenues **-7% Q/Q** vs. typical seasonality of -4% and St -5% due to the extra week in FQ4."[163]

- <u>FBN Securities</u>: "For the FQ1/Apr. quarter, DELL is guiding for revenue being **down 7% Q/Q** (DELL is coming off of a 14-week quarter in FQ4). This suggests revenue of **$15.0B**, below consensus of $15.2B."[164]

- <u>JP Morgan</u>: "Dell guided revenue to a QoQ **decline of -7%** in Apr-Q, versus prior Street consensus of -5%. Without the extra week in Jan-Q, the Apr-Q guide would be for a -4% QoQ decline."[165]

- <u>Morgan Stanley</u>: "Management Commentary: F1Q13 revenue **decline 7% Q/Q**."[166]

- <u>RBC</u>: "Dell guided for an Apr-qtr revenue **decline of 7% sequentially**, negatively impacted due to the extra week in Jan-qtr. This implies revenues of **$14.9 billion**."[167]

- <u>S&P Capital IQ</u>: "Sees Q1 FY 13 revenues **down about 7% sequentially**, which aligns with normal seasonality adjusted for the fourteenth week."[168]

---

[161] Cowen and Company, "DELL Reports Mixed F4Q12; Revenue Outlook Below Consensus," February 22, 2012 (emphasis added).

[162] Indigo Equity Research, "Snapshot - 2012 Q4 Results," February 22, 2012 (emphasis added).

[163] Jefferies, "FQ4 (Jan) Results: Revenues and EPS Guidance Solid but GM Pressured, EPS Light," February 22, 2012 (emphasis added).

[164] FBN Securities, "DELL: FQ4 – Retain Sector Perform on Margin/Revenue Concerns, but Stock Could Be Attractive Below $17," February 22, 2012 (emphasis added).

[165] JP Morgan, "Near-Term Bump Creates Opportunity as Mix Shift Continues; We Still Expect Positive Inflection Point," February 22, 2012 (emphasis added).

[166] Morgan Stanley, "Margin Headwinds Offset Commercial Share Gains," February 21, 2012 (emphasis added). Morgan Stanley repeated this same comment again, "Weak April with Low Visibility," May 22, 2012.

[167] RBC Capital Markets, "Thoughts on Dell's earnings report," February 22, 2012 (emphasis added).

[168] S&P Capital IQ, "Dell, Inc," February 23, 2012 (emphasis added).

**Exhibit 5 to the Expert Report of Zachary Nye, Ph.D., Dated July 30, 2018**

- <u>Sterne Agee</u>: "For its outlook, the company guided its April quarter revenue to be **down 7% Q/Q to $14.9 billion** vs. consensus at $15.2 billion."[169]

- <u>Yuanta</u>: "For FY1Q13 (ended Apr-12), revenue is guided by Dell **to decline 7% QoQ to around US$14.9 bn**."[170]

- <u>Barclays</u>: "We note that Dell guided F1Q13 revenue to be **down 7% q/q** vs. a typical sequential decline of 4% but adjusted to take into account an extra week in F4Q12."[171]

61.     As Ms. Allen admitted at her deposition, when Dell announced that its first-quarter 2013 revenue decline was actually 10%, neither the Company's representatives nor any analyst covering Dell discussed the revenue results as being within or "in-line" with any previously announced range.[172]  Based on my review of Dell's May 22, 2012 disclosures and the analyst and news reports that followed, I have not been able to identify a single instance in which Dell's actual first-quarter 2013 revenue results were described as being in-line with any previously expected or announced range.  To the contrary, on May 22, 2012, Dell representative Brian Gladden, acknowledged that the Company's quarterly revenue fell short of guidance: "For the quarter, we delivered revenue of $14.4 billion, down 4%.  **This was below our outlook**."[173] Analysts also unanimously concluded that Dell's revenue for the first quarter was *lower than* the Company's guidance, not "at the low end of the range":[174]

---

[169] Sterne Agee, "Slight January Quarter Eps Miss; Maintain Estimates and Underperform Rating," February 22, 2012 (emphasis added).

[170] Yuanta, "Dell (DELL US; Not rated) - FY4Q12 results miss," February 22, 2012 (emphasis added).

[171] Barclays, "Earnings Guide 7/12: HP Restructuring? Eyes on Dell Margin & NTAP Guidance too," May 14, 2012 (emphasis added).

[172] Allen Deposition, 134:21–135:17, 267:14–19, 268:11–269:15.

[173] *Thomson Reuters StreetEvents*, "Edited Transcript, DELL - Q1 2013 Dell Inc. Earnings Conference Call," May 22, 2012 (emphasis added).

[174] Allen Report, ¶28 ("At the end of the alleged class period, Dell announced revenues that were *in-line* with historical declines, although at the low end of the range.")

Exhibit 5 to the Expert Report of Zachary Nye, Ph.D., Dated July 30, 2018

- <u>RBC Capital Markets</u>: "Revenues and EPS were below expectations at $14.4 billion/$0.43 versus Street estimates of $14.9B/$0.46.  Sales were -10% q/q, **below guidance** of a -7% sequential decrease."[175]

- <u>Morgan Stanley</u>: "We expect Dell shares to trade below our base case in the near-term due to a **larger than expected revenue and EPS miss** in April."[176]

- <u>BMO</u>: Dell had "much weaker revenues (**-10% q/q versus forecast of -7% q/q**)."[177]

- <u>Cowen</u>: "F1Q13 sales of $14.4B (-10% q/q) came in **below consensus and -7% q/q guidance**."[178]

- <u>FBN</u>: "For the FQ1/Apr. quarter, DELL reported revenue of $14.4B (-10% Q/Q; this is **lower than consensus of $14.9B and guidance of down 7% Q/Q)**."[179]

- <u>Jyske</u>: "**Dell guided a decline in sales of 7% q/q, but sales declined by 10%** to USD 14.4bn (vs consensus at USD 14.9bn)."[180]

- <u>Jefferies</u>: "**Dell's guidance was poor**".[181]

- <u>Morningstar</u>: "Total revenue of $14.4 billion was down 4%.  This is below our expectations, and **nearly 6% below management's guidance from the previous quarter**."[182]

- <u>Credit Suisse</u>: "Q1FY13 results were **weaker than expected** across most lines with group revenues of $14.4bn (**3% below consensus expectations** and down 4% y/y)."[183]

62.     Ms. Allen's opinion that the Company's first-quarter 2013 revenue results were "in-line"

with Dell's February 21, 2012 guidance is premised on a false fact.  Accordingly, it is not

---

[175] RBC Capital Markets, "More Pain Ahead.  Remain on the Sidelines," May 22, 2012 (emphasis added).

[176] Morgan Stanley, "Weak April with Low Visibility," May 22, 2012 (emphasis added).

[177] BMO Capital Markets, "Weak Results," May 23, 2012 (emphasis added).

[178] Cowen and Company, "DELL Reports F1Q13 Miss; Outlook for Growth Increasingly Hinges on Windows 8," May 23, 2012 (emphasis added).

[179] FBN Securities, "DELL: FQ1 – Retain Sector Perform/Lowering PT to $15," May 23, 2012 (emphasis added).

[180] Jyske Markets, "Dell punished hard after close of trading," May 23, 2012 (emphasis added).

[181] Jefferies, "FQ1 (Apr) Results Poor; We Expect Continued PC Weakness," May 23, 2012 (emphasis added).

[182] Morningstar, "Dell's Results Take a Hit as the Firm Walks Away from Tough PC Pricing," May 23, 2012 (emphasis added).

[183] Credit Suisse, "A challenging transition," May 23, 2012 (emphasis added).

**Exhibit 5 to the Expert Report of Zachary Nye, Ph.D., Dated July 30, 2018**

surprising that Ms. Allen is unable to identify any analyst or news report attributing any of Dell's May 23, 2012 stock price decline to "the fact that although in-line with historical declines, first quarter revenues were at the low end of the estimated range."[184]   Based on my review, I have not identified a single analyst or news commentator that states that the reported first-quarter 2013 revenue was "in-line" with any prior guidance, let alone any report attributing any of the May 23, 2012 stock price decline to a disclosure that revenue was "in-line" with prior guidance.   Thus, Ms. Allen has provided no basis for her conclusion that there is a lack of price impact because the Dell-specific May 23, 2012 stock price decline was due to "the fact that although in-line with historical declines, first quarter revenues were at the low end of the estimated range."

## VI.    Conclusion

63.    In summary, the Allen Report has not caused me to change any of the opinions in the Nye Report regarding the efficiency of the market for Dell stock.   Ms. Allen has also failed to establish that the statistically-significant, Company specific 17.50% decline in Dell's stock price on May 23, 2012 was unrelated to the disclosure of information Plaintiff alleges was not disclosed during the Class Period and that the stock price decline was due to "other factors."   As a result, Ms. Allen's opinion that there is no price impact from the alleged misrepresentations is unsupported and unreliable.

64.    My work in this matter is ongoing.   My opinions in this report are subject to refinement or revision based on analysis of new information which may be provided to me, including the opinions of other experts, receipt of additional documents and data, and based on further analysis of the data and materials described herein.   Should additional relevant information be provided to me, my opinions may be supplemented at a later date.

---

[184] Allen Deposition, 133:23–134:14, 134:15–20, 265:23–266:5, 267:1–13.

**Exhibit 5 to the Expert Report of Zachary Nye, Ph.D., Dated July 30, 2018**

Executed on July 13, 2017, at New York, New York.

Zachary Nye, Ph.D.

# EXHIBIT 13
# [Filed Under Seal]